C94ZHIC1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

CIRO CHARLES HICKS,

                    Plaintiff,

          v.                            11 CV 8158 (KBF)

VANE LINE BUNKERING, INC. and
the TUG PATRIOT, In Rem,

                    Defendants.

------------------------------x

                                        September 4, 2012
                                        9:05 a.m.

Before:

                    HON. KATHERINE B. FORREST,

                                        District Judge

                          APPEARANCES

HOFMANN & SCHWEITZER
      Attorneys for Plaintiff
BY:  PAUL T. HOFMANN

HILL BETTS & NASH
      Attorneys for Defendants
BY:  JAMES FORDE
      BORIANA FARRAR
      KENNETH F. McGINIS

C94ZHIC1

1          THE DEPUTY CLERK:  All rise.

2          THE COURT:  Good morning, everyone.  You could be

3     seated.  Thank you.

4          (Case called)

5          THE COURT:  You can all be seated.  Thank you.

6          MR. HOFMANN:  Paul Hofmann, Hofmann & Schweitzer for

7     the plaintiff.

8          THE COURT:  Good morning, Mr. Hofmann.

9          MR. FORDE:  Jim Forde for Vane Line Bunkering.  It's

10    been mislabeled on the docket for awhile now, but it's V-a-n-e

11    Line Bunkering.

12         THE COURT:  It's B-a-n-e?

13         MR. FORDE:  V as in Victor.

14         THE COURT:  Oh, V-a-n-e.  All right.

15         MR. FORDE:  Jim Forde from Hill Betts & and Nash.

16         MS. FARRAR:  Boriana Farrar from Hill Betts & Nash for

17    Vane Line Bunkering.

18         THE COURT:  Good morning.

19         MR. McGINIS:  Kenneth McGinis, Hill Betts & Nash for

20    Vane Line Bunkering, your Honor.

21         THE COURT:  Good morning, all.

22         All right, we are here to commence the trial in this

23    matter.  We will have a jury that will be available to us

24    probably close to quarter to 10:00 to 10:00 o'clock is my

25    guess.  The reason for that is there's a criminal matter also

C94ZHIC1

1    scheduled for jury selection today, and that would go first.

2    They won't do the whole selection, but they'll pick it --

3    they'll pull the panel first to make sure that they've got

4    enough people.  We requested and ordered a jury, a group of in

5    excess of 20 for us to choose from, so ours will come next so,

6    assuming all the jurors, prospective jurors show up, and we

7    will have an ample number, and we should get them fairly fairly

8    quickly.

9            I wanted to go over a couple of housekeeping matters

10   first, and then address whatever you folks would like to

11   address in addition to these matters.

12           First, we are going to select a jury of eight.  We can

13   get down to, if you will, a jury of six before we run into any

14   issues.  So we'll have eight, and all eight would deliberate.

15   There won't be any alternates.  But if we lose one for any

16   reason or lose two, we would then be able to deliberate with

17   the remaining six.  You folks, of course, can let me know --

18   and I think we've discussed this very briefly last time --

19   whether or not you are looking for unanimity with the eight or

20   in a civil trial, of course, we can go for less than unanimous.

21   So, for instance, I've had civil cases where they've wanted to

22   have seven and one or six and two, but in the instance where

23   we've lost one or two, it then becomes unanimous.  If there is

24   no agreement, then well go with unanimous on whomever is left.

25   Do you folks have a view?

C94ZHIC1

1          MR. FORDE:  All right, seven to one.

2          THE COURT:  Seven one, all right.  So seven one it is.

3     So it's got to be seven in agreement and one can be not in

4     agreement.  That would be as to each of the individual

5     questions on the verdict form, just so that we're all in

6     agreement.  So there will be the particular causes of action,

7     and there will be a couple of special questions of course, such

8     as if they happen to find, you know, contributory negligence,

9     the percentage, there would have to be a seven to one answer to

10    that as well.  It doesn't have to be the same seven for each

11    question, but they'd be instructed that it would be seven and

12    one for each question.  If we lose a juror, then it will be

13    unanimous.  Okay?

14          MR. HOFMANN:  Agreed.

15          THE COURT:  All right.  The second issue that I wanted

16    to deal with goes to one of the points from my trial process

17    order from last week which had to do with deposition

18    designations.  I wanted to be sure that we were all on the same

19    page about the use of those designations.  And in the order I

20    had asked, one, that if people are going to be testifying live,

21    that we not stand up and read designations from these people.

22    That would be, I think, unnecessary.  You can use those

23    designations to elicit the testimony on cross-examination.  If

24    you wanted to have a little bit of leeway to go beyond the

25    scope of the direct to get out particularly interesting

C94ZHIC1

1     material that was elicited at the deposition, I will allow that

2     if there is such a situation.

3              And then, secondly, for the videotape I wanted to make

4     sure that all colloquy was excluded.  Are we all on the same

5     page?

6              MR. HOFMANN:  We're on the same page, Judge.

7              As to the depositions, the live witnesses, we're going

8     to be just using the deposition transcripts for

9     cross-examination.

10             And there is no colloquy really to be concerned about

11    with the videotapes.  We've, counsel and I have agreed we're

12    just going to let them run.  There's no arguments or anything.

13    And the objections that were stated very quietly are waived,

14    so.  Agreed?

15             MR. FORDE:  That's agreed, your Honor.

16             THE COURT:  Okay.

17             MR. FORDE:  It just seems to make more sense to do it

18    that way.

19             THE COURT:  All right, terrific.

20             Now the third issue I just wanted to make sure that we

21    had covered was whether there were any documents, questions,

22    concerns about admissibility.  I had gone through some things

23    and wanted to make sure that we all understood what was going

24    to the offered or not offered and whether or not we needed to

25    present anything right now and get a specific ruling.

C94ZHIC1

1          MR. HOFMANN:  Yeah, I think that you, from the

2     plaintiff's perspective, everything that you raised tracks what

3     my objections were, and counsel will have to address those.

4          As to the other issues, counsel and I, as our firms

5     have practiced for many years, and he and I have practiced each

6     against each other many years, we basically agreed that

7     everything that's there, except for those few that have

8     objections, will come in, they're all relevant.  And you may

9     want to address the Judge's --

10          MR. FORDE:  Well, one of the -- I really didn't have

11     very many objections to -- I don't think I had any objections

12     to your exhibits.

13          MR. HOFMANN:  Right.

14          MR. FORDE:  But there was one particular exhibit that

15     had third-party handwriting and that has been redacted, so I've

16     addressed counsel's concern.

17          THE COURT:  Okay, all right.  There had been, I noted,

18     some letters that were proposed as exhibits, and there weren't

19     objections raised as to those letters.  They looked to be

20     correspondence from the way in which they were worded, and

21     what's the intended use for those?

22          MR. FORDE:  At this stage of the game I think, your

23     Honor, both of us tried cases and it's basically, just grab

24     everything that we possibly can, and there will be

25     significantly less documents that would be marked.

C94ZHIC1

1          THE COURT:  All right, terrific.  Even though --

2          MR. HOFMANN:  Can I address though that, Judge?

3          THE COURT:  Sure.

4          MR. HOFMANN:  Some of -- I think some of the

5   correspondence is our exhibits I propose, and they were -- they

6   are business matters, in that my client is, as you know, is

7   claiming a claim for maintenance and cure.  Those letters were

8   directly addressing either to counsel when he was in the case

9   or to Mr. Neubrand of Vane, requesting maintenance and cure for

10  my client.  So those were business transactions, not, gee,

11  how -- you know, let's have lunch and talk about the case, that

12  type of thing.  So that's why they are relevant.

13          And if I -- if Jim had stated an objection, then I

14  would have to get up on the stand and authenticate them, and

15  he's not made that objection because I think he understands

16  that these were requests for maintenance and cure and they

17  might go to the issue of before the Court.

18          THE COURT:  All right, so why don't we do it this way,

19  though.  What I want to make sure is that we don't, even by

20  stipulation, present the jury with material that would not

21  otherwise be admissible.  It sounds like you'll be able to ask

22  your client just directly whether or not he received

23  maintenance and cure or whether or not he instructed counsel to

24  make such a request and was it received.  In other words, I

25  don't know that you'll need the letters.  And if you do need

C94ZHIC1

1    the letters, you can use them on cross, but I don't know that

2    they would -- I do not know that they would need to be admitted

3    as evidence.

4              MR. HOFMANN:  Well, the problem with that, Judge, is

5    we are not just claiming claim for maintenance and cure.  We're

6    also claiming that the failure to pay maintenance and cure was

7    unreasonable and may have raised to the level of arbitrary and

8    capricious.  And the content of those letters does say to the

9    other side, look, here are medical records showing my client's

10   entitled to this.  I think the jury needs to know what those

11   requests were and what the content of the requests were and

12   what the reasoning was so they can judge whether Vane Line

13   acted appropriately.

14             THE COURT:  Well, maybe it's best, then, that I see

15   the letters.  Because if they're being offered for the fact

16   that they were said and not for the truth, then they wouldn't

17   fall under -- they wouldn't be hearsay, and so there is not

18   really going to be an issue.  So why don't you --

19             MR. HOFMANN:  Exactly.  And they are more than just

20   offered for the truth.  They are offered for the purpose of the

21   statements that we were stating to them and that they needed to

22   respond to, and that's --

23             THE COURT:  Right, all right.  So why don't you, if

24   you could just hand my Deputy a copy of the couple that you

25   think you're going to use, I'll take a quick look at them, and

C94ZHIC1

1    then if I have any other issues we'll deal with them.

2                MR. HOFMANN:  Right.

3                THE COURT:  Okay, any other document issues that you

4    folks can think of?

5                Well, let me then raise a related issue, which is

6    demonstratives.  I see that there are some pictures over here

7    on the left-hand side.  I think those are just bigger pictures

8    of the smaller photographs which I've seen pretrial.  Is that

9    right?

10               MR. HOFMANN:  Correct.

11               MR. FORDE:  Correct, your Honor.

12               THE COURT:  Okay.  So you both have agreed on that

13   those are okay, shall I say?

14               MR. FORDE:  Yes.

15               THE COURT:  All right.  I've had instances where

16   people have blown things up, and in the blowing up process some

17   things are emphasized which otherwise others don't want to have

18   emphasized.  That doesn't seem the case here with a ship.  It

19   can be more of a case if there is a black eye or something like

20   that.

21               All right.  The other issues.  I understand that there

22   is a video that is, essentially, a reenactment of the moving of

23   the donut?

24               MR. HOFMANN:  18 seconds worth of, yes.

25               MR. FORDE:  That's all it is.

C94ZHIC1

1          THE COURT:  All right.  And you folks are both okay

2     with that?

3          MR. FORDE:  Yes.

4          MR. HOFMANN:  Yes, Judge.

5          THE COURT:  All right.  All right, now, witnesses and

6     duration.  Who do we have really who is going to be coming here

7     and in what order and how long are they going to be?

8          MR. HOFMANN:  Charles Hicks will be my first, will be

9     the plaintiff's first witness himself, and that should take on

10    direct I would assume about two to two and a half hours because

11    there are many many topics to deal with.

12          Next my intention was to play the one hour videotape

13    of Dr. Rizzo.

14          I may have about five to ten minutes of -- at the

15    most, five minutes of direct examination of Mrs. Hicks who is

16    here.

17          Then tomorrow morning, sort of in a joint presentation

18    Vincent Lusardi will be here and we will run through his

19    direct, rather than playing his videotape deposition, and that

20    will be it for live witnesses and videotape witnesses for the

21    plaintiff.

22          THE COURT:  All right.  What do we have for

23    defendants?

24          MR. FORDE:  And then segueing after Mr. Lusardi, we're

25    going to, depending on how it goes, we have a Dr. Lisser, who

C94ZHIC1

1    is coming on Wednesday afternoon.  He'll be there.  He's

2    leaving at noon from his offices to be here testifying live.

3              Failing that, we also have the direct testimony of

4    Captain Comiskey.  That testimony should take approximate --

5    direct approximately take about one to two hours.

6              And then we have the -- I'm missing one.  Who is the

7    next one?  We've got -- oh, sorry, Bill.  We got Bill Neubrand

8    who is going to be testifying as the corporate representative

9    of Vane Line Bunkering, and he'll be roughly about 40 minutes

10   on direct, and that's it.

11             THE COURT:  All right.  And how long did you say

12   Lisser's testimony was going to be?

13             MR. FORDE:  If it goes an hour, it's going to be a

14   lot.

15             THE COURT:  All right.  Now, just so that we're clear

16   because we've mentioned Mr. Lusardi tomorrow morning,

17   Mr. Lisser, Dr. Lisser Wednesday afternoon, and Captain

18   Comiskey after that.  As I stated in the order issued last

19   week, and have also mentioned, we're going to go straight till

20   5:00 and we'll end, you know, promptly at 5:00, we won't keep

21   the jury past 5:00, but we want to have witnesses who fill up

22   that entire time.  So if, for instance, we run out of witnesses

23   at 4:00 o'clock, then we'll call somebody out of order.

24             MR. FORDE:  Your Honor, we also have in the can a

25   video deposition of Rich DiNapoli who is -- he's going to be --

C94ZHIC1

1   and that ran 45 minutes?

2                MR. HOFMANN:  40 minutes.

3                MR. FORDE:  40 minutes.  And we have the Captain

4   Comiskey on standby here already, as well as Mr. Neubrand.  So

5   we can swap witnesses in as needed.

6                THE COURT:  Okay, that's terrific.  All right.

7                MR. FORDE:  And we're also going to be reading in some

8   deposition testimony of Mr, I think you are as well, Andrew

9   Johnson and Glen Scroggins, which shouldn't take that much.  It

10  wasn't that much testimony.

11               THE COURT:  All right.  And for that testimony you

12  were just going to read designations and the counters just

13  straight through.

14               MR. FORDE:  Yeah, if it's okay with you, your Honor,

15  I'd like to put somebody in the witness box answering, that's

16  all.

17               THE COURT:  Yes.  No voice inflection if you could

18  because we don't really know how it was said, and so sometimes

19  people get dramatic and just sort of run through it.

20               MR. FORDE:  Fair enough, your Honor.

21               THE COURT:  Okay.  All right.  That then gives me a

22  sense of things.  So today is Tuesday.  Sounds like this will

23  go on till probably Thursday.  Maybe we'll end Wednesday late

24  afternoon, but we could end Thursday morning, something like

25  that.

C94ZHIC1

1          MR. FORDE:  Yes.

2          THE COURT:  All right.  Well go into closings directly

3    after the end of the defendant's case, assuming there is no

4    rebuttal case, but we'll go straight into closings so that you

5    folks are prepared for that.  We won't, if it's noon, break

6    until the next day, being mindful of the jury's time.  So we'll

7    tell them this morning, it'll help us to get a panel very

8    quickly that this will be something that won't go over into

9    next week likely.  It'll, you know, I always give myself

10   maneuvering room and give you maneuvering room because things

11   happen, but I'll tell them we expect it to be a relatively

12   short trial.  That prevents the biggest, largest objection

13   which is, I can't possibly do this because of some scheduling

14   issue from arising.

15          Now, in terms of the jury charges, we have taken each

16   of -- taken the charges which you folks have submitted.  We

17   also looked very carefully at the objections and have created

18   our set of charges, which we'll give to you probably later on

19   this afternoon, and then we'll have a charging conference

20   tomorrow morning at 9:00.  What I'll propose to do is just

21   literally go through the them page by page, and if you've got a

22   concern, you'll raise the concern.  If they get to you really

23   late, then we'll do it during the midmorning break or something

24   else and give you a little bit more time.  And the kinds of

25   concerns that I'll be looking for are things that are really

C94ZHIC1

1   substantive as opposed to switching around my colloquial

2   wording that I do for the jury.

3            I'll tell you right now that the charge that we are

4   currently struggling over the most is punitive damages.  There

5   is no Second Circuit decision currently on the availability of

6   punitive damages in this kind of case.  It's clear that under

7   the Jones Act punitive damages are not allowed for Maritime.

8   On seaworthiness claims it is I would say an unsettled issue in

9   terms of same thing with the maintenance and cure issue in the

10  Second Circuit.  There are other Circuits which have said no to

11  those kinds of case.  There are some cases in the Southern

12  District, and we are sorting through that and I will come to a

13  position which I will state for the record, one way or the

14  other, so that should somebody later on want to make an appeal

15  issue out of either the availability or lack of availability of

16  punitive damages, you'll have the rationale on the record and

17  be able to raise that then whoever sees fit, if you see fit.

18            MR. FORDE:  Your Honor?

19            THE COURT:  Yes.

20            MR. FORDE:  To that, just procedurally.  Should we

21  then, if we are objecting to one of your charges, put our

22  objection on the record.

23            THE COURT:  Absolutely, that would be the purpose.

24  The letters which you have submitted will be effectively gone,

25  if you will, and we will be dealing with the Court having

C94ZHIC1

reviewed carefully your objections, having gone through the
case law, and made my own determination as to the appropriate
wording of the instructions.  If you object, you'll state your
objection.  I'll listen to why.  I'll make a ruling.  Your
objection will then be there for the record for later on.  If
there's no objection, then I'm going to turn the page and
you'll have waived any objection to that particular
instruction.  That's not to encourage unnecessary objections,
but it is to tell you that if you want to preserve it, preserve
it.

        Okay, speaking of objections.  On a different note,
the objections that you folks, when there is testimony going
on -- hopefully during the openings and closings there won't be
a need for objections.  If there is, there is.  But I'm sure
you folks -- it sounds like you've tried cases against each
other in the past and will have a sense of what you're likely
to do.  But I try, unless necessary really, truly necessary, to
leave the openings and closings to let them flow.  But if
there's something that you need to preserve for appeal, you
need to preserve it for appeal.

        In terms of the objections generally, they should be
one word, just objection.  Because it's a jury trial, stand up
say objection, I will rule on it.  Hopefully I'll be aware
enough as to where you're going and why I think you're making
the objection.  And you can then argue to the Court of Appeals

C94ZHIC1

1   if you want, she overruled my objection as a hearsay based

2   objection and there is no hearsay exception to this or, you

3   know, whatever.  If I feel that I need to say more, then I'll

4   either do it at sidebar or I'll say two words like, you know,

5   401 and hopefully you'll be aware enough of the Rules of

6   Evidence to understand what I'm getting at and that will be it

7   and that will be what we'll have.  But I don't want to have

8   speaking objections in front of the jury because it can

9   obviously tread over into argument.  They don't need to have

10  their time wasted.  They'll be confused.  It may seem like I'm

11  picking on somebody if I keep overruling somebody who makes a

12  lot of speaking objections, so we don't want that.  So one

13  word.  That then leads to sidebars asking for side bars.  I

14  will avoid sidebars as much as possible.  Because they will

15  take a lot of time.  And, again, I'm mindful of keeping things

16  really just moving right along.  Hopefully you're not designing

17  your direct and cross on the fly, you've got it in the can and

18  will be able to move things through in a speedy fashion.

19  Sidebars require, obviously, the Court Reporter to move over

20  out of the hearing of the jury and to be in this area over here

21  it, takes time, he's got to plug back in, unless he's got

22  enough charge left to do it on battery, but it takes time.  So

23  if we really need sidebar, I will have a sidebar.  If you

24  really think I didn't get your objection, it's really

25  important, and there's a serious issue here that isn't just a

C94ZHIC1

1    serious objection, but a serious objection where we're going to

2    run into mistrial or something else where you really need to

3    deal with it, then you can say, you know, I'd really like a

4    sidebar.  I will honor that and I will allow you to have

5    sidebar, but use them wisely.  Some judges will have a lot of

6    sidebars.  I'm one of the ones who is going down the route of

7    not.

8            In terms of the voir dire.  I will conduct it from

9    here, because I think I've mentioned to you I will have a group

10   out there, we will seat eight in the box itself.  I'll tell

11   everybody that we're going to -- I'm going to ask a lot of

12   questions.  They should think about whether or not they've got

13   yes answers to the questions, and if they do, not to raise

14   their hands if they're in the audience, but to remember that.

15   Those who have yes answers, depending upon the nature of the

16   yes answer, I'll either speak to them from here or I'll take it

17   at sidebar.  But not everything happens at sidebar, again, it's

18   because it goes much faster if I just take it from here.  So

19   having been on a jury before, three hands go up, okay, without

20   telling me, what verdict you reached, you know, was it criminal

21   or civil, they'll say what they say.  Did you reach a verdict,

22   yes or no?  Is there anything about that jury service that

23   would prevent you from being fair in this case.  That's the

24   nature of the way I would handle that kind of thing.  If they

25   say is there any -- if I ask is there any medical reason why

C94ZHIC1

1   you could not sit for a jury trial of this length and somebody

2   raises their hand, I will take that over at sidebar.  I won't

3   make people go into their medical conditions in open court.

4   But that's the way we'll handle the voir dire sidebars.

5           Now, that voir dire process, when I'm going through

6   those questions, I'm essentially going through the cause

7   challenges.  I will ask a catch all at the end, is there any

8   reason that I haven't mentioned why you don't think you could

9   be a fair jury in this matter, and we'll deal with those

10  over -- that would be a sidebar-type question.  But once I'm

11  done with those, people may be gone because people know

12  somebody or can't sit for the trial or don't understand

13  English, they'll be gone.  We'll replace people.  Once we're

14  done, we've got eight people, and we've gone through that

15  entire process, at that point we are done with the cause and

16  we're going -- we'll go through the jury questionnaire and

17  we'll be done with the cause.  You'll then get the opportunity

18  to have your three peremptories.  We'll do them in three

19  tranches but they will be simultaneous.  So you'll do one

20  tranche, you can both -- give a post-it to my Deputy.  Both may

21  want to strike juror number two, only juror number two will be

22  removed, we'll replace juror number two.  I'll say did you

23  answer yes to any of the questions?  I'll go through the

24  questionnaire with the new juror number two, then you'll be

25  given your opportunity for your second strike.  We'll do the

C94ZHIC1

1    same thing.  Then you'll be given your opportunity for your

2    third strike.  After your third strike, just be aware, and I

3    think it is obvious and you've done this before, whoever comes

4    in they're in, so long as there is no cause.  We go through the

5    same questions, go through the questionnaire, but you don't get

6    a peremptory.  So when you're doing your last strike, if you

7    like your eight, you may or may not want to get somebody

8    random.  It's up to you, all right.  They're randomly drawn,

9    they're not in order.  I know it's a sort of unusual way of

10   picking a jury, it's a combination of different styles, but it

11   goes very quickly, so it works.

12           All right.  In terms of the verdict sheet, we'll give

13   you that as well either this afternoon or probably a little bit

14   later than that, because once our jury charges are baked, we'll

15   do a version of the verdict form.  It's relatively straight

16   forward, but there are a few special questions that have to be

17   asked depending upon where some of the charges wording comes

18   out.  And for that as well, I'll ask you specifically at the

19   charge conference whether you have objections to the manner of

20   the wording of the form of the verdict sheet.  And if you have

21   any objections, state them for the record.  If you want to

22   lodge an objection, then I'll rule on it.

23           Okay, those are the things that I had.  Did you folks

24   have anything that you want to raise?

25           MR. HOFMANN:  Just a couple things, Judge.  For the

C94ZHIC1

1    benefit of the Court, I gave counsel one of these also, it's

2    sort of an exhibit list that you may or may not want to use to

3    follow as to what would be offered and admitted.

4            The next thing.  I heard what you're saying about the

5    punitive damages issue in a maintenance and cure case, and

6    you're referring to the Second Circuit, I'm sure that was the

7    decision and others.  I think the issue's one that's foreclosed

8    for you to have to rule on.  Atlantic Sounding versus Townsend

9    out of the Supreme Court last year tell you that punitive

10   damages in maintenance and cure case are available.  It may not

11   apply in this case under the facts, but the Supreme Court

12   Justice Thomas has clearly ruled that in a punitive damage,

13   excuse me, in a maintenance and cure case, punitive damages may

14   be awarded.

15           THE COURT:  All right.  What's the name of that case?

16           MR. HOFMANN:  Atlantic Sounding versus Townsend.

17           THE COURT:  All right, I'm not sure if that's one of

18   the ones I've looked at, Supreme Court on that issue.

19           MR. HOFMANN:  That was last year that the issue came

20   up to a head.

21           THE COURT:  All right.  So we will look at that and

22   that will -- you know, the Court will state it's overall

23   rationale one way or the other.

24           MR. HOFMANN:  I'm sure you will, but since you didn't

25   mention the Supreme Court, I figured that --

C94ZHIC1

```
 1            THE COURT:  It would be helpful.  Of course the
 2   Supreme Court is above the Second Circuit.
 3            MR. HOFMANN:  At least some judges think so.
 4            But you mentioned the verdict sheet.  I just, you
 5   know, last minute reviewing it I saw that there are two
 6   questions that I think should be posed, and I will -- I know
 7   you're working on this and hate last minute, but it has to do
 8   with the maintenance and cure issue.  There is -- and I'll
 9   write it out and give you the proposal and a give a copy to
10   Mr. Forde.  It would be two additional questions and I want to
11   get that to you as soon as possible.
12            THE COURT:  All right.  Why don't you do that.  I
13   don't mind if it's handwritten.  It's better if you can both
14   reach agreement that these are appropriate questions to ask to
15   agree.  If you can't, then so be it, I'll rule on it.
16            MR. HOFMANN:  Since we're going to be waiting a little
17   bit, I can talk to Mr. Forde about that.
18            THE COURT:  Sure.
19            MR. HOFMANN:  The last thing I just want to state for
20   the record.  I heard what you said you're going to do with the
21   voir dire.  I remember we had a short debate at the last -- at
22   the preliminary conference a couple months ago about once new
23   jurors are in -- are in the box, we would not have the
24   opportunity to save and use peremptories.  I --
25            THE COURT:  Well, you've got the three, and we're
```

C94ZHIC1

```
 1   going to do them -- I may have described three simultaneously
 2   all at once.  That we're not going to do.  We're going to do
 3   them three rounds.  So you will have one round, let's just say
 4   you replace number two and you don't like the new number two,
 5   you can strike the new number two --
 6           MR. HOFMANN:  Okay.
 7           THE COURT:  -- with your second peremptory.
 8           MR. HOFMANN:  Okay.
 9           THE COURT:  All right.
10           MR. HOFMANN:  All right.  That is a little bit
11   different from what I remember you had said.
12           THE COURT:  Let me make sure that everybody
13   understands this process, because it is very important to your
14   strategy of how you're going to go through --
15           MR. HOFMANN:  Exactly.
16           THE COURT:  Of the eight, there will be eight there.
17   I'll have gone through my list of questions.  They'll have
18   stood up and they'll do, stand up each and do their short
19   questionnaire who they are, what TV shows they watch, what
20   occupations they have, et cetera, et cetera.  If nothing falls
21   out of that which causes concern, I'll say thank you very much.
22   I'll explain to them they shouldn't care or think twice about
23   what's going to happen next, which is that counsel have an
24   opportunity to excuse one of them for any reason at all -- not
25   really any reason at all, but for --
```

C94ZHIC1

1              MR. HOFMANN:  Constitutionally appropriate.

2              THE COURT:  For constitutionally appropriate reasons.

3    And we'll then take them -- we'll do one round.  You get one

4    number during that first round, just give me one number each,

5    each give me one number at the same time.  Let's just say one

6    person picks juror number two, one person picks juror number

7    four.  They're both excused.  Two new ones come in.  I say, are

8    there any questions you answered yes to?  I don't speak

9    English.  Okay, you're gone.  Put in somebody else.  Any

10   questions you answered yes to?  No.  Okay.  Read the

11   questionnaire.  They read the questionnaire.  Round number two,

12   you can both strike whoever you strike.  You can strike two

13   more people might get struck, numbers one and five.  Two more

14   people come in.  Then you're at your last round.  At that point

15   I'll go through the same thing, any yes questions, read the

16   questionnaire.  If that person, those people stay in the box

17   we've got eight, you now have your final shot at striking one

18   more person, or not.  My only point is that when you strike

19   that person, whoever gets filled in, I'll go through the cause

20   and the questionnaire, but if there is no cause challenge,

21   they're done.

22             MR. HOFMANN:  I understand that and that's acceptable

23   to me.

24             THE COURT:  I know you didn't like the three and

25   three.  It goes much faster, but --

C94ZHIC1

1      MR. HOFMANN:  The way you had described it --

2      THE COURT:  It was three and three.

3      MR. HOFMANN:  No.  You said you're going to put in

4  eight and we're going to use all --

5      THE COURT:  Three.

6      MR. HOFMANN:  -- peremptories on those eight and then

7  whoever came in, we wouldn't have the chance to vet.  And the

8  way you've described it your process is --

9      THE COURT:  Okay.

10      MR. HOFMANN:  -- very familiar and acceptable.

11      THE COURT:  Okay.

12      Now witnesses who are present.  I take it neither of

13  you have any objection to people being present, other than a

14  corporate representative?  Because I see there are people in

15  the courtroom.

16      MR. HOFMANN:  The only non-party witnesses is

17  Mrs. Hicks, who is here with her husband.

18      THE COURT:  All right, okay.  So everybody's set with

19  that?  All right, so my Deputy will not look around for people

20  who happen to wander in and make sure that they're taken out of

21  the courtroom.  You're both fine with people's presence in the

22  courtroom, right?

23      MR. FORDE:  Yes.

24      MR. HOFMANN:  Yes, your Honor.  Thank you.

25      THE COURT:  Okay, anything else?  No, all right.  We

C94ZHIC1

1    should hear from the jury assembly room 10:00 o'clock, okay, so

2    not quarter to 10:00, but 10:00.  You got 20 minutes.  So why

3    don't you try to work out your verdict form wording if you

4    want.  If you can agree on it, then hand it to my Clerk.  And

5    if you can't agree on it, you can still hand it to my Clerk,

6    but it will be unagreed.

7               MR. HOFMANN:  Right.

8               THE COURT:  Okay.  And I will then make a ruling.

9    Thanks, I'll be back in a few minutes then.

10              THE DEPUTY CLERK:  All rise.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C94MHIC2

1          (A jury of 8 empanelled and sworn)

2          THE COURT:  Now that you have been sworn I am going to

3     give you some preliminary instructions about your role as

4     jurors in this case.  After that we are going to have opening

5     statements by counsel, then we are going to go directly into

6     the evidence.  After all of the evidence has been presented, we

7     will have closing statements or summations, and then you'll

8     deliberate.

9          I do want to, at the outset, promise to you that I am

10     going to try to be very efficient with your time.  The thing

11     that I will keep pressing counsel for is to keep the witnesses

12     moving along and to try to keep things generally moving along

13     so that your time is used as efficiently as possible.  That's

14     my commitment to you.

15          Now, as I've told you previously, it's your function

16     in this case to decide the issues of fact.  You are the judges

17     of the facts in this case.  Your decisions on those facts

18     should be based solely on the evidence that is presented and

19     admitted here in court.  Nothing that I say is evidence.

20     Nothing that any of the lawyers say is evidence.  And, in

21     particular, the questions that lawyers ask are not evidence.

22     It is only the answers to the questions from the witnesses that

23     constitute evidence.

24          Objections are not evidence and testimony that may be

25     excluded is not evidence.  If there is such testimony you will

C94MHIC2

hear me state it specifically to you, that such testimony is
stricken from the record and you are to disregard it.

         The evidence will consist of sworn testimony of
witnesses who will be sitting here in the jury box and will be
testifying and exhibits that will be admitted.  There will also
be deposition testimony.  Depositions are out-of-court
testimony.  They are testimony that is taken in a very formal
atmosphere, but not in the courtroom and it's under oath and
sworn.  The individual who is being questioned must testify
truthfully under penalty of perjury.  You are going to hear two
types of such testimony, such deposition testimony.  You will
be watching a videotape of one deposition and you are also
going to hear read into the record a transcript of portions of
another deposition.  That also is evidence.

         In some instances there may be facts which the lawyers
agree to stipulate to which will also be evidence.  Now, there
are two kinds of evidence in a case.  There is direct evidence;
that is, evidence which is apparent to your senses, what you
can see, hear, feel, touch, and circumstantial evidence, which
is putting two and two together and inferring a fact from the
existence of other facts.

         So, for instance, let's say that when you came into
the courthouse this morning it was raining.  It was when I came
into the courthouse this morning.  And let's assume that
everybody, as the day progresses, comes in, without umbrellas

C94MHIC2

1  and as the day goes on you realize that nobody has gotten an

2  umbrella and there is lots of people coming in and there is

3  nobody wearing a raincoat.  You might infer that the rain has

4  stopped, or if it's the opposite, you come in on a sunny day

5  tomorrow and you don't see any sign of rain and people start

6  coming into the courtroom with umbrellas that are dripping wet,

7  you might infer that it's raining outside.  That's

8  circumstantial evidence.  It's common sense.  And the law

9  treats direct evidence and circumstantial evidence equally.

10          One of the things that you are going to have to decide

11  is the credibility of the witnesses who testify.  You will

12  decide how much credit to give to an individual's testimony.

13  Do you believe him or her or do you not believe him or her?  Do

14  you believe part of what he or she says, all of what he or she

15  says, or none of what he or she says?  That is for you to

16  decide.  How do you decide the very important issue of

17  credibility?  You decide it based upon your plain old common

18  sense.  You use the same skills that you use in your everyday

19  life when you are talking to somebody and evaluating when you

20  are having a discussion with somebody as to whether or not you

21  think they are telling the truth.  Are they being evasive?  Are

22  they being straightforward?  Do they look like they are hiding

23  something?  Do they look like they are being truthful to you in

24  various ways?  You use those skills, those common sense,

25  everyday skills to evaluate credibility.  There is nothing

C94MHIC2

1   magical about it.

2        If you have friends or relatives who come to watch

3   these proceedings, please let my deputy know because it's very

4   important that you not be exposed to things that happen outside

5   of your presence.  There will be times when you will be on

6   lunch break or you will be excused to go back into the jury

7   room, which is that door right there below the clock, and there

8   will be various discussions which counsel will have with the

9   Court and we will deal with evidentiary issues and other things

10   that may come up.

11        (Continued on next page)

C94ZHIC3

1            THE COURT:  Those are things which the law says that

2       the jury should not be exposed to.  If you got a friend or

3       relative here, they might just say to you, without meaning to

4       do any harm, hey, did you know about X, Y or Z.  We don't want

5       that to happen.  We're not saying that you can't have friends

6       or relatives here, but we're saying we have to be very cautious

7       if that does occur.  And we probably would have them, if they

8       were amenable, to leave the courtroom when you leave the

9       courtroom so that there would be no issues surrounding their

10      presence.

11           Now, you see these lawyers here and the plaintiff and

12      his wife.  You're going to probably run into some of these

13      folks in the elevator bank.  There is a single elevator bank

14      for all of you.  So when you're going to go to lunch, you might

15      run into them.  You might run into them in the restroom, in the

16      hallways, and they're not going to speak to you, and you're not

17      going to speak to them because I have instructed the counsel

18      not to speak to you.  So don't think they're being rude.

19      Nobody's being rude.  And you should not say hello.  It's just

20      the way that the courtroom procedure operates.  It's to prevent

21      there being, by chance, some kind of communication which

22      somebody thinks might not be appropriate.  So to prevent ever

23      having to discuss that issue, we ask that they never speak to

24      you nor you speak to them, all right.  So if you run into folks

25      and they sort of act like you're somebody who they've never met

C94ZHIC3

1    on the subway, then just don't even pay any attention to it.

2    That's the instruction that they're given.

3            My computer over here, which has gone dark for the

4    moment, of course in a minute, has Live Note on it.  I will be

5    referring to it from time to time.  live Note means I get a

6    real time feed from the Court Reporter of what's happening,

7    being said.  Sometimes I have to fiddle with it because I let

8    it sit for so long that it goes dark on me.  I am not surfing

9    the web, I'm not doing my e-mail, I don't do that while I'm

10   sitting in trial.  It is exclusively the transcript that's

11   appearing on my screen.  And that allows me, if there is an

12   objection, to go back and to look hard at the question.  So

13   you'll see me looking at that.  And I just wanted to explain it

14   to you so you know I'm not just spacing out and surfing Amazon

15   and trying to figure out, you know, what's new on Zappos.

16           All right, the other issue that I want to cover is

17   beverages.  Some courtrooms have a rule against beverages.  I

18   have no such rule.  My view is whatever makes you comfortable

19   during the time that you're doing your jury service, you

20   know -- not whatever, but whatever beverage makes you

21   comfortable, bring in your beverage, all right.  Because if I'm

22   going to drink coffee and if you want to drink coffee, you

23   should feel free to bring in a cup of coffee.  If you want to

24   bring in a soda, you can bring in a soda.  You know, you can

25   bring in whatever you want and have it back there.  I've not

C94ZHIC3

1    yet had a terrible spill.  I've had minor spills, but I've not

2    yet had a terrible spill.  I've also had people who feel that

3    they really need to have a small snack and when I say snack,

4    I'm not talking about a bag of Doritos, but they've had like,

5    you know, a few things they've sort of just felt like they

6    really had to have in the afternoon.  That's also okay so long

7    as it's discreet.  And by discreet I don't mean you have to

8    hide it, you don't have to lean down and hide it be just be

9    discreet.  I want you jurors to be comfortable.  That's my

10   point, all right.  So if there's something that we can do to

11   help make you more comfortable, let us know.

12          Final remarks on trial procedure.  We're going to get

13   to the opening statements.  Opening statements are not

14   evidence, okay.  Remember what I said, what the lawyers say is

15   not evidence.  They may be very persuasive, but it's not

16   evidence.  They're going to give you an overview of what they

17   expect that you're likely to hear.  That's the purpose of an

18   opening statement, is to give you a road map to the case, to

19   help you put things into context as things proceed.  But it's

20   not evidence.  After that you're going to hear from the

21   witnesses.  That is evidence.  The questions are not evidence,

22   but what you hear from the witness is evidence.

23          And then I told you that you're going to be then,

24   finally at the very end of all the evidence, hearing closing

25   arguments which are, in fact, arguments.  They're also not

C94ZHIC3

1    evidence.  They're arguments by the lawyers as to what

2    conclusions they think you should draw based upon the evidence

3    that was presented at this trial.

4            Let me finally end by telling you what about the

5    burden of proof.  The burden of proof here on these claims is

6    preponderance of the evidence.  It's different from a criminal

7    case.  In a criminal case it's beyond a reasonable doubt.  And

8    those of you who talked about having heard or watched some of

9    the criminal TV shows may have heard the phrase beyond a

10   reasonable doubt a lot.  That is not the standard here.  The

11   standard here is a civil standard, it's preponderance of the

12   evidence.  What does that mean?  It means more likely than not;

13   a fact or a claim must be proven to be more likely than not

14   true.  Okay.  So it's a lower standard than the criminal

15   standard, which is beyond a reasonable doubt.  I will go

16   through that again when I instruct you on the law at the end of

17   the case, okay.

18           So my Deputy will take you into the back room, show

19   you the jury room.  We'll give you a few minutes and then we'll

20   come back and go directly into opening statements.  We'll take

21   a lunch break at about 12:45, and then in the afternoon we'll

22   take one break.  Otherwise, we'll go till 5:00 o'clock, but

23   we'll end promptly at 5:00.  Okay, take five minutes.

24           THE DEPUTY CLERK:  All rise as the jury leaves.

25           THE COURT:  All right, counsel, before we take our own

C94ZHIC3

1   break, is there anything that any of you would like to raise?

2        MR. HOFMANN:  Just that coffee thing that you talked

3   about, does --

4        THE COURT:  Yes.

5        MR. HOFMANN:  -- that apply to us?

6        THE COURT:  It applies to you as well.  I figure if

7   I'm up here drinking coffee, which I will do, what's good for

8   the goose is good for the gander.  And I will warn you about

9   those pitchers, they are dangerous.  They look like they're

10  mild mannered, but they're dangerous.  He's already -- you've

11  had a spill?  Okay.  If the government had more money we would

12  get new ones, but we don't, so.  Just maybe do it on the side.

13  But let's just take then a couple of minutes.  We'll do

14  openings.  How long do you folks expect your openings to go?

15       MR. HOFMANN:  Typically I like to keep it very short,

16  but this is so many issues, I'm thinking it's probably going to

17  be a half-hour for me.

18       MR. FORDE:  If I hit 15 minutes, I'll be a lot.

19       THE COURT:  All right, okay.  You're welcome to turn

20  the podium during the opening, but don't waltz around too much.

21  Try to keep yourself generally tethered to the podium, and that

22  includes when you're questioning the witnesses unless you

23  approach.

24       Okay, let's take a few minutes.

25       MR. HOFMANN:  Thanks.  Judge, last question.  May I

C94ZHIC3

1  display one of the agreed upon exhibits to the jury during my

2  opening?

3       THE COURT:  If it's an agreed upon exhibit, it's going

4  to be going into evidence?

5       MR. FORDE:  Yeah, it's a picture that speaks a

6  thousand words.  No objection by us.

7       THE COURT:  All right, no objection, you can show it.

8       (Recess)

9       (In open court; jury not present)

10      THE DEPUTY CLERK:  All rise.

11      THE COURT:  Let's go ahead and bring the jury in.

12      THE DEPUTY CLERK:  All rise as the jury enters.

13      (Jury present)

14      THE COURT:  All right, let's all be seated.

15      Ladies and gentlemen of the jury, it gets sort of cold

16  in this courtroom sometimes, and because it's the summer time

17  you may not have come with jackets and sweaters with you.  If

18  you find yourself cold, let my Deputy know at a break and we'll

19  see if we can do something -- not put us to sleep, but to

20  increase the temperature, okay.  We'll try to find the right

21  balance.

22      Okay, why don't we go ahead and proceed.

23      Mr. Hofmann.

24      MR. HOFMANN:  Thank you, Judge Forrest.

25      Mr. Forde, counsel, Mr. Hicks, when I approach cases

C94ZHIC3A                 Opening - Mr. Hofmann

1   such as this, I normally would be very brief, give a quick

2   explanation of the facts, but I think here I have to be a

3   little bit more in-depth about what you're going to learn about

4   my client during the testimony and during this case.

5              So this is Charles Hicks.  He's a Jersey boy, hard

6   working man, always worked with his hands.  He's now 61 years

7   old.  He had many professions over the years, but his primary

8   one was working in the Maritime industry, the tugboat industry,

9   tugboat captain, master of tug boats.  What are tug boats?

10  You're going to learn a lot about tug boats during this trial.

11  It will be kind of interesting.  Tug boats are work boats.

12  They move ships, they move barges, they move scows.  It's the

13  engine that moves other vessels that do work.

14             Back in the 1990s, Charlie was a tugboat man, and

15  worked at many jobs.  He had an injury.  He had eventually left

16  the tugboat industry, went into the construction field.

17  Unfortunately, you'll find he had another accident, very

18  serious injuries.

19             But the one thing that you will find is, despite the

20  fact that he became injured, he always wanted to get back to

21  work.  And that is one of the things that generates some of the

22  issues that become -- that are involved in this case that

23  you're going to be deciding.

24             In the mid 2000's, around 2003, Charlie decided to

25  return to working in the tugboat industry.  He took a bunch of

C94ZHIC3A                    Opening - Mr. Hofmann

1    jobs through several unions that referred him work.  And he

2    decided that because he needed to improve and advance, he had

3    to get or renew his mate's and captain's license.  And you'll

4    find out that by 2008 he had gone through Maritime school, he

5    had worked, had taken the tests from the United States Coast

6    Guard, and he got certified as a licensed tugboat captain.

7            He applied for work with the company known as Vane

8    Line Bunkering.  And they're the defendant in this case.  The

9    company out of Philadelphia that they have a bunch of tugboats

10   and barges, and they primarily move petroleum products.

11           He went through a rigorous physical examination before

12   he started working for Vane Line and he passed it.

13           He then was given a two week period where he was

14   evaluated by Vane Line supervisory personnel, and he was given

15   glowing recommendations and assigned to a vessel as a mate.

16   And the vessel is the Tug Patriot.  I got a picture of it here,

17   I'll show it to you in a minute.  This was the dream come true

18   for Charlie, because he was now in a position where he had been

19   working steady for good money.  You'll see that he was making

20   over $400 a day.  He would be work two weeks on, two weeks off.

21   He was one of the five main crew members on the tugboat.

22   There's captain, there's a mate, there's an engineer and two

23   deck hands, and this was his dream come true.  Charlie's, like

24   I said, from the old school, you do things by the rules, you do

25   things correctly.

C94ZHIC3A                    Opening – Mr. Hofmann

1          He was working on April 21st, 2009, moving an oil

2     barge called the VB-53, big three, 400-foot long vessel, by

3     using the Tug Patriot, his boat.  And they were coming into or

4     close to the Chesapeake Bay coming down from the James River.

5     And we'll show you some charts just to get you oriented.  And

6     they had to change over from pushing the barge in what's known

7     as a notch, to towing the barge on a cable that extends off the

8     back of the boat.  Now, he's the mate at the time that this

9     change over is occurring, so he directs his deck hands, who are

10    the primary grunt workers on the vessel, to change over from

11    the towing cables that were connected to the notch of the barge

12    that they're pushing, and connect the tow wire to the cables

13    that come, and chains that come off the front of the barge, and

14    they connect them.

15         Now he turns the boat and gets ready to proceed

16    forward.  Now, the workers work, you'll see, six hours on, six

17    hours off.  The mate operates the tugboat from the hours of

18    12:00 noon till 6:00 in the evening, and from 12:00 midnight to

19    6:00 in the morning.  The captain works the other 12 hours of

20    the day.  The boat works 24 hours a day.

21         This incident happened during the mate's watch when,

22    in the afternoon, when Charles was in charge, but before the

23    captain went to bed.  At the end of his 6:00 in the morning to

24    12:00 watch, he said to Charles, I want you to get me up

25    because I want to assist in doing this change over of the

C94ZHIC3A                    Opening – Mr. Hofmann

1   barge.  You're going to be going out into the Chesapeake Bay,

2   we got to put it on the wire, I'm new to the boat and I want to

3   get some practice doing it, I want to be involved in it.  So

4   Charles does get the captain up, and they proceed together to

5   the back of the boat.  And here's a picture of the Tug Patriot.

6   The two of them proceed back to this little work station.  This

7   is a control station up here, it's called the dog house, where

8   you can see all of the work that's going on.

9          Now this big thing here, that's a towing winch, it's

10   got a drum, and this is the big wire that comes off the back of

11   the boat, and that runs to the front of the barge and it tows

12   it.  The captain comes over to that control station where

13   Charles is and says, Charles, you've not put out enough cable,

14   I want more cable put out.  Charles wants to discuss it, but

15   says, listen, he's the captain, I do what he says.

16          Now, as you can see, and it's curious, you see how

17   this cable is coming down here.  It comes over this steel bar.

18   This steel bar they call a Texas bar or a towing bar.  And the

19   wire is held up off of the back of the boat so it doesn't chafe

20   on the back of the boat, but of course it would chafe on this

21   Texas bar.  So they have a device, it's called a donut.  And

22   you can see it sort of sitting over here on the side.  It's a

23   round spool.  It's called a shiv.  And the wire sits in that

24   spool and it can roll and, it's greased so it doesn't chafe and

25   break.

C94ZHIC3A                    Opening - Mr. Hofmann

1          When Charles first set up the boat, you're going to

2    find, on this day when they're setting up the tow, the wire was

3    in the donut properly.  But then captain Comiskey, Bruce

4    Comiskey comes out and says, Charles, I want more wire put out.

5    And the captain proceeds to put out more wire.  In so doing,

6    the wire comes back out of this donut and the donut falls over

7    to the side.

8          Now, there's a company rule that says, at all times

9    when towing, you're to have this wire in that donut.  Why?

10   These wires are very expensive.  In fact, defendants will put

11   on a deposition of an expert who concedes these wires are very

12   expensive.  You lose a wire, you break the wire, you have all

13   kinds of problems.  First the tow could go all over the place,

14   and if you're in close quarters, that's a bad thing.  Of course

15   the wire itself would have to be replaced, and that's an

16   expense.

17         So now they have a method, you're going to find, of

18   just taking the boat, and if you turn it this way the wire

19   would lead back to the other side, and it can catch the donut.

20   And if you turn the boat back, the wire slides back up the rail

21   with the donut and it sits in.  And that's the typical way of

22   catching the donut, they call it.

23         On this day, Captain Comiskey took over controls, and

24   probably because he was new to the boat, he couldn't get that

25   wire into the donut.  Now, as I said, there's a rule that says

C94ZHIC3A                    Opening - Mr. Hofmann

1    you have to have the wire in the donut if you're going to tow,

2    and Captain Comiskey's having difficulty.  So Charles, who is

3    the mate, says, listen, I'll go down there and I'll push this

4    donut up the bar, intending to having the help from either the

5    engineer who is out on the deck or his deck hand, so that the

6    captain could lay this wire into the donut.  So he goes down on

7    the deck.  He sees one of the deck hands and says, come on,

8    give me a hand.  Now this deck hand whose name is Scroggins, is

9    deathly afraid of being anywhere near the wire when it's out.

10   And he says, no, and he walks away.  And you'll find that he

11   was with another deck hand, who will testify here, he'll be

12   here tomorrow Vin Lusardi.  And Mr. Lusardi says, yes, I saw

13   that the wire was out of the donut on this day, I saw them

14   trying to manipulate it, but we went for it and he went into

15   the galley.  He doesn't recall Charles coming down, probably

16   because they went forward and Mr. Hicks had his communication

17   with Mr. Scroggins, who said I'm not helping.

18           Also out there was the engineer.  And it's typical for

19   the engineer to help with deck work.  And it's typical, and

20   even Mr. Lusardi will tell you, it's typical for the engineer

21   to be out there when they're making up the tow, because there's

22   mechanical equipment involved and that's the engineer's job.

23           Now, Charles says to the engineer, you'll find --

24   he'll so testify -- that, here, give me a hand.  And the

25   engineer says, look, I've been told by the captain not to get

C94ZHIC3A                    Opening - Mr. Hofmann

1   involved with handling the wire.  So Charlie's left with a

2   dilemma.  They're going to be towing this over a tunnel near

3   Newport News, they're going to be in a narrow channel, and the

4   wire's not in the donut.  So Charles -- and it's all conceded

5   by everybody, this is a two man job if you're going to do it

6   manually -- Charlie tries doing it by himself because nobody

7   would help.  The captain wants it done.  The captain's looking

8   down and let's him do it.  Charlie pushes up the donut on the

9   cable.  Unfortunately, this donut weighs 200 some odd pounds,

10  and he tears up his shoulder.

11          Now, there's going to be testimony by Mr. Comiskey, if

12  he comes in tomorrow as expected, he's going to say, I know

13  nothing.  You're going to find that he does all this.  I don't

14  remember anything.

15          There may be testimony read to you by the engineer

16  Mark Johnson, I don't remember anything.  Well, these are guys

17  that are still working for the company.

18          Now, we know from other circumstantial evidence -- you

19  remember the judge mentioned circumstantial -- we're going to

20  show you circumstantial evidence that shows that these people

21  were there and knew about what Mr. Hicks was doing by himself.

22  And you're going to judge.  You're going to have Mr. Hicks

23  telling you the story, and you're going to have these others,

24  who are going to have some very shady and shaky recollections.

25  And there will be some documentary evidence, some statements

C94ZHIC3A                    Opening - Mr. Hofmann

1    that Mr. Hicks provided to the company as part of the company's

2    investigation, which corroborate everything Mr. Hicks says.

3    And you're going to find that the company's investigation --

4    which should have been done thoroughly, talking to all the

5    witnesses -- was never done.

6            All right, so what happened to Mr. Hicks?  I said he

7    tore up his shoulder.  To be a little more technical, got a

8    student here, he has what's known as a torn labrum and a torn

9    rotator cuff from this accident.

10           He gets treatment.  He goes to a Dr. Lisser, who

11   apparently will be here to testify tomorrow.  And there's

12   intervening things going on, but he goes to a Dr. Lisser who

13   does a surgery to repair the rotator cuff and the labrum.  And

14   from the evidence, we'll even concede that surgery went well,

15   it was a good surgery.

16           So what's done next when you've had a severe shoulder

17   injury such as this, you start doing physical therapy, and

18   Charlie's partook of that.

19           Unfortunately, and we're going to have testimony from

20   a different doctor, a Dr. Charles Rizzo -- and I'll explain how

21   this comes about in a minute -- who says that, in his opinion,

22   what happened was during the physical therapy -- and it's not

23   common, but it occurs frequently -- you can have a retear in

24   the shoulder, and Charles has a retear.  And there's going to

25   be MRI evidence and medical testimony.  All of this sounds

C94ZHIC3A                    Opening – Mr. Hofmann

1    like, hey, this is a case that should easily get resolved.  Why

2    are we doing all this, what happened, why is this so complex?

3    It doesn't sound that difficult.

4         Well, here it goes.  In the Maritime law the employer

5    is required to provide what's known as maintenance and cure.

6    And the Judge is going to teach you all about that later.  But

7    this is a benefit, you're going to find, that provides a living

8    amount of money to help pay your food and lodging, and also to

9    pay your medical bills.

10        Now, Charles comes and is being treated at the

11   company's expense by Dr. Lisser who did the surgery and

12   prescribed the physical therapy, but Charles is working at

13   getting better.  But he's falling behind, behind, behind in his

14   house payments, his home payments.  He's got three sons, two

15   living with him, one in college.  He's got a wife.  They have a

16   beautiful home down in Middletown, New Jersey, and their

17   mortgage, utilities, outstripped the $15 a day that the company

18   was paying.  So Charles has to do what any provider does.  He

19   has to go and look for additional work.  And there's nothing

20   wrong with working while receiving this maintenance and cure if

21   you can't make your bills, and he did so.  And over the course

22   of the next -- well, he had surgery on July 1st.

23        He goes to see Dr. Lisser in October, sees him in

24   November, sees him in December, sees him in January, and he's

25   not getting better.  And, as I said, Dr. Rizzo will testify

C94ZHIC3A                    Opening - Mr. Hofmann

1   what happened was he had a recurrent tear doing his exercise.

2   And the way he did the exercises, you'll find, is there's this

3   device, it's a theraband and you do exercises with it and you

4   connect -- you wrap it around a pole and you do different

5   exercise.  And Charles is going to tell you that's what he was

6   doing.

7          Well, comes the spring of 2010, Charles still has his

8   house.  He can't afford to hire people to do everything.  He

9   does light work around his house.  He's been told he can do

10  things within his capacity.  He decides to, on a beautiful

11  spring day, to plant a shrub in his yard.  You'll find that he

12  has this son dig the hole for it.  It's a little Christmas

13  tree.  And he and his grandson work on putting the tree in.

14  And Charles does some shoveling, some kind of motions that he's

15  doing in exercise.  Well, this company surreptitiously sent an

16  investigator who sat in some truck or some car and filmed this.

17  And they took this video of him doing motions that he was

18  perfectly capable doing, because he'd been doing this exercise

19  for seven months, and they took it to his doctor, Dr. Lisser

20  and said, look at this.  And then they give Dr. Lisser an

21  explanation of what they wanted Dr. Lisser to believe were the

22  physical capacities of a mate on a boat.  And Dr. Lisser sees

23  this and says, oh, this guy's reached maximum medical

24  improvement.  They don't tell -- you're going to find they

25  don't tell Dr. Lisser that Mr. Hicks in his job has to carry

C94ZHIC3A                    Opening - Mr. Hofmann

1   60, 70-pound weights, has to climb 30-foot ladders, work

2   overhead.  And I'm sure Dr. Lisser, when he testifies, is going

3   to concede that Mr. Hicks' biggest problem is working overhead

4   and lifting.

5        Now, we're going to have that surveillance video for

6   you and you'll be able to watch all 25 minutes of him putting

7   in this shrub.  And you won't see one second where he raises

8   his hand overhead.  Because he can't because of the injury,

9   because of the torn rotator cuff he now has.

10        So what does this do?  Vane Line cuts him out of

11   maintenance and cure so he can't get any further medical care,

12   even though Dr. Lisser on April 26, before he saw this video,

13   said this man needs an MRI because there's something going on

14   here and it's not improving.

15        So this is now in April that Dr. Lisser says he needs

16   an MRI.  June comes along.  He sees this video and cuts him

17   off, leaves Mr. Hicks completely alone.  Vane Line cuts him off

18   says you're fit for duty, when we know he's not.  Now, you're

19   going to hear a lot of evidence about the work that tugboat men

20   have to do.  Whether you're a mate, or a deck hand, there is a

21   lot of heavy physical work.  You can even see on this, these

22   are ladders.  These are the ladders they have to climb to go

23   from the tug to the barge.  Here's an almost straight up ladder

24   to get up to the this upper wheel house.  You can't do that

25   with this kind of shoulder he currently has.

C94ZHIC3A                    Opening - Mr. Hofmann

1              All right.  Let's get back to the donut.  As I said,

2     the company has a rule that requires it to be carried, the

3     wire, in the donut.  They failed to have that done that day, so

4     Charlie was trying to comply with the company rule.  There is

5     the rule that I said that you're going to find out about

6     maintenance and cure that they're supposed to cure him.  They

7     didn't.  These are the issues that get us here.

8              Now, there are some things that men and women will do

9     when their lives are threatened, their home and health are

10    threatened.  And maybe they're not proud of it.  And you're

11    going to find that Charles' house was put into foreclosure, and

12    he and his wife Janet were desperate.  So Charles does start

13    working, and he works quite a bit.  And he applies to companies

14    in the tow boat industry with his license.  And he doesn't tell

15    them the particulars about this accident.  He doesn't tell them

16    that he has an injured shoulder, because he needs to work and

17    earn money and.  You're going to find he earned some fairly

18    good money in 2010, and 2011.  You're going to judge his

19    credibility.  He didn't tell the truth, and he will tell you up

20    there why, what he was going to do?  He was desperate.  But

21    you'll have to judge his credibility about everything.  Because

22    I'm sure Mr. Forde is going to say, he admits he lied about

23    this, so he must be lying about everything.  Ladies and

24    gentlemen, that's going to be your job to judge that

25    credibility.

C94ZHIC3A                    Opening - Mr. Hofmann

1           So what are we -- what are the things that we intend
2    to prove to you?  Well, this case is about money, to a certain
3    extent.  It's about justice, to a certain extent.  We're going
4    to prove what Mr. Hicks could've been earning if he had been
5    able to continue, hadn't been injured.  And it's a fairly
6    substantial amount of money he would make from Vane.  We're not
7    claiming that Charles will never go back to work again.  All
8    we're claiming here is they have an obligation to provide him
9    that cure to get him the surgery, pay for that surgery so he
10   can get back to work, which is you'll find is what he wants to
11   do.
12          We're going to be making a claim for, here, for the
13   pain and suffering he's gone through.  That's going to be a
14   judgment for you.
15          We're also making a claim for the failure to pay a
16   reasonable amount of maintenance and cure.  He owned a home.
17   They knew that.  He had utilities.  They know that, but they
18   were paying him $15 a day, rather than a reasonable amount.
19   And we will show you what that reasonable amount should be.
20          So in a nutshell, and I'm sorry it took as long as I
21   did, but I needed to bring these issues out so you understand
22   what this case is about, and what we're intending to prove to
23   you.
24          So thank you, and I hope you pay attention to all the
25   evidence that's adduced before you make your decision.  Thank

C94ZHIC3A                    Opening – Mr. Hofmann

1    you.

2                    THE COURT:  All right.

3                    Mr. Forde.

4                    MR. FORDE:  Ladies and gentlemen of the jury, thank

5    you.  Fortunately, this is going to be a relatively short

6    trial, we hope.  And I would like to just start this off with

7    that Vane bent over backwards for this guy.  They paid him his

8    full salary, even when they didn't have to, for over three

9    months.  They got him -- the doctor that operated on him was

10   the doctor that plaintiff had chosen himself.  This is Dr.

11   Lisser.  Dr. Lisser is the one that went and looked, after

12   looking at all his evidence, his records, and then saw this

13   video, he was hurt.  You're going to have testimony from Dr.

14   Lisser saying this guy was taking advantage of the system.

15                    And you're also going to get additional situation,

16   he's the only one that witnessed his own accident.  Nobody else

17   did on the vessel.  The first time the captain learned about

18   this was when Mr. Hicks came in and wrote down on his discharge

19   thing, I hurt my shoulder.  And captain goes, oh, come on, you

20   know you're supposed to tell us right away, now you got to fill

21   out the incident report.  Don't worry about it, don't worry

22   about it, everything's fine, everything's fine, I'll go see my

23   own doctor.  And that's why there wasn't any formal

24   investigation.  Because the next thing we know we got a letter

25   from the attorney, he's going that route.  So we have that

C94ZHIC3A                    Opening - Mr. Forde

1  going.

2          This is a case where there's going to be some serious

3  credibility issues regarding the plaintiff; how the plaintiff

4  got hurt, and whether the plaintiff actually got hurt the way

5  he describes it.  Specifically, you're going to have to decide

6  whether the plaintiff is telling the truth, because no one else

7  witnessed it.  He's claiming that the captain ordered him to

8  move the 200-pound piece of equipment.  Frankly, it's hogwash.

9  The evidence is going to show you that that's not the case.  In

10 fact, at the time of the incident, they were towing close

11 quarters sea by land, that's what they call it, and they were

12 towing short, short wire, which depending on how short the wire

13 is, the tow bar doesn't even get involved because of the angle.

14 Added to that, he was towing a light barge.

15         Now what happens is when you load the barge, you are

16 able to look out on the Hudson River, you actually see those

17 guys that are kind of like, are they really floating, it's just

18 about like two or three feet of the boat you can see, that's

19 generally a loaded barge.

20         This was a light barge.  This was like 40 feet up in

21 the air, and had maybe drawing a draft of maybe 2 feet, 3 feet.

22 It was an empty barge.

23         So you're at close quarters.  You would never, ever

24 put out extra line in that area because the longer the line is,

25 the less control you have of the barge.  They were going over a

C94ZHIC3A                          Opening - Mr. Forde

1   tunnel area, allegedly.  In that particular case, you need on

2   short wire.

3          And, lastly, and this is a really important thing,

4   safety.  Humans come first.  Vane would never ever tell

5   somebody while the line, the towline is out, to go to the Texas

6   bar and manhandle that donut.  A line just a cost a few

7   bucks -- maybe it's an expensive few bucks, but there is

8   insurance on these things.  You got pulling machinery.  The tow

9   wire snapped, you make the claim.  Humans first.

10         And you're going to get testimony from the captain and

11  actually everybody, aside from him, that basically say, look,

12  thou shalt not go behind the tow winch in this area while there

13  is a wire out.  You leave it.  If you're in close quarters and

14  it's out of the donut -- as a matter of fact in this picture

15  it's out of the donut -- you just leave it.

16         And, frankly, in conclusion, I think the evidence is

17  going to show that Vane did nothing wrong.  They bent over

18  backwards to make sure that he was well cared for.  But you got

19  to remember something, that like the tugboat workers and the

20  crew members that are out there, the tugboat industry is a very

21  close knit society.  There is -- you've got McAllister out

22  here, family owned for over 100 years, you've got Bouchard

23  around here that's over 100 years in the area.  And what they

24  do -- and this is how we found out about it, that he was

25  working for another tugboat company called Dan Towing in

C94ZHIC3A                          Opening - Mr. Forde

1    October of 2011.  And the evidence will show that he actually

2    had a physical there -- he applied for the job, he got a

3    physical, and he got a fit for duty to work on Dan.  And lo and

4    behold, two weeks into it he falls and he hurts his shoulder.

5    And, interestingly enough, the evidence is also going to show

6    there's this similar cast of characters that are involved in

7    that second claim, which is not yet a lawsuit because, well,

8    they got to get this one done first.

9              I have nothing further.  Thank you.

10             THE COURT:  All right, thank you, Mr. Forde.

11             Okay, Mr. Hofmann, would you like to call your first

12   witness?

13             MR. HOFMANN:  Yes, your Honor.  We will call

14   Mr. Hicks.

15             THE COURT:  Great.  Just take this picture, move it

16   away so I can get a full line of sight there.

17    CIRO CHARLES HICKS,

18        called as a witness by the plaintiff,

19        having been duly sworn, testified as follows:

20   DIRECT EXAMINATION

21   BY MR. HOFMANN:

22             THE COURT:  All right, please be seated, Mr. Hicks.

23   And it'll be very important for you to speak into the mic

24   close, but not too close.  And there's water.  And it is, as

25   with the other pitchers, a little booby trapped, so just be

C94ZHIC3A                    Hicks – direct

1    very careful with it.  It's booby trapped, yes.  Serious issue

2    that we have.

3              Okay, you may proceed, Mr. Hofmann.

4              MR. HOFMANN:  Thank you, your Honor.

5    Q.  Good morning, Mr. Hicks.

6    A.  Good morning.

7    Q.  Can you tell us your address, please?

8    A.  5 Chanowich Court, Middletown, New Jersey.

9    Q.  And is that a, what kind of house, what kind of home is

10   that?

11   A.  Single family residential.

12   Q.  And how long have you lived there?

13   A.  26 years.

14   Q.  And do you own that single family home?

15   A.  Yes.

16   Q.  And with whom do you live?

17   A.  My wife Janet and my two sons, Steven and Scott.

18   Q.  How old is Steven?

19   A.  Steven is 30.

20   Q.  And how old is Scott?

21   A.  28.

22   Q.  Does your wife work outside of the home?

23   A.  No, she doesn't.

24   Q.  And during the five years before the incident in April of

25   2009, was she working outside of the house?

C94ZHIC3A                          Hicks - direct

1   A.  No.

2   Q.  Now, can you tell the jury what is your profession, how do

3   you make your living?

4   A.  I'm working on the tug as licensed captain.

5   Q.  And for how long in total have you worked in the tugboat

6   field?

7   A.  Roughly 35 years.

8   Q.  Have you worked in other fields during that 35 year period?

9   A.  Well, construction, working in construction.

10  Q.  Now, you said you have your license.  Can you tell us

11  licensed by whom and to do what?

12  A.  I have a 200 ton master of tow and -- to work on a tugboat

13  to operate it as master.

14  Q.  Who issues that license?

15  A.  United States Coast Guard.

16  Q.  Is it required licensing in order to tow barges of carrying

17  petroleum?

18  A.  Yes, it is.

19  Q.  When did you first get your tugboat masters license?

20  A.  The first time around or the second time?

21  Q.  Just tell us when you first got your license?

22  A.  Originally back in 1974.

23  Q.  And did there come a time when it lapsed?

24  A.  Yes, it did.

25  Q.  And when did you renew your license?

C94ZHIC3A                         Hicks - direct

1    A.  Back in 2008, February of 2008.

2    Q.  And was there a need for that license when you were working

3    in the tow boat industry for that first for the first part of

4    that 35 year period?

5    A.  Yes, there was.  You had to have a license, but then also

6    you could work on 20, 25-foot tug boats without a license.

7    Q.  And were you working on that type of boat?

8    A.  Yes, I was.

9    Q.  Tell us what your Maritime tugboat experience in general

10   was over that period of time?

11   A.  I originally started working for Reinauer in 1972 as a deck

12   hand, and we were towing oil barges up and down the coast, also

13   to Boston.  And we also towed some sand scows.  We did some

14   ship work.

15          Then I transferred over to McAllister Brothers when I

16   got my first shot to be able to steer, because at that time

17   they had the garbage run, and that was called a crash, boom

18   bank.  They didn't care, because they were extremely heavily

19   built.  So that's where you got your main experience in

20   steering.

21   Q.  And what did you do after you worked for those couple

22   companies?

23   A.  Well, I worked for McAllister.  I did oil barges also, and

24   then I started training and doing ship work, docking ships,

25   pulling them off docks, putting them into port, turning them.

1              And then I went the to work for Moran doing ship work,

2     and also the garbage run at that time.  They had the contract

3     of it.

4     Q.  Did you also do construction barge work?

5     A.  Yes, I did.  We did some dock building, and we needed a tug

6     and a small barge to push material and be able to get out to

7     some of the docks that we were doing.

8     Q.  So was there a period of time in the 1990s that you were

9     not working in the tugboat industry?

10    A.  Yes, it was a period in the '90s.

11    Q.  And what you were doing then?

12    A.  I was doing strictly heavy construction.

13    Q.  Had your own business?

14    A.  Yes, I did.

15    Q.  So did there come a time around 2003 or so that you started

16    to return to the tugboat industry?

17    A.  Yes.  I started to go back to school and training and

18    stuff.  Because I went to the Coast Guard and they wouldn't

19    give me my original license back without retesting again.

20    Q.  Did you, between -- let's just do the period between 2003

21    and 2008, for whom did you work during that period?

22    A.  I worked for K.T. Marine Coastline Towing, McAllister,

23    Village Dock, Avanti.

24    Q.  Were you getting some of that work through union referrals?

25    A.  Yes, Local 25.

1   Q.  And what is Local 25?

2   A.  It's the dredge men's union.

3   Q.  Now, you said that around 2008 I believe you said you

4   renewed your license or you got your license again?

5   A.  Yes.  I was able to get my license back in February of

6   2008.

7   Q.  What did you have to do, what were the steps you had to do

8   to get your license in 2008?

9   A.  I had to go back to -- they wanted me to take a class again

10  to get all the, all the updated rules of the road, take the

11  test for that.  I passed that.

12          Deck general test, they wanted.  Also radar, what they

13  call maneuvering, which was doing anchoring, towing, stuff.

14  You had to also do -- take a test on that, your knowledge of

15  that, and then also a practical test doing that.

16  Q.  Did you have a plan or a goal when you got that license as

17  to what you wanted to do with it?

18  A.  Well, I wanted to stay in the tugboat industry.  I always

19  did love it right from the day I started with it.  My goal was

20  to go on and get higher and higher with it and stay with it.

21  Q.  Okay.  Let's talk a little bit about the work of a tugboat.

22  What, in general, do tugboats do?

23  A.  We generally we -- do if you're an oil company, you tow oil

24  barges.  You can push them, take them on the hip.  You can tow

25  them on a wire.  You do ship work, sand work, scow work,

C94ZHIC3A                        Hicks - direct

1   construction equipment, towing cranes around, towing material

2   that has to go for -- when they're building a bridge or

3   something, you're towing large concrete objects that are

4   extremely delicate that have to go in the Sandy Hook.  I don't

5   know if anyone's ever been that way, the prefab bridges they

6   built, did that.  Quite a bit of stuff in that.

7   Q.  What is the general compliment of crew on a working

8   tugboat?

9   A.  You have a captain, a mate, two deck hands and an engineer.

10  Q.  And what are the general -- do tugboats generally work 24

11  hours a day?

12  A.  Yes, you do.

13  Q.  And what are the watching, watches that the workers work?

14  A.  The captain works the morning watches, 6:00 in the morning

15  to 12:00 noon, and 6:00 in the evening to midnight.  Then the

16  mate takes over, which is called the second watch from midnight

17  to 6:00 in the morning, and then from noon to 6:00 in the

18  evening.

19  Q.  Now, I think you mentioned, and just so that the jury

20  understands some of work that has to be done, you mentioned

21  three different means of moving barges, is that right?

22  A.  Yes, sir.

23  Q.  All right, what are those three main means?

24  A.  Well, you can push a barge from behind, and what they call

25  a notch vessels where you get into it, and you put up a set of

C94ZHIC3A                    Hicks - direct

cables and you're able to push the vessel that you're pushing a

barge.  It's easier to control, much -- easy to handle through

tight quarters.

          The other way is on what they call alongside.  You're

using rope to put up a strap, a bow line and the stern line.

          The 3rd way is tow on a wire.  You would hookup a tow

wire to a set of bridles, hook it together, and you could also

tow like that.

          MR. HOFMANN:  If I may approach, your Honor?

          THE COURT:  You may.

Q.  Mr. Hicks, I'd like you to take a look first at plaintiff's

trial exhibit 60 and trial Exhibit 4, And explain which of

these three methods may be described in those photographs?

A.  Well, 60 is a push mode through the notch.

Q.  Show the jury.

          THE COURT:  Well, you've got to, before you publish it

to the jury, you need to get it admitted.

          MR. HOFMANN:  All right.  Your Honor, may I offer

plaintiff's exhibit --

          THE COURT:  4 and 60?

          MR. HOFMANN:  -- 4 and 60?

          THE COURT:  All right.

          MR. FORDE:  No objection.

          THE COURT:  All right, so plaintiff's Exhibit 4 and

plaintiff's exhibit 60 are admitted.

C94ZHIC3A                    Hicks - direct

1           (Plaintiff's Exhibits 4 and 60 received in evidence)

2           THE COURT:  Now you can have him show it to the jury.

3           MR. HOFMANN:  Yes, your Honor.  Thank you.  I'm sorry.

4   Q.  Just hold it up and show the jury what we've got.

5   A.  60 is what they call a push mode, what they call getting it

6   in a notch.  That's how you would push.  This obviously is a

7   light barge, but that's how you would push it.

8           This is also light barge and a push mode with the --

9   as you notice here, there is a set of cables running out from

10  the stern to the bow connected to the barge.  That's how you

11  are able to maneuver and control it.

12  Q.  Now, if you would then take a look at plaintiff's trial

13  exhibit 56.

14          MR. HOFMANN:  Your Honor, I offer that in evidence

15  before he discusses it?

16          THE COURT:  All right.  Any objection to 56?

17          MR. FORDE:  No, your Honor.

18          THE COURT:  All right, Plaintiff's Exhibit 56

19  admitted.

20          (Plaintiff's Exhibit 56 received in evidence)

21  A.  This is a vessel, what they call alongside, whereas you

22  notice there's a trying to -- you see here there is a bow line

23  and a strap, and there's also a stern line, which you obviously

24  can't see on this photo -- actually, yes, you can, it's right

25  back in here.  This is what they call alongside on the hip.

C94ZHIC3A                    Hicks - direct

1   Q.  On the hip?

2   A.  Yeah.  The other terminology is on the hip.  But this is

3   alongside, push towing it.

4   Q.  And how does the tugboat move the barge that's shown in

5   that photograph.

6   A.  In this one?

7   Q.  Yeah -- no, the one that you have.  Just tell the jury

8   how -- what does the tugboat do?

9   A.  What he's doing is he's pushing the barge alongside

10  traveling down the river, and he's able to control it wherever

11  he has to -- the reason he has it on this is because he's

12  obviously going into an area that he has to be able to release

13  it and do what he has to do.

14  Q.  Okay.  Now if you would --

15          MR. HOFMANN:  At first, your Honor, I'll offer exhibit

16  58.

17          THE COURT:  Any objection?

18          MR. FORDE:  No objection, your Honor.

19          THE COURT:  All right, plaintiff's exhibit 58

20  admitted.

21          (Plaintiff's Exhibits 58 received in evidence)

22  Q.  If you would explain, Mr. Hicks, what is shown in exhibit

23  58?

24  A.  You have the tug is hooked up to a barge.  And this is

25  towing from behind.  And he's hooked up to a set of bridles

C94ZHIC3A                       Hicks – direct

1    here.  As you can see chain, heavy bridles, and there's a cable

2    running from the stern of the tug to the bridles, which I guess

3    you can see that.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C94MHIC4                         Hicks - direct

1  Q.  What do you mean by a bridle?

2  A.  A bridle is two heavy -- it could be either two heavy

3  chains or two heavy cables which are permanently usually on a

4  bow of the barge.  Whereas when the tug comes along side, he

5  hooks up to it and is able to connect the large shackle to it

6  and tie off on it.  That's what they call a set of bridles.

7  It's actually pulling cables, as you would.

8           MR. HOFMANN:  Your Honor, if we could, with your

9  permission, pass those photos around.

10          THE COURT:  You may.

11          Mr. Hofmann, why don't you go ahead and proceed while

12  the jury --

13          MR. HOFMANN:  I didn't know if you wanted me to, your

14  Honor.

15  Q.  Mr. Hicks, these barges appear to have cables that are

16  rather large, is that right?

17  A.  Correct.

18  Q.  Describe the equipment, size and shape and how it's moved

19  that connects all these tugs to these barges.

20  A.  The cable on the stern of a tug on a winch, which is the

21  towing machine that he showed you, could be as large as two and

22  a half, could be also as small as two.  It's a large cable that

23  you let out to tow the vessel that you are towing, which is the

24  barge.  There is also heavy-duty chains that they use, which

25  you can see on that one photo there, it's a huge chain.  It's

C94MHIC4                          Hicks - direct

1   in a shackle that's on there that is approximately about this

2   big.  It could weigh upward of 120 pounds.  The gear that is on

3   the tug is extremely heavy, which is obviously to sea, and it

4   has to be high-grade steel.  You have to hook it all up and set

5   it up and be able to tow it and hold it.

6   Q.  In general, on a tug boat, who primarily does the

7   manhandling, the heavy work?

8   A.  The deckhands do it and also the maid has to pitch in

9   sometimes and the captain also has to pitch in, depending on

10  what we are doing.

11  Q.  Now, there came a time, I believe, that you applied for

12  work with a company called Vane Line Bunkering, company

13  involved in this case, is that right?

14  A.  Yes, sir.

15  Q.  When was that?

16  A.  That was in September of 2008.

17  Q.  And what sort of business is Vane Line Bunkering?

18  A.  They are strictly in the oil business.  They do bunkering

19  to ships, which is bringing a barge out with fuel on it to

20  power the ship so the ship can -- like gas in a car.

21  Q.  What type of vessels does Vane Line operate?

22  A.  Barges and tugs.

23  Q.  Where are they located?

24  A.  In Baltimore, Maryland.

25  Q.  And in 2008, you said you applied for -- what position did

C94MHIC4                          Hicks – direct

1  you apply for?

2  A.  I had applied for a captain or maids position.

3  Q.  Were you invited to perhaps join that company if you passed

4  certain tests?

5  A.  Yes.

6  Q.  What tests did you have to pass in order to be offered a

7  job at Vane Line?

8  A.  I had to be able to climb ladders vertically, I had to be

9  able to crawl through tunnels, I had to be able to take 30

10  pounds of weight and put it up eye level on a shelf.  You had

11  to do that consecutively three times.  You also had to be able

12  to crawl through a 24-inch tunnel, come out, go down into a

13  hole and then come around and come out the other side and go

14  down four or five steps at that point.  Then you also had to

15  pull a sled, which was deadman weight of about 150 pounds, and

16  you had to run it across probably the length of this courtroom.

17  You had to do that five times.  You had to go up, down, up,

18  down with your arms, and you are able to pull it.

19  Q.  This was a physical exam, you are talking about?

20  A.  Yes, sir.

21  Q.  Who administered this physical exam?

22  A.  Concentra.

23  Q.  Concentra?

24  A.  Yes, sir.

25          MR. HOFMANN:  Your Honor, I offer Trial Exhibit 15,

1  records of Concentra Medical.

2              THE COURT:  Any objection?

3              MR. FORDE:  No objection, your Honor.

4              THE COURT:  Plaintiff's Exhibit 15 admitted.

5              (Plaintiff's Exhibit 15 received in evidence)

6  Q.  Mr. Hicks, did Concentra have you do this physical

7  examination according to the standards that Vane Line had asked

8  them have you do?

9  A.  Yes.

10 Q.  After you did the physical exam, were you then given an

11 evaluation period where you worked with Vane to be evaluated to

12 determine whether you were competent to work on their boats?

13 A.  Yes.

14 Q.  Describe what you did for them in that evaluation.

15 A.  They put me on the tug Endeavor, my first tour for two

16 weeks.  I had to control and operate the vessel, I had to put

17 it on the tow wire.  I also had to put in push mode, handle it,

18 docking it, taking it out of a dock, and I had to do that -- I

19 was there for two weeks, so I did it, I would say, probably

20 about four times, roughly.

21 Q.  Did you have to do any physical tasks involved?

22 A.  I also had to go down and help on a deck to show that I

23 knew the correct procedure to hook up a barge with the cable in

24 case a deckhand wasn't familiar with it.  The maid or the

25 captain is responsible to go down and show them the safe way to

C94MHIC4                          Hicks - direct

1   hook up everything.

2   Q.  Did you have to do any part of your evaluation while you

3   were actually up on the barge?

4   A.  Yes.  You also had to be able to go up on a barge, climb up

5   there, talk to -- you're in a supervisory position where you

6   have to go up and talk to the bargeman, find out what time they

7   are going to be finished so you can notify the company.  You

8   also have to talk to the dock sometimes.  There could be a port

9   captain up there or dock bargeman and stuff like that.

10  Q.  Do you know who Captain Dennis J. Kozu is?

11  A.  Yes.

12  Q.  Who is?

13  A.  He was placed on the tug Patriot.  He's a captain there.

14  Q.  Dennis Kozu?

15  A.  No.  Dennis Kozu.  Excuse me.  He is the head port captain

16  in Philadelphia.

17  Q.  Did he do your evaluations?

18  A.  Yes, did he.

19  Q.  Did you pass the evaluations by Dennis Kozu?

20  A.  Yes, sir.

21          MR. HOFMANN:  Your Honor, I offer Exhibits 27 and 28.

22          THE COURT:  Any objection?

23          MR. FORDE:  No, your Honor.

24          THE COURT:  Plaintiff's Exhibit 27 and Plaintiff's

25  Exhibit 28 admitted.

C94MHIC4                        Hicks – direct

1           (Plaintiff's Exhibits 27 and 28 received in evidence)

2           MR. HOFMANN:  If your Honor will allow me, very short,

3      may I read to the jury the contents?

4           THE COURT:  Yes.

5           MR. HOFMANN:  27 is an exhibit from Dennis Kozu

6      concerning crew evaluation of Mr. Hicks and it states after

7      being evaluated by Captain Michael Crosch, the master of the

8      Endeavor and myself, it has been determined that Mr. Ciro Hicks

9      has demonstrated his abilities to carry out the duties of tug

10     mate on a class 3 or lower vessel.  As of 11/18/08, Mr. Hicks

11     is considered release from his training period and is a

12     qualified class 3 mate.  That's signed by Captain Dennis Kozu.

13          And then Exhibit 28 is dated November 24, 2008.  It's

14     to a Rhonda Chaffer.  As per our earlier conversation, Mr. Ciro

15     Charlie Hicks should be listed as a class 4 mate.  And as of

16     11/05/08, his permanent position is mate on the Patriot.

17  Q.  Now, as I just read, you were given a permanent assignment

18     by Vane after your evaluation period, is that correct?

19  A.  Yes, I was.

20  Q.  And that was on what vessel?

21  A.  That was on the tug Patriot.

22  Q.  Can you describe what is the tug Patriot?

23  A.  She has three engines in it.  She is 3,000 horse power.

24     She has an upper wheelhouse, as you had seen, it has a tow

25     machine on it, pushing gear.  She primarily tows the VB53, Vane

C94MHIC4                         Hicks - direct

1   Brothers.

2          MR. HOFMANN:  Your Honor, I offer into evidence what's

3   been marked as Plaintiff's Exhibits 2 and 3.

4          THE COURT:  Any objection?

5          MR. FORDE:  None, your Honor.

6          THE COURT:  Plaintiff's Exhibits 2 and 3 admitted.

7          (Plaintiff's Exhibits 2 and 3 received in evidence)

8          THE COURT:  Mr. Hofmann, also, for your planning

9   purposes, we will take our lunch break in about four minutes.

10  Q.  Mr. Hicks, let me ask you this.  I'm showing you what's

11  marked as Plaintiff's Exhibit 2.  Can you tell us what that is

12  a photograph of?

13  A.  That's a picture of the tug Patriot, a starboard side view.

14  Q.  Starboard means what?

15  A.  That's the right side of the tug.

16  Q.  As you look forward?

17  A.  Yes, sir.

18  Q.  What's the left side of the tug?

19  A.  The port side.

20  Q.  Let me show you Plaintiff's Exhibit 3.  Can you tell us

21  what this is a photograph of?

22  A.  That's the stern view of the Patriot.

23  Q.  Now, what sort of work in general did you say that the tug

24  Patriot did?

25  A.  She strictly did oil work.  She was assigned to the, as I

C94MHIC4                          Hicks - direct

1    said before, the VB53.

2    Q.   And where did the tug Patriot and the VB53 trade when you

3    were aboard her?

4    A.   We used to sail from the James River all the way up, there

5    was a plant there, come down, and we also went to the Yorktown

6    River, and we were also on the east coast run up to IMTT,

7    Bayonne.  That was a gas company.  We used to take blue gas up

8    there.

9    Q.   There is a phrase in the maritime business that's called a

10   hitch.  What's a hitch?

11   A.   A hitch is two weeks on, two weeks off.  You go to work,

12   you work there two weeks, and then you go home for two weeks.

13   Q.   Is that what your normal rotation schedule was?

14   A.   Yes.  Two weeks on and two weeks off.

15   Q.   Now, what were your duties as mate on the tug Patriot?

16   A.   To steer and operate the tug, hook up to the barge, put it

17   on the tow wire alongside, taking care of the crew.

18   Q.   And in your job as mate would you have to, on the Patriot,

19   did you have to climb ladders?

20   A.   Yes.  You had to climb up to the upper wheelhouse.

21   Q.   Any other times you would have to climb ladders when you

22   worked on the Patriot?

23   A.   You see the ladders on the side, you used to have to put

24   them, to be able to go up on top of the barge.

25   Q.   Did you as mate have to do that?

C94MHIC4                          Hicks - direct

1   A.  Yes, sir.

2   Q.  Now, when you refer to the ladders, are you talking about

3   these things here that are on either side?

4   A.  Yes, sir.

5   Q.  How long of those ladders?

6   A.  They are 30-footers.

7   Q.  And would at times you have to climb all 30 feet to get up

8   on a barge?

9   A.  Yes, sir.

10  Q.  Now, you mentioned the upper wheelhouse.  There is a ladder

11  that runs from a lower deck up to there.  How high up is that

12  upper wheelhouse?

13  A.  That was -- it had to be a good 24 foot or more.

14  Q.  Is there another means or method of climbing up on barges

15  other than using wooden ladders like that?

16  A.  What they call pigeonholes on the side of a barge or

17  ladder, if they have a ladder built into it.

18  Q.  What is meant by a pigeonhole?

19  A.  Picture a coffee cup, a large coffee cup with a little bar

20  in it just enough to get your foot in it and be able to climb

21  vertically straight up on it.

22  Q.  If I may refer you to Exhibits 4 and 56.  Do either of

23  these show barges that have pigeonholes and, if so, if you can

24  show the jury where they are.

25  A.  These are what you call pigeonholes on a barge itself where

C94MHIC4                        Hicks - direct

you have to climb up.  This is a Bouchard.  These are what you

call pigeonholes, coffee cups that you described.

         MR. HOFMANN:  Can I walk it in front of the jury for

two seconds.

         THE COURT:  Why don't you do that and then we will

take our lunch break.

         Ladies and gentlemen of the jury, we will now take our

lunch break.  It will actually be from 12:45 and we will resume

testimony promptly at 2:00.  You'll have an hour and 15

minutes.

         Now, we will need you back in the jury room several

minutes before 2:00.  Otherwise, if people wander in at 2, we

have to wait until all of you are here until we actually bring

you out.  We will try to be prompt on our end if you folks can

try to be prompt on your end.  Sometimes you don't have control

over like the security lines downstairs, the lines in the deli.

But plan ahead for that so you take those moments into

consideration.

         Some of you are taking notes.  That's perfectly fine

and appropriate.  I want to remind you or tell you that the

notes are for your use only.  They are just a reminder to you

of some things that you have heard.  Eventually, when you go

into the jury room and are deliberating, at the end of all of

the evidence, those notes should not become a substitute for

evidence.  Just because one individual may have taken notes and

C94MHIC4

another individual may have not taken notes does not mean that
one individual's views of the facts should prevail over the
other individual's view.  The evidence is the evidence, and you
shouldn't be showing anybody else your notes.  They are just
for you.

Also, I just want to tell you to keep an open mind.
Until you have heard all of the evidence and the closing
arguments, you want to keep an open mind.  While the evidence
is coming in, it comes in in pieces and it doesn't always come
in in a linear fashion.  You hear bits and pieces as it goes
along.  So keep an open mind.

Also, don't talk to each other about this case until
you are put into the jury room at the close of the closing
arguments and told, after instructed on the law, now is your
time to deliberate.  Until then, just keep your thoughts about
this case, about the witnesses, about the lawyers to yourself.
Don't Twitter about it, don't e-mail anybody about it, don't
speak to anybody about it.  Don't talk to any other juror about
it and don't talk to anybody, friend or family, about the case
until it is concluded.  That's very important.

Let's take our lunch break.  Thank you.

MR. HOFMANN:  Will you also tell them that we are not
being rude if I don't say hello to them?

THE COURT:  I told them that.  They know.

(Jury not present)

C94MHIC4

1          THE COURT:  I have one matter that I wanted to raise

2     and make sure that we have clarity on the record.

3          There have been a number of exhibits to which there is

4     no objection which helps the trial move right along.  We are

5     not going through the motions or Mr. Hofmann hasn't been going

6     through the motions of actually laying a foundation for those

7     documents in particular, and some of them would be considered

8     hearsay.

9          I want to make sure that counsel understand and are

10    perfectly willing to accept that if documents go in without

11    objection that they are taking those documents in for all

12    purposes.  If there is any objection for hearsay or anything

13    else, those objections need to be raised in advance to there

14    being admitted without objection.  Are we all on the same page?

15         MR. HOFMANN:  We are, your Honor.

16         MR. FORDE:  Yes, your Honor.

17         THE COURT:  I'm sure you had spoken about it, but I

18    wanted the trial record to reflect that the fact that these

19    things are going in in the manner that they are is perfectly

20    clear for posterity.

21         MR. HOFMANN:  I think you are probably used to the

22    criminal field where everything is a fight over every possible

23    bit.

24         THE COURT:  That's certainly true.  Even in many of

25    the civil cases, that's also true.  I'm not suggesting that we

C94MHIC4

1    have to do anything differently.  I just want to make sure for

2    the record that there is not an argument about the use of an

3    e-mail, for instance, or something of that nature.

4              MR. FORDE:  This is all preliminary stuff, your Honor.

5              THE COURT:  Terrific.

6              Is there anything you folks would like to raise with

7    me?

8              MR. HOFMANN:  No, thank you.

9              THE COURT:  I have I have a criminal matter in this

10   room at 1:00.  I don't need you to move everything, but I'll

11   need the first two seats.  If you could push things to one

12   side, if you could.  You're welcome to be in the courtroom

13   while I have this matter, but you'll just need to move back a

14   little bit.

15             (Recess)

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

1              A F T E R N O O N   S E S S I O N

2                         2:05 P.M.

3           THE COURT:  All right.

4           Let's bring the jury back in.

5           We're trying to warm this place up.

6           (Jury present)

7           THE COURT:  Ladies and gentlemen of the jury, I have

8     tried to get a hold of our maintenance group to try to warm

9     this room up a little bit.  It's actually a little bit cold for

10    me.  It may be too cold for all of you.  By nods of the head,

11    is there anybody who is cold?  You are cold.

12          So we'll see if we can make it not too warm.  You

13    folks are directly underneath a couple of vents.

14          All right.

15          Mr. Hofmann.

16          MR. HOFMANN:  Thank you, Judge.

17    BY MR. HOFMANN:

18    Q.  All right.

19          Mr. Hicks, let me get a little more detail about the

20    towing operation on the Tug Patriot.  And so to do so, I'm

21    going to ask you to explain to the jury some structures that

22    are shown in photo Exhibit Plaintiff's 3.

23          I've got the pointer here, and I'm just going to ask

24    you to explain what certain structures are.

25          Can you see the photo, Mr. Hicks, from there?

C94VHIC5                          Hicks - direct

 1   A.  Yes, sir.

 2   Q.  I'll turn it a little bit.  I just want the jury to be able

 3   to see.

 4          Now, you indicated, just to get our orientation back

 5   since the lunch break, that a tugboat will tow with its wire

 6   barges, right?

 7   A.  Correct.

 8   Q.  And you talked about the bridles and connections, etc.

 9          Now, I want you to tell the jury, what is this

10   machinery that I'm pointing to right back here on the back of

11   the Patriot?

12          MR. FORDE:  Your Honor, could we have Mr. Hofmann step

13   back a little bit?  We can't actually see where he's pointing

14   to.

15          THE COURT:  You know, there's a fine line between the

16   jury being able to see it.  And all of the above should be able

17   to see this.

18          Why don't I suggest that -- counsel, would you mind,

19   why don't you come over here just for a second.

20          MR. HOFMANN:  I have no problem with --

21          THE COURT:  Just stand over -- don't get in the court

22   reporter's way, but stand over there.

23          MR. HOFMANN:  Is that good, Judge?

24          THE COURT:  All right.

25          MR. HOFMANN:  Good?

C94VHIC5                          Hicks - direct

1              MR. FORDE:  Perfect.

2              MR. HOFMANN:  All right.

3         And also, Mr. Hicks has to see it, as well as the

4    jurors.

5    BY MR. HOFMANN:

6    Q.   Okay.  This large machine here, what is that called?

7    A.   It's a towing machine.

8    Q.   And what is the purpose -- what does a towing machine

9    consist of?

10   A.   It's driven by a diesel motor, and it has a wire on a drum

11   which is operated by the captain, or more in that upper house

12   right there.  The doghouse.  It's to get the barge away from

13   you in sea conditions safely enough to tow it.  Very difficult

14   to tow alongside, which I was explaining before, on a hit,

15   because you and the barge could be crashing into one another.

16   And if it's a gas barge, I don't need to tell you what the

17   results of that is.  But it could be very dangerous to the tug,

18   putting a hole in it or damaging the vessel itself or the barge

19   itself.  And the VB53 was a single skin.  That's why everybody

20   puts them on a tow wire in a sea condition, as you can see.

21   Q.   You used a term "a single skin."  What does that mean?

22   A.   Single skin is barges that are just one layer of steel.

23   Behind the steel is the gas or the oil, whatever it might be,

24   that they are carrying at that time.  That's what a single skin

25   barge is called.

C94VHIC5                         Hicks - direct

1          Today they are double skin, which protects the bottom

2     of the barge from running aground.  If it ran aground, it would

3     puncture the first layer of steel on the side of the barge.  It

4     has the same principle, to protect the barge and the contents

5     and the environment, actually.

6     Q.  Now, what about when you're pushing in the notch, which you

7     explained, is that also something that when you encounter

8     weather, you have to change?

9     A.  When you're pushing in a notch and the weather can kick up,

10    you have to get out of the notch and go on the tow wire, which

11    is right there.

12    Q.  Okay.

13         Now, do you see this steel bar that's here?

14    A.  Yes.

15    Q.  And can you tell the jury what is that called and what's

16    its purpose?

17    A.  It's called the Texas bar.  It's a steel bar that runs

18    across from both sides of the tug, from the port to the

19    starboard.  And there is --

20    Q.  What's the purpose of the Texas bar?

21    A.  It protects the wire, keeps the wire from chafing off the

22    stern in the tug where it says "Patriot."  It keeps the wire up

23    off the vessel itself from cutting into the bar, the tug

24    itself, and cutting the wire.

25    Q.  Do you see this little round object here?

C94VHIC5                          Hicks - direct

1    A.  Yes.

2    Q.  And what is that called?

3    A.  That's called the doughnut.

4    Q.  And what is a doughnut?

5    A.  A doughnut is a steel wheel.  It's built on the Texas bar,

6    which allows the wire to ride in there, because a wire will

7    tend to stretch in and out constantly.  So when it's on the

8    wheel, the wheel will turn like this, protecting the wire.  And

9    also when you're running the wire out, it protects it from

10   cutting up against the Texas bar itself.

11   Q.  What can happen if you don't use the wheel, the doughnut,

12   what can happen to the wire?

13   A.  If you don't use the doughnut, what happens is the wire

14   constantly keeps chafing, and it doesn't take long for the

15   build-up enough for friction and heat, it could break.

16   Q.  Now, let me show you --

17            MR. HOFMANN:  And let me offer into evidence Trial

18   Exhibit 5.

19            THE COURT:  Any objection?

20            MR. FORDE:  No objection, your Honor.

21            THE COURT:  Plaintiff's Exhibit 5 admitted.

22            (Plaintiff's Exhibit 5 received in evidence)

23   Q.  If you could hold this up and show it to the jury,

24   Mr. Hicks.

25            Can you tell us what does Trial Exhibit 5 display?

1   A.  This is called a safety chain, which wraps around on one

2   side of the wire, the front part, and all the way around to the

3   back part.  That allows the cable to stay stationary in the

4   doughnut.  So if there's any sea condition bouncing up and

5   down, the wire can't lift up and come out of the doughnut; it

6   stays permanent right there.  And it's a safety chain

7   protecting the wire.

8   Q.  Does that picture depict a Texas bar?

9   A.  Yes, it does.

10  Q.  What else does it depict?

11  A.  It shows the doughnut, and it also shows the safety chain

12  that's on there holding the wire.

13  Q.  Does it show a wire?

14  A.  Yes, it does.  And also the cable, the wire.

15  Q.  Is this a typical configuration of when you're towing an

16  oil barge of the equipment on the stern?

17  A.  Yes.  You would use this on anything, oil barge, or even if

18  you were towing rock scowls or --

19  Q.  Does the Tug Patriot have the same equipment that's

20  depicted in Trial Exhibit 5?

21  A.  Actually, it looks the same.  Yeah, it's a simple hook on

22  it.  It has a spring release right here.  As you can see, that

23  allows you to snap it on quickly and snap it on the other end

24  quickly.

25  Q.  My question was does the Tug Patriot have this equipment on

C94VHIC5                         Hicks - direct

1    it?

2    A.  Yes, it does.

3    Q.  Okay.

4           You can put the photo --

5           MR. FORDE:  Are you done with --

6           MR. HOFMANN:  Wait a minute.

7           We're almost there.

8           MR. FORDE:  Okay.

9    Q.  Now, why do you use this -- is there a reason why the

10   safety chain that you talked about is used?

11   A.  It protects the wire from jumping out of the doughnut.  And

12   this particular tug, prior to this, lost the barge for that

13   reason, for not having a wire in the doughnut.

14   Q.  Were you involved in having something to do with the wire

15   that was lost?

16   A.  No, that was the other watch.  When we said I worked two

17   weeks, there's another watch that comes in for that two weeks.

18   That was John Cater, the captain at that time.

19   Q.  Were you involved in restoring the cable or reinstalling

20   the cable?

21   A.  Yes, we were brought in to Philadelphia when the wire came

22   in to -- and take the old one off and put the new one on.

23   Q.  When the tow wire is not out, where do the doughnuts sit?

24   A.  They sit off on a port or starboard side, depending on the

25   last tow.

C94VHIC5                    Hicks - direct

1   Q.  Now, did Vane Line Bunkering have a policy of when

2   doughnuts were to be used on the Tug Patriot?

3           MR. FORDE:  Objection.

4           THE COURT:  Overruled.

5   A.  We received a memo from Vane Line.

6   Q.  Is the answer yes?

7   A.  Yes, sir.  I'm sorry.

8   Q.  Could you tell us what the Vane Line policy was?

9   A.  The policy was that the wire had to be in the doughnut at

10  all times and secured with safety chain.

11  Q.  When the wire was out?

12  A.  When the wire was in operation.

13  Q.  Now, in what form of -- how did you learn about this

14  policy?

15  A.  Every week when you come aboard, there's new memos and

16  safety regulations and rules that they want you to abide by.

17  We received a memo that the vessel is not to be -- the wire is

18  not to be used at any time without the doughnut nor the safety

19  chain; it must be used at all times.  Captains and mates must

20  secure the doughnut and the wire with the safety chain.

21  Q.  Now, were you -- as part of your training back in

22  September, when you were first training with the company, was

23  that a topic that was addressed?

24  A.  Yes.

25  Q.  And tell us what you were taught and by whom and how.

C94VHIC5                          Hicks - direct

1          THE COURT:  Are we at the point now where counsel can

2     return now perhaps?

3          MR. HOFMANN:  I'm going to get into how you get into

4     it, and we'll be using the photograph.

5          THE COURT:  Do you feel like you need to be here

6     anymore?

7          MR. FORDE:  No.  We've got it.

8          THE COURT:  Seared to the brain.

9          MR. FORDE:  Seared to the brain, yes.

10         THE COURT:  All right.

11         Seared to the brain.

12         MS. FARRAR:  Thank you, your Honor.

13         THE COURT:  All right.

14         So there was a pending question.  Would the court

15    reporter read back that question.

16         (Record read)

17    A.   When I had my training on the Tug Endeavor, the guy I was

18    working with, his name was -- gentleman's name was Mike.  And

19    he was the captain -- he was actually the master of the vessel.

20    And he was explaining to me -- when I had to do the practice of

21    catching the doughnut and putting it out, he explained to me

22    that you must -- the company's rule is to use the doughnut and

23    the safety chain at all times.  That's what I was taught right

24    at the beginning.  So you don't forget it.  They put you on

25    another boat and you do it for another two weeks.

C94VHIC5                        Hicks - direct

1   Q.  Now, when and how do you get the wire into the doughnut?

2   A.  Normally, when you're running the cable out, you'll --

3   you'll take the tug and you'll swing it this way, which will

4   put the wire the opposite direction.  That will put the wire

5   all the ways down on one end.  The wire will slip onto the

6   Texas bar, and the doughnut will be right there, and it will

7   catch it right at that point.  There's like a smooth edge.  It

8   goes right up to where the doughnut sits.  The wire comes in,

9   falls into that, and then you back off the throttles.  The wire

10  will come up slowly right on top of the Texas bar.  Or when I

11  was working on the Vane Brothers, the other ways, tight

12  quarters, you really need to get it up quick.  Two guys shove

13  it right up and push it into position.

14  Q.  All right.

15          Let's turn to the events of your voyage in April of

16  2009.

17          Did you sail on the Tug Patriot in 2009?

18  A.  Yes, I did.

19  Q.  Were you doing your normal two-week on/two-week off?

20  A.  Yes, I was.

21  Q.  Did there come a time in April that you joined the Tug

22  Patriot for one of your hitches?

23  A.  Yes, I did.

24  Q.  When did you join the vessel?

25  A.  I joined it, I believe it was, a day later.  They flew me

1    down to -- I was filling in on another boat, and they flew me

2    down to Virginia.

3              MR. HOFMANN:  Your Honor --

4    Q.  Would the logbook for the Patriot help refresh your memory

5    as to when you joined the vessel?

6    A.  Yes.

7              MR. HOFMANN:  Your Honor, I offer Exhibit 6, Trial

8    Exhibit 6.

9              THE COURT:  All right.

10             Any objection?

11             MR. FORDE:  To the extent that -- yes, your Honor.

12             THE COURT:  I don't think you need to offer it into

13   evidence if you just want to have it refresh his recollection,

14   unless you've got another purpose for it.

15             I was going to wait and see if anyone had an

16   objection.  But if it's just to refresh his recollection, you

17   can go ahead and show it to him.

18             MR. HOFMANN:  Okay, your Honor.

19   Q.  Let me show you what has been marked as Exhibit 6, and show

20   you these pages for April -- can you tell us what information

21   is contained in the vessel logbook in general?

22             THE COURT:  Okay, in general.  Not what you're seeing

23   on the page, but just generally describe the logbooks in your

24   experience.

25   A.  Logbook keeps track of where you're at at all times, what

C94VHIC5                         Hicks - direct

1    time you did it, what you were doing, who was on the vessel.

2    It's a method for the Coast Guard to track down what exactly is

3    going on with the boat itself and the company.

4    Q.  If you would take a look at the entry for the 15th of

5    April.  Does that indicate who was on the vessel?

6    A.  Yes.  It was John Cater, Bruce Comiskey, Mark Johnson,

7    Vinny Lusardi, and Glenn Scoggins was on the vessel.

8    Q.  Take a look at the April 15th, Mr. Hicks.

9             THE COURT:  Rather than reading it, just look at the

10   names and see whether it refreshes your recollection as to who

11   was present.

12   A.  Bruce Comiskey, myself.

13   Q.  Does that refresh your recollection --

14   A.  Yes.

15   Q.  -- as to when you joined the vessel?

16   A.  Yes, it does.

17   Q.  Do you recall where the vessel was at the time you joined

18   it?

19   A.  It was at anchorage in Yorktown.

20   Q.  And what does it mean to be at anchorage?

21   A.  At anchorage is where Yorktown, the refinery Western is

22   there.  Sometimes when there's a barge inside, we have to wait

23   at the anchorage, which is directly right across from the

24   refinery.  They pull out; we pull in.

25   Q.  Is an anchorage like a parking spot in the water?

C94VHIC5                          Hicks - direct

```
 1    A.   Yeah.  Big parking lot for tugs and barges.

 2    Q.   And were you at anchorage for a couple of days?

 3    A.   Four days.

 4    Q.   Then what happened with the vessel?

 5    A.   They repaired it.  And then we went into Western.  They

 6    fueled the VB53.  And then that was going up into the James

 7    River.

 8    Q.   How was it going to go into the James River?

 9    A.   We had made up to the vessel with the tug.  And we had

10    pushed across the Chesapeake on -- what we did was we ran up

11    into the James River, all the way up to a refinery that we went

12    up to there.  Actually, not a refinery, a storage tank area

13    where they distribute the fuels from.

14    Q.   Where was that storage tank area?

15    A.   It's all the ways up in the James River.  The name of the

16    refinery I can't remember, to be honest with you.  I was only

17    there a couple of times.

18    Q.   All right.

19              So after you -- how long did it take to push the VB53

20    up to that tank farm?

21    A.   Well, we met the pilots in Newport News.  It was roughly

22    about a day and-a-half.

23    Q.   Now, do you recall sailing on the vessel on April 21st,

24    2009?

25    A.   Yes, I do.
```

C94VHIC5                          Hicks - direct

1   Q.  You were sailing on the Patriot?

2   A.  Yes, I was.

3   Q.  What hours did you work that day?

4   A.  Midnight to six in the morning; the second watch, the

5   mate's watch.

6   Q.  Those are the only hours you worked?

7   A.  Also 12 noon to six in the evening.

8   Q.  Let's talk about the 12 noon to six in the evening watch

9   you worked.

10  A.  Correct.

11  Q.  Where were the vessels at that time?

12  A.  We were coming up -- coming down out of the James River.

13  We were approaching Newport News.  And we were going to be

14  letting the pilots off at that point.

15  Q.  Who was at the helm?

16  A.  I was.

17  Q.  And meaning -- the "helm" means what?

18  A.  I was steering the tug from the pilot house.

19  Q.  I'm going to show you what we've marked as Trial Exhibit

20  7A.

21          MR. HOFMANN:  And I'll offer Trial Exhibit 7A.

22          THE COURT:  Is it a map of the Chesapeake area?

23          MR. HOFMANN:  It is.

24          MR. FORDE:  No objection, your Honor.

25          THE COURT:  All right.

C94VHIC5                              Hicks - direct

1          Exhibit 7A, admitted.

2          (Plaintiff's Exhibit 7A received in evidence)

3          MR. HOFMANN:  Your Honor, may I ask permission to have

4     Mr. Hicks come up and hold the chart up against here so that he

5     could point things to the jury?

6          THE COURT:  Sure.

7     Q.  Now, Mr. Hicks, could you tell us what you recall about the

8     voyaging of the tug and the VB53.

9          THE COURT:  Could I ask you to back up just one step

10    just so that it's perfectly clear to the jury.  Why don't you

11    describe the geographical area that we're looking at here, what

12    that waterway is.

13         THE WITNESS:  This is the James River coming down

14    through here.

15         THE COURT:  In where?  In what state?

16         THE WITNESS:  Virginia, ma'am.  I'm sorry.

17         THE COURT:  I just want to go back, sort of the first

18    principles, makes sure everybody knows where you were.

19         THE WITNESS:  I'm sorry.

20         THE COURT:  No, no, no.  Just for clarification of the

21    record.

22    BY MR. HOFMANN:

23    Q.  And you can maybe use this pointer, Charles.

24         You took over the watch at what time?

25    A.  At 12 noon.

C94VHIC5                         Hicks - direct

1   Q.  And what landmark city were you on the way approaching?

2   A.  We were coming down out of the James River.  We were right

3   in the main channel right here.  And we were coming down along

4   this way, coming to Newport News, which is right here.

5          This is the tunnel.

6   Q.  So you were approaching Newport News?

7   A.  Correct.

8   Q.  When you took over the watch at 12 o'clock, did you have a

9   conversation with the captain as to his orders as to what was

10  to be done with the vessel?

11  A.  He gave me orders that -- to get him up just before Newport

12  News.  He wanted to get up to operate the tug and handle it

13  himself.  He wasn't that familiar with the tug, so he wanted to

14  get more familiar with the tug on putting it on the wire.

15  Q.  Before you approached Newport News, how were you moving the

16  barge with the tug?

17  A.  We were in a notch pushing it down the river.  I was at the

18  controls with the pilot.

19  Q.  And did there come a time when you changed it over from

20  being in the notch to going on the wire?

21  A.  Yes.  When we got down near Newport News, I let go of the

22  push gear and swung around, threw a line up, a rope up to the

23  stern.

24  Q.  Let me ask my questions before we get to these things.

25  A.  I'm sorry.

C94VHIC5                         Hicks - direct

1   Q.  Was there a reason why it was going to go from being in the

2   notch to being on the wire?

3   A.  Yes, the sea conditions going across the Chesapeake to

4   Yorktown.

5   Q.  Let me show you what we premarked as Exhibit 7B, which

6   is --

7           MR. HOFMANN:  Just leave that there, Lou.  Just leave

8   that up there for a second.

9   Q.  Let me just ask a few preliminary questions.

10          Mr. Hicks, is this a nautical chart showing the lower

11  part below Newport News and parts of Chesapeake Bay?

12  A.  Yes, it is.

13          MR. HOFMANN:  Your Honor, I offer Exhibit 7B.

14          MR. FORDE:  No objection, your Honor.

15          THE COURT:  All right.

16          Plaintiff's Exhibit 7B, admitted.

17          (Plaintiff's Exhibit 7B received in evidence)

18  Q.  Let me hold it up for a second, Mr. Hicks.

19          And can you show where -- does the chart show where

20  Newport News is?

21  A.  Yes, it does.

22          We are right over here, Newport News.

23  Q.  Is that labeled there?

24  A.  It should be.

25  Q.  Well, is it?

1    A.  Yes.

2    Q.  Now, you mentioned something about Chesapeake Bay.

3         Where is Chesapeake Bay?

4    A.  Well, it's all of this right in here.

5    Q.  And what are the land bodies around here?  Is that what's

6    known as the Delmarva Peninsula?

7    A.  Yes, it is.

8    Q.  Which is Delaware, Maryland, and then Virginia; correct?

9    A.  Yes.

10   Q.  All right.

11        Now, where was the boat intending to go?

12   A.  We were going to Yorktown, which is up in the river, up in

13   here.

14   Q.  And that's the York River?

15   A.  Yes, it is.

16   Q.  That's labeled on this chart also, right?

17   A.  Yes, it is.

18   Q.  Now, we're asking questions about why you were going from

19   pushing in the notch to going on the wire.

20        Could you explain using the chart.

21   A.  Well, when you're coming down and out of here, you've got

22   the entire ocean barreling in on the Chesapeake Bay.

23        What happens is the sea condition can get real rough

24   in this area, when you're coming across, until you get up into

25   about this area, then it starts to calm down, because you

C94VHIC5                          Hicks - direct

1   have -- actually call it the land mass protecting the body of

2   water in that area.  But it still can be quite a problem in

3   this area also at the same time.

4   Q.  So what do you do?

5          MR. FORDE:  Objection.

6          THE COURT:  Sustained.

7          Why don't you reword it.

8   Q.  What is the procedure that was to be followed on the

9   Patriot that day?

10  A.  Right at Newport News there's a small area of an anchorage.

11  And it's a safe place to put the wire out, get everything set

12  up before you head out in this area across the tunnel.

13  Q.  All right.

14         You can go on back to your seat.

15         So now you can tell us, Mr. Hicks, what did you do as

16  you approached Newport News?  Tell the jury what actions you

17  took as a mate of the vessel.

18  A.  I had broken down the tug from push mode and swung around,

19  let go of the push gear, swung around, and caught the stern

20  line first is what we normally do.  Catch the bowel line, and

21  then what we do is take the receiving line from the barge.  We

22  bring that down on deck.  What we do is we put it across -- I

23  don't know if you can see it on there.  There's a --

24  Q.  Keep giving a verbal --

25  A.  We run the rope right around the cleat.  We pull it in on a

1   drum, which is connected to the tow machine.  That brings the

2   cables right on board the tug itself to be able to took it up.

3   Q.  This is the cable that comes from the barge?

4   A.  Correct.

5   Q.  All right.

6        Then what happens?

7   A.  What you do is you --

8   Q.  Or what did you do, rather than in general.

9   A.  What we did was we set up the shackles.  We hooked in the

10  bridle, set up into the tow wire itself.  I was on the stern.

11  I had ran the wire out a little bit so it would fall down on

12  deck for them.

13  Q.  When you say you were on the stern, where were you?

14  A.  I was in the doghouse.

15  Q.  Okay.

16        Again, which is the little house up above, right?

17  A.  Yes.

18  Q.  Okay.

19        Continue.

20  A.  I return.

21        The engineer started the winch.  I let the drum peel

22  out a little bit, which that allows you to -- the deck hands

23  have to lift the wire and bring it back up over the Texas bar.

24  So when it falls down over the Texas bar, that allows them to

25  have the cables right there, and then hook into -- it's a large

C94VHIC5                         Hicks - direct

1   shackle with a big screw and a nut on it.  I mean it's --

2   Q.  What do you mean by a shackle?  I don't know that the jury

3   knows what a shackle is.

4   A.  A shackle is a shape like this, almost like a horseshoe,

5   with two holes on each side.  And what it does is there's a

6   two-inch bolt that runs through this, and then there's a nut on

7   the end.  You screw the nut on, and then there's a hole right

8   at the end where the nut is, and you run a welding rod through

9   that.  You bend that over.  That keeps the nut from vibrating

10  off the shackle itself.

11  Q.  The shackle shackles two things together?

12  A.  Correct.

13          It shackles the bridles together, and makes a

14  connection with the tow wire.

15  Q.  You did that work.

16          Then what happened?

17  A.  The captain was up.  He came to the doghouse where I was.

18  And I had just let go of the bowel line.  As I came around, we

19  let go of the stern line.  The deck hands knew to let go of the

20  bowel line, let go of the stern line.

21          As I came around, I caught the doughnut right off the

22  starboard side there.  I picked it right up.  And it came right

23  up above.

24  Q.  When you say you picked it up, what do you mean?

25  A.  The wire fell into the doughnut.  It was off on the side of

1    the tug there, which is the starboard side.  It fell right into

2    it.  And I brought the wire right up on top of the Texas bar.

3    Q.  Where were you at that time?

4    A.  I was in the aft doghouse.

5    Q.  After you did that, after you got the wire up in the

6    doughnut, what happened next?

7    A.  The captain came down to the stern of the boat in the

8    doghouse.

9            And he said, I want to let some more wire out.

10           I said, Well, we're going across the tunnel at this

11   point.

12           He proceeds to take over.  He says, Well, I got it.

13           He took over and started to peel out the wire.

14   Q.  Took over what?

15   A.  Took over the controls of steering and the tow winch motor

16   itself.

17   Q.  Where did you go?

18   A.  I went right on the outside of the doghouse to make sure

19   that the brake was off; because he had turned the brake off,

20   and I just wanted to make sure that it was off enough.

21           And at that particular point, the wire jumped out of

22   the doughnut, and we were fighting it back and forth.

23           He said, Okay.  Look.

24           I said, What do you want to do?  We got a --

25   Q.  Wait a second.

C94VHIC5                          Hicks - direct

1          What do you mean by "we were fighting it back and

2     forth"?

3     A.  Well, he was in there.  He was trying to catch it back and

4     forth, and he couldn't grab the wire.

5     Q.  What was he doing?

6     A.  He was maneuvering the tug, the stern of the tug, to the

7     left, to the right, trying to manipulate to catch that wire

8     again on one side or the other, either the starboard or --

9     starboard or portside of the vessel.

10    Q.  While he was operating the vessel trying to catch the wire,

11    where were you?

12    A.  At that point, I went down --

13    Q.  Where were you as he was manipulating?  That's the first

14    thing I want to know.

15    A.  I was right there next to him.

16    Q.  Okay.  So then what happened?

17    A.  I said to him, I said, Look, do you want -- I'll go down,

18    I'll push -- get this doughnut up on there before we cut this

19    wire.

20          We just put this on a couple of months ago.

21          He got a little frustrated.  Said, Yeah, get down on

22    deck and push the doughnut up.

23          I said, Okay.  Fine.

24          So I went, crawled down the ladder on the -- you could

25    see it there.  I went down on the ladder to the lower deck.

C94VHIC5                          Hicks - direct

1   Q.  Okay.

2          What did you see when you got down there?

3   A.  The two deck hands were standing on the stern right there

4   on the starboard corner.  And right next to the towing machine

5   was Mark Johnson, the engineer.

6   Q.  So what did you do now?

7   A.  I went over towards the Texas bar, and I had flagged the

8   two deck hands to come over to give me a hand to push the --

9   well, actually, I flagged over Glenn, my deck hand, to push the

10  doughnut up onto the Texas bar, which I had showed you before.

11  Q.  Why do you call Glenn your deck hand?

12  A.  Glenn always worked my watch, the 12 to midnight -- from

13  midnight to six in the morning.  We were always teamed up

14  together.  He was my deck hand.  And Vinny Lusardi was Bruce's

15  deck hand.

16  Q.  So you motioned to Glenn, your deck hand, to help; is that

17  right?

18  A.  To give me a hand.

19  Q.  What happened?

20  A.  They proceeded to go up and walked away and said, like

21  this.  And they walked away up to the forward part of the boat,

22  which is where the galley is where they went into.

23  Q.  You just made a hand gesture and shook your head; is that

24  right?

25  A.  Yeah.  He just said, and walked up the starboard side there

C94VHIC5                          Hicks - direct

1    to the pilot house.

2              In turn, I went to proceed to push it.  I called Mark

3    Johnson.  I said, Mark, I said, come on give me a hand with

4    this thing.

5              He flagged up and he said, No.  You remember, no, I

6    can't do it.

7    Q.   He said to you, You remember I can't do it?

8              What did that mean?

9    A.   The captain had a conversation with myself and Mark Johnson

10   not to help the deck hands out anymore on deck when it came to

11   hooking up the wire, because they were -- they were scared of

12   the wire.  Hooking it up back there can be really dangerous.  I

13   mean you got to do it, you got to do it quick, and you got to

14   get it done, and you got to get it over.

15             So normally I would jump down to give them a hand or

16   the engineer would help to assist in doing this.

17             Actually --

18   Q.   Okay.

19             Let's not go on too far.

20             You said to Mr. Johnson, Give me a hand.

21             Was he on deck at the time?

22   A.   He was standing right next to the tow machine.

23   Q.   And what was his response when you asked give me a hand?

24   A.   He looked up towards Bruce Comiskey and said, No.  You

25   remember the conversation we had.

C94VHIC5                          Hicks - direct

1              And I said, Come on, Mark.  Give me a hand with this

2       thing.

3              He said no.

4              THE COURT:  Let me just ask, why is the wire

5       dangerous?

6              THE WITNESS:  Well, six months ago, they killed a kid

7       with a tow wire.

8              THE COURT:  It can just -- sort of moves across and

9       act --

10             THE WITNESS:  Your Honor, slice you like a piece of

11      butter.  It's extremely dangerous.

12             THE COURT:  Okay.

13      BY MR. HOFMANN:

14      Q.  Now, when you were down on deck, where was Captain

15      Comiskey?

16      A.  He was in the doghouse right there.

17      Q.  On the stern?

18      A.  On the stern.

19      Q.  After Mr. Johnson said no, what did you then do?

20      A.  I proceeded to push the doughnut up on top of the Texas bar

21      to protect the wire.  We were maneuvering.  As I got the wire,

22      as I got the doughnut up to about, I would say -- can I point

23      to that?

24      Q.  Just tell the jury --

25      A.  All right.

1          As I got it up there about more than a quarter of a

2    way, the next thing I know, the doughnut is coming in my arm,

3    slams my -- well, my arm was stretched all the way out; it was

4    stiff as a board like this.  When it hit me, it shot in the

5    palm of my hand and my shoulder went out.  My shoulder got out

6    of the socket itself.

7    Q.  So what did you do with the doughnut?

8    A.  I let it go.

9    Q.  Then what happened next?

10   A.  I ran over -- I was in a ton of pain.  And Bruce was

11   looking at me right at that point.  I had asked -- I went over

12   to Mark.

13          And I said, Mark, please, pull my shoulder down.

14   Either I pulled my shoulder out of the socket or my muscle

15   damaged something or other.

16          He grabbed my arm, pulled it down.  Then I backed off

17   of him like this, trying to stretch it to get it to pop back

18   into -- I guess you call, I don't know medical terms, the joint

19   or the rotator cuff, whatever that is.

20          At that point, I went forward, went up the -- on the

21   bow there's a set of regular steps to go up.  That's when I

22   went up.

23   Q.  Did the wire ever get put into the doughnut on the Texas

24   bar at that time?

25   A.  No, not then.

1  Q.  You went where?  After you had Mr. Johnson help you, as you

2  said, what did you do next?

3  A.  I went into the galley.  I had asked Vinny if he could do

4  me a favor and please get me a bag of ice.  I explained to him

5  what happened.

6          I said, you know, I must have pulled my shoulder out

7  or damaged a muscle or something or other.

8          So Vinny was kind enough to get me a bag of ice.  And

9  I went up into the pilot house.

10  Q.  Slow down.

11          After you put the ice on it, what did you do next?

12  A.  Bruce was at the helm at that time.

13  Q.  Just asking what did you do next.

14  A.  I went into the pilot house and said, I got it.

15  Q.  Who was there in the pilot house?

16  A.  The captain.

17  Q.  Were you still on watch?

18  A.  Yes, I was.

19  Q.  So was it your responsibility to take over steering the

20  boat?

21  A.  Yes, I was.

22  Q.  Did you have conversation with Mr. Comiskey at that time?

23  A.  I had said to him -- I said, My arm, I sprained my arm in

24  the back.

25          I was trying to not make a big deal out of this at

1    this particular point.

2    Q.  What happened with Mr. Comiskey then?

3    A.  He said, Are you all right?

4           And I said, Yeah, I guess.  I mean I was in tears.  So

5    what I did was -- he left the pilot house.  I sat down in the

6    chair, and I put the ice on my shoulder.

7           THE COURT:  Let me just ask, how much time has elapsed

8    between the time that you have maneuvered the doughnut,

9    experienced the shoulder incident, and going back into the

10   pilot house where you're now sitting down, what length of time

11   are we talking about?

12          THE WITNESS:  Your Honor, I'd say between -- it

13   couldn't have been no more than 10, 15 minutes tops.

14          THE COURT:  All right.

15          Thank you.

16          MR. HOFMANN:  Thank you, your Honor.

17   BY MR. HOFMANN:

18   Q.  Did you finish your 12 to six watch?

19   A.  Yes.

20   Q.  What did you do next?

21   A.  When I sat down with the ice, I called down to Vinny.  And

22   I asked Vinny to get another bag of ice for me, because the bag

23   was just dripping all over the place.

24          Vinny, he brought me up another bag of ice.  There's a

25   phone system that you can call one another up.  He just

1  happened to be in the galley at the time, and I had asked him.

2        At that point, when the captain came in, I just went

3  straight to my room.  And my room is right behind the pilot

4  house.  I just got to open the door, and I'm like five steps to

5  my quarters.

6  Q.  Did there come a time later that evening that you had

7  another conversation with Captain Bruce Comiskey regarding this

8  incident?

9  A.  Yeah.  We were filling out -- he said I had to fill out an

10  accident report.

11  Q.  How did that come about?  Where were you having this

12  conversation?

13  A.  We were in the pilot house.

14  Q.  Was this on the change of watch?

15  A.  At midnight itself.

16  Q.  And what did you say to him, what did he say to you?

17  A.  He said, Well, you got to fill out an accident report.  And

18  you have to -- I had put down on the --

19  Q.  Well, let's --

20  A.  Go ahead.  I'm sorry.

21  Q.  -- stay with what I'm asking you, all right?

22        Mr. Comiskey told you you had to fill out an accident

23  report?

24  A.  Correct.

25  Q.  Is that correct?

C94VHIC5                        Hicks - direct

1          Let me show you Trial Exhibit 9.

2          MR. HOFMANN:  And let me offer Trial Exhibit 9 in

3     evidence.

4          MR. FORDE:  No objection.

5          THE COURT:  All right.

6          Thank you.

7          Plaintiff's Exhibit 9, admitted.

8          (Plaintiff's Exhibit 9 received in evidence)

9          THE COURT:  Let me ask you, Mr. Hicks, what time of

10    day did the incident occur with your shoulder?

11         THE WITNESS:  Between 16:00 and 16:30.

12         THE COURT:  So between 4 and 4:30 in the afternoon?

13         THE WITNESS:  Yes, ma'am.

14         THE COURT:  Okay.

15         So that was during your noon to 6 p.m. watch?

16         THE WITNESS:  Yes, ma'am.

17         THE COURT:  And then you went off duty at 6 p.m.?

18         THE WITNESS:  Yes, ma'am.

19         THE COURT:  And then your next conversation with the

20    captain was around midnight?

21         THE WITNESS:  Well, it was around 5:30.  We usually

22    change between 5:30 and 6 o'clock.

23         THE COURT:  Okay.

24         I'm just trying to get the timeline, Mr. Hofmann, of

25    when the incident report got filled out.

C94VHIC5                           Hicks - direct

```
 1            MR. HOFMANN:  Yeah, that's what I was going to get to.
 2            THE COURT:  All right.
 3   BY MR. HOFMANN:
 4   Q.  When did you have the conversation about filling out the
 5   incident report, was that at the change of night at midnight?
 6   A.  Yes, it was.
 7   Q.  All right.
 8            Is this exhibit the incident report you filled out?
 9   A.  Yes.
10   Q.  In response to him telling you to do so?
11   A.  Yeah, to fill out the incident report, which is this.
12   Q.  Does it have your signature on it?
13   A.  Yes, on the last page.
14   Q.  And does it have the date?
15   A.  Yes, it does, on 4/21.
16   Q.  And is that -- and you signed it on 4/21?
17   A.  Yes, I did.
18   Q.  All right.
19            In that report, did you describe how you got hurt?
20   A.  Yes, I did.
21   Q.  Could you read to the jury what you wrote.
22   A.  I tried to lift a doughnut up on the Texas bar and pulled
23   on my shoulder.  I pulled on my shoulder, right arm.  Time,
24   16:30.
25   Q.  Now --
```

C94VHIC5                          Hicks - direct

1           MR. FORDE:  Objection, your Honor.

2           That was not -- that's not actually verbatim of what's

3     in the --

4           THE COURT:  All right.

5           Why don't we just read it verbatim.  Since it's in

6     evidence and so it can be published to the jury, why don't we

7     have Mr. Hofmann read it.

8           MR. HOFMANN:  Thank you, your Honor.

9     Q.  It says:  "Describe the incident in detail, including what

10    happened before the incident, any steps taken to avoid the

11    incident, whether human error played a role in the incident."

12          And what's written in handwriting -- is this your

13    handwriting?

14    A.  Yes, it is.

15    Q.  All right.

16          "Trying to lift doughnut up on Texas bar and pulled on

17    shoulder, right arm.  Time, 16:30."

18          Now, did you stand your next watch, which would be at

19    6 a.m. on the 23rd?

20    A.  At 6 a.m. did I stand my --

21    Q.  No.  You would have been on the midnight watch, right?  I'm

22    sorry.

23    A.  Yes, the midnight --

24    Q.  Did you stand the midnight watch on April 23rd?

25    A.  Yeah, we were -- yes, I did.

C94VHIC5                          Hicks - direct

1    Q.  Where was the boat by this time?

2    A.  We were right at anchorage.

3    Q.  Where?

4    A.  In Yorktown Heights.

5    Q.  Did there come a time when you -- were you scheduled to

6    leave the vessel on that day?

7    A.  Yes, the following -- in the morning.

8    Q.  And that would be April 22nd?

9    A.  Yes, sir.

10   Q.  All right.

11            As part of your leaving the vessels, working for Vane

12   Line, did they have a practice where you were supposed to sign

13   off on a separation agreement?

14   A.  Yes, there's --

15   Q.  Yes?

16   A.  Yes, sir.

17   Q.  All right.

18            MR. HOFMANN:  Let me offer Trial Exhibit 8.

19            THE COURT:  Any objection?

20            MR. FORDE:  No objection, your Honor.

21   Q.  Is this a copy --

22            THE COURT:  Plaintiff's Exhibit 8 is admitted.

23            (Plaintiff's Exhibit 8 received in evidence)

24            MR. HOFMANN:  I'm sorry, your Honor, for stepping on

25   you.

C94VHIC5                              Hicks - direct

1   Q.  Do you recognize this as being the separation agreement

2   that -- for your leaving the vessel on April 22nd?

3   A.  Yes, I did.

4   Q.  Now, in general, what is -- what information is put into

5   the separation agreement?

6   A.  It says:  Any injuries or illnesses upon boarding, yes or

7   no.  The crew signs it; you initial it; you print your name.

8   Actually, the captain prints your name out.  You put your date,

9   no, whether you came home with the flu or a cold or anything.

10  Q.  Hold on, Mr. Hicks.

11  A.  I'm sorry.

12  Q.  Does it give the dates that you sailed on the vessel?

13  A.  The --

14  Q.  Does it give the dates?

15  A.  Yes, it does.

16  Q.  Does everybody sign this when they leave the vessel?

17  A.  Yes.

18  Q.  Now, with respect to -- you said it has a section for if

19  you have an injury to make a report; is that correct?

20  A.  Yes.

21  Q.  Did you make a report in the separation agreement?

22  A.  Yes.

23  Q.  Could you read to the jury what you wrote, read it verbatim

24  please.

25  A.  Okay.

C94VHIC5                    Hicks - direct

1        Read on the top also what it says to do?  That's what

2   you just did before.

3   Q.  Yes, you can do that.  That would be good.

4   A.  All right.

5        If the answer is yes to any of the questions, please

6   explain here, okay.

7        Pulled doughnut up on Texas bar and hurt right arm --

8   right shoulder.

9   Q.  Is that what you wrote?

10  A.  Yes, I did.

11  Q.  All right.

12       Did you then leave the vessel?

13  A.  Yes, that morning.

14  Q.  And do you remember what time you left the vessel?

15  A.  I have to be honest with you, no.  It was some time early

16  morning, because Bruce --

17  Q.  That's fine.

18       Where was the vessel actually sitting when you left

19  the vessel?

20  A.  We were sitting at anchorage.

21  Q.  So how did you get off the vessel?

22  A.  They send a launch boat out.  There's a little marina next

23  to Yorktown Heights Refinery Western.  They bring the other

24  crew out, they board, we put our gear on the little boat, and

25  get brought back into the shoreline.

1   Q.  Did you require assistance in order to get off the vessel?

2   A.  Yes.

3   Q.  Tell us what assistance you required.

4   A.  I couldn't carry my bags.  I had my computer bag and my big

5   duffle bag.  Vinny and Glenn were very nice, grabbed both items

6   and helped me onto the small boat to get into the dock.

7   Q.  And then this is Yorktown, Virginia; correct?

8   A.  Yes, sir.

9   Q.  Where were you ultimately traveling to?

10  A.  Back to Philadelphia.

11  Q.  How were you going to get to Philadelphia?

12  A.  Vane had sent a car rental company, which is a big van that

13  we all pile in and get driven back to Philly.

14  Q.  Did you take that van ride back to Philadelphia?

15  A.  Yes.

16  Q.  Now, while you were in the van, did you have -- did you

17  have a conversation with the Vane office regarding the injury

18  suffered by you on the vessel?

19  A.  Yeah, Marge Lucas had called me cell phone.

20  Q.  Who is Marge Lucas?

21  A.  She's in charge of the operation of the tugs.  I guess

22  makes sure crews get on, monies, a bunch of stuff.  Exactly

23  what she does there, I really don't know.

24  Q.  What was the sum and substance of the conversation?

25  A.  She had read the report, and had said to me that, You had

C94VHIC5                         Hicks - direct

1   gotten hurt on the vessel.  She said, Why didn't you give me a

2   call right away; we could have sent you to doctors right down

3   here.

4           And I said, No, I want to go home.  I just want to get

5   home.  That's all I want to do.

6   Q.  And did she agree to allow you to go home to see a doctor?

7   A.  Yes.

8   Q.  Did you have a doctor in mind that you wanted to see?

9   A.  I wanted to see Dr. Murphy.  He's an orthopedic doctor.

10  Q.  How did you know Dr. Murphy?

11  A.  He put a replacement knee in me in 2003, I believe it was.

12  Q.  So he was an orthopedist you were familiar with?

13  A.  Yeah.

14  Q.  Did you ultimately get to New Jersey and have an

15  appointment with Dr. Murphy?

16  A.  Yes, I did.

17  Q.  And when was that?

18  A.  On the 23rd of April.  I called him up that morning, when I

19  had gotten home.  And he said he couldn't see me then.  The

20  fastest he could get to me was the 23rd.

21  Q.  Now, before we get to that --

22          THE COURT:  What was the date?  You said you called

23  him on the 23rd, and then he said the fastest he could get to

24  you was when?

25          THE WITNESS:  I mean I called him when I got home that

1    morning, the 22nd.  And he said the fastest I could get you is

2    tomorrow morning on the 23rd.

3              THE COURT:  Okay.

4    BY MR. HOFMANN:

5    Q.  Now, with respect to the incident and reporting --

6              MR. HOFMANN:  Plaintiff offers Trial Exhibit 10 and

7    11.

8              MR. FORDE:  No objection, your Honor.

9              THE COURT:  All right.

10             Plaintiff's Exhibit 10 and Plaintiff's Exhibit 11

11   admitted.

12             (Plaintiff's Exhibits 10, 11 received in evidence)

13             MR. HOFMANN:  Your Honor, if I may -- very short, if I

14   may just read --

15             THE COURT:  Yes.

16             MR. HOFMANN:  Exhibit 10 is an email from B. L.

17   Comiskey.  Subject to connection.  That's Bruce Comiskey, your

18   Honor.  And it's to Ed Fitchet.

19             Who's Ed Fitchet?

20   A.  He was the port captain.

21   Q.  It says:  Captain Ed, while aboard Patriot Tuesday night,

22   4/21/09, Mate C. Hicks reported on boarding form a shoulder

23   injury.  When instructed -- when I instructed him to fill out

24   the incident report, Mr. Hicks said he didn't -- quote, he did

25   not want to make a big deal about it, end quote.  He had put

1    some ice on it and, quote, did not see -- did not need to go to

2    a doctor, end quote.  I did not see what he was doing to

3    sustain the injury.  Signed, B. E. Comiskey, Captain, Patriot.

4            Exhibit Trial 11 is from an entity known as

5    safetyincidents@vanebrothers.com to a whole list of

6    individuals.  And it says:  Incident type, injury.  It says:

7    An incident was reported that occurred at 4/21/2009.  It said

8    it was submitted by Vane.  And then it says, K. Shaner.

9            And then it says:  On 4/21, Mate Charles Hicks injured

10   his right shoulder while pushing up on the tow wire doughnut.

11   He refused medical at the time.  After speaking with his doctor

12   at home, he then contacted the office to report the injury.

13           MR. HOFMANN:  That's the important stuff I wanted to

14   read, your Honor.

15   Q.  All right.

16           Did you get to see Dr. Murphy?

17   A.  Yes, I did.

18   Q.  All right.

19           And did you tell Dr. Murphy what happened?

20   A.  I explained to him what happened.

21   Q.  All right.

22           Did you ask him for medical treatment?

23   A.  Yes.  I asked him if he could please do me a favor and give

24   me a shot in the shoulder.  And I said would that help.  I

25   believe they call it cortisone.

1  Q.  Did you receive a shot in the shoulder?

2  A.  Yes.  He gave me a shot in the shoulder.

3  Q.  Did you have a discussion with him with respect to your

4  being either fit for duty or not fit for duty?

5  A.  I had said to him, Dr. Murphy, can you please give me a

6  fit-for-duty slip.

7          He said, Well, I'll tell you what.  I'll give it to

8  you under one condition:  If you're not good in two weeks, you

9  got to come back to me and let me know what's going on.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  What was the reason why you asked for the fit for duty

2   slip?

3   A.  Honestly, I was petrified of losing my job.  I just wanted

4   to go back to work.  I really didn't know what was wrong with

5   me at the time, but I figured -- I was praying it would just go

6   away.

7   Q.  Did you get the fit for duty slip from the doctor?

8   A.  Yes, I did.

9   Q.  What did you do with it?

10  A.  I came home.  The first thing I did was I faxed it off to

11  Marge Lucas, the office personnel at Vane Brothers in

12  Baltimore, Maryland.  She received that, and I said, OK, I'm

13  great, I'd be willing to go back to work in two weeks' time.

14  She said OK, fine.  She said, but before you come back to work,

15  you got to go to our doctor.

16  Q.  Did she tell you who her doctor was?

17  A.  She made an appointment with Concentra in Jersey, where I

18  live.

19  Q.  The same Concentra that did the physical examination before

20  you started working?

21  A.  Yes, sir.

22  Q.  Did you go to an appointment at Concentra?

23  A.  Yes, I did.

24  Q.  Do you recall when that was?

25  A.  It was just before -- I think it was on a Tuesday, just

C94rhic6                        Hicks – direct

1    before I would leave for, Wednesday morning, Philadelphia.

2    Q.  Did you see a doctor at Concentra?

3    A.  Yes, I did.

4    Q.  Did you discuss with the doctor who had happened?

5    A.  I explained to him -- well, Marjorie had a whole --

6    Q.  I'm just asking --

7    A.  Yes, I explained to him what happened.

8    Q.  Did you tell him where you had pain?

9    A.  Yes.

10   Q.  Did you have pain at that time?

11   A.  Yes.

12   Q.  Where were you having pain?

13   A.  In the shoulder joint area, right here.

14   Q.  Did that doctor do an examination of you?

15   A.  Yes.

16   Q.  What did the doctor say to you or do for you with respect

17   to your duty slip or duty status?  Were you fit for duty or not

18   fit for duty?

19   A.  He said he wouldn't authorize me to go back to work.  I

20   pleaded with him.  He said no.

21   Q.  Did he recommend that you receive some sort of examination

22   or treatment?

23   A.  He said that I really think you need to get an MR -- he

24   said, did you have an x-ray?  I said yes.  He said, I really

25   think you need an MRI here, there's something more than a

C94rhic6                           Hicks – direct

1  sprained muscle, what you are telling me you have.

2           MR. HOFMANN:  Your Honor, I will point out some of

3  those medical records are already in evidence, but we don't

4  need them.

5           THE COURT:  All right.  The initial Concentra was in.

6           MR. HOFMANN:  That also has the medical records

7  attached to it for this examination.

8           MR. FORDE:  OK.

9  Q.  Did you then return to Dr. Murphy after you saw the doctor

10 at Concentra?

11 A.  I returned to Dr. Murphy.  He examined me again and said

12 you need to see Dr. Lisser, our shoulder specialist.

13 Q.  Did he have you see Dr. Lisser?

14 A.  Yes.  Then I went back and I seen Dr. Lisser.  He examined

15 me and he said, look, you've got to get an MRI, that's the only

16 way we're going to see what's going on here.

17 Q.  Did Dr. Lisser request authorization from Vane to have the

18 MRI done on your shoulder?

19 A.  Yes.

20 Q.  Was an MRI actually done?

21 A.  Yes, it was.

22 Q.  When was the MRI?

23 A.  That was on the 21st, I believe.

24 Q.  Of May?

25 A.  June.

1    Q.  Of May?

2    A.  May, I'm sorry.

3    Q.  When was the MRI?

4    A.  I believe it was on the 21st or the 23rd.  I'm not a

5    hundred percent sure on that.

6    Q.  Of which month?

7    A.  Of May, sir.

8    Q.  Did you go back to see Dr. Lisser after the MRI was

9    performed?

10   A.  Yes, the following day.

11   Q.  Did he review the MRI with you?

12   A.  Yes.  He showed me on the --

13   Q.  Did he review it with you?

14   A.  Yes, he did.

15   Q.  What did he recommend as far as treatment thereafter?

16   A.  He said that you need surgery.

17   Q.  Did he seek approval from Vane Brothers, Vane Line

18   Bunkering, to have surgery performed on your right shoulder?

19              MR. FORDE:  Objection.

20              THE COURT:  Was the surgery performed.

21   Q.  Was surgery performed?

22   A.  Yes, it was.

23              THE COURT:  To the best of your understanding, did

24   Vane approve that surgery?

25              THE WITNESS:  Yes.

C94rhic6                          Hicks - direct

1   Q.  Before surgery was performed, did you receive a letter from

2   Vane Line advising you about certain benefits to which you

3   would be entitled?

4   A.  Yes.

5           MR. HOFMANN:  Your Honor, I offer Plaintiff's Trial

6   Exhibit 34.

7           MR. FORDE:  No objection, your Honor.

8           THE COURT:  All right.  Plaintiff's Exhibit 34

9   admitted.

10          (Plaintiff's Exhibit 34 received in evidence)

11  Q.  I show you Exhibit 34.  Is the letter you received from

12  Vane outlining certain benefits which Vane Line was willing to

13  pay you?

14  A.  Yes, I did.

15  Q.  Did Vane Line tell you that they were going to pay you a

16  certain amount of money for maintenance?

17  A.  Yes.

18  Q.  How much money did they say they would pay you on a daily

19  basis?

20  A.  $15 a day.

21  Q.  Did Vane Brothers tell you that they were willing to

22  provide for your medical care until you were at maximum medical

23  improvement?

24  A.  Yes, they did.

25  Q.  Did Vane Brothers also offer to provide you for an

1  unspecified period of time additional money to compensate you

2  for lost wages?

3  A.  They didn't have a specified time.

4  Q.  But did they offer to provide you some money as

5  compensation for lost wages?

6  A.  Yes, they did.

7  Q.  Was that about $3500 per month?

8  A.  3512 a month.

9  Q.  Were you requested to provide a more thorough accident

10  report to Vane Brothers or Vane Line Bunkering?

11  A.  Yes.

12  Q.  Did you do so?

13  A.  Yes, I did.

14  Q.  Who requested it of you?

15  A.  Marge Lucas.

16          MR. HOFMANN:  Let me offer into evidence Trial Exhibit

17  12.

18          THE COURT:  Any objection?

19          MR. FORDE:  No objection, your Honor.

20          THE COURT:  Plaintiff's Exhibit 12 admitted.

21          (Plaintiff's Exhibit 12 received in evidence)

22  Q.  Is this your accident report that you provided to Vane?

23  A.  Yes, it is.

24  Q.  When did you provide that to Vane?

25  A.  On 6/28.

C94rhic6                          Hicks - direct

1    Q.  June 28, 2009?

2    A.  Yes, sir.

3    Q.  Did you actually or ultimately have surgery on your

4    shoulder?

5    A.  Yes, I did, sir.

6    Q.  What was the date of the surgery on your shoulder?

7    A.  July 1, 2009.

8    Q.  Where was that surgery performed?

9    A.  Riverview Hospital in Red Bank, New Jersey.

10   Q.  Before you had the surgery, what physical symptoms or

11   problems were you experiencing?

12   A.  I had a lot of discomfort and pain in my right shoulder.  I

13   couldn't use the arm at that point.  I had gotten -- well,

14   couldn't use was after then.  I had a lot of discomfort and

15   pain.  What they did was --

16   Q.  Were there certain motions that you could or had difficulty

17   doing?

18   A.  Yes.  Raising my arm above my head, doing any heavy lifting

19   or any of that nature.

20   Q.  Who did the surgery on your arm on July 1, 2009?

21   A.  Dr. Lisser.

22   Q.  Tell the jury how your arm felt when you came out of

23   surgery and the first day or so after.

24   A.  I was in a lot of discomfort and pain.  They had put a pain

25   pump on me, a liquid with a needle going into my arm.  I went

C94rhic6                    Hicks - direct

1   home that night and I suffered all through the night.  We

2   called the doctors.  We couldn't get ahold of them.  At 5:00 in

3   the morning my wife drove me to the emergency room to see what

4   they could do for me.

5   Q.  Was anything done for you when you were at the emergency

6   room?

7   A.  Yes.  They had to bring me into a room, and a

8   anesthesiologist that originally put the pump in came back

9   down.  The needle wasn't in -- it came out of the right spot.

10  It was fun.  They redid it again there.  So I had the thing for

11  five days.  I was as numb as could be.

12  Q.  In the first few days after the needle and pump was

13  removed, tell the jury how your arm felt during that period of

14  time.

15  A.  I was still in a lot of discomfort at that point.  They had

16  given me pain medication to tolerate the pain.

17  Q.  Did you return to see Dr. Lisser for further treatment and

18  follow-up?

19  A.  Yes.  I went to see him.  He looked at the shoulder, pulled

20  the bandages off, and then said, you're going to have to come

21  back.  He gave me another date to come back which was like

22  another two weeks.  In return, I went home.

23  Q.  In total, approximately how many times did you see Dr.

24  Lisser in follow-up?

25  A.  About ten times, roughly.

C94rhic6                         Hicks – direct

1   Q.  Did Dr. Lisser prescribe for you any treatments to help you

2   recuperate from your shoulder surgery?

3   A.  He sent me up after six weeks or eight weeks to the therapy

4   center up above his office.  They have a big company there.

5   Q.  Physical therapy?

6   A.  Yes, physical therapy.

7   Q.  He prescribed that to you, correct?

8   A.  Yes, sir.

9   Q.  Did you go to the physical therapy center to get physical

10  therapy treatment?

11  A.  Yes, I did.

12  Q.  Would you tell the jury what the physical therapy

13  treatments were that you were prescribed.

14  A.  The first week it was just warm and cold compresses and two

15  big bandages.  They vibrate your arm, a stimulus machine.  They

16  did that.  And the physical therapist talked to me, asked me

17  what my occupation was and what he had to do to get me back in

18  shape for work itself.

19  Q.  What physical therapy did they start having you do?

20  A.  Walk up a wall with my fingers, take a rubber band and

21  stretching.  Well, he stretched the arm, I didn't.  He was

22  stretching it back and forth to get it loose enough to work

23  with.  Then they put me on a machine to rotate with your hands,

24  like a bicycle but for the upper end.  I did that.  It had some

25  motion to it.  You didn't really push it.  The machine kind of

 1  helped you until you got maneuvering with it.

 2  Q.  How often were you prescribed to go to the physical therapy

 3  center for Dr. Lisser?

 4  A.  About three times a week.

 5  Q.  Were you also prescribed home physical therapy?

 6  A.  Yes.

 7  Q.  What was the home physical therapy that you were prescribed

 8  to do?

 9  A.  Basically the same thing I was doing there less the

10  stimulus machine and less the bicycle.  They gave me a rubber

11  band and gave me a set of charts to follow the procedure on how

12  to do the exercise.

13  Q.  You said you were given a band.  Were you given a band to

14  do some exercises?

15  A.  Yes, a big rubber band.  That was the one.

16  Q.  Did you bring this from home?

17  A.  Yes, I did.

18  Q.  Is this what was given to you?

19  A.  Yes.

20  Q.  Could you show the jury what exercises you were told to do

21  at home with this and how to do so.

22  A.  There is not a doorknob here.

23  Q.  Just describe it.

24  A.  You put this around a doorknob and then you stretch your

25  arm out like ten times and then you bring it in.  You do curls

C94rhic6                          Hicks - direct

1    with it to strengthen the muscle here and here.  You do that

2    about ten times.  Then a little bit more tension.  You put it

3    on your foot and you do that.  Then behind you, you try to -- a

4    broom handle, try to raise the broom behind you a couple of

5    times, like ten times, five or ten times.

6            Also take a hot shower and rotate your arm.  That I

7    had to do, I didn't have a big enough hot water tank, at least

8    30 minutes.  You had to rotate it in a circle constantly, just

9    maneuvering.  It would just dangle, no muscle pressure.

10           THE COURT:  How good were you about doing all of those

11   exercises?  Some people with physical therapy, they get

12   prescribed to do home physical therapy and don't really do it.

13   Some people are really methodical about it, some people are in

14   between.  How would you describe yourself?

15           THE WITNESS:  You're not married to her.  It was twice

16   a day.  My wife insisted on the fact that I do it.  She came to

17   me with physical therapy.  He said twice a day, don't kill

18   yourself, but try to do it as much as you possibly can to get

19   yourself back in working order.

20   Q.  Did there come a time when you spoke to the physical

21   therapist and told him or her that you needed to return to work

22   and that you might be missing physical therapy sessions?

23   A.  Yes.

24   Q.  Approximately when was that?

25   A.  I went up to --

C94rhic6                          Hicks - direct

1   Q.  When was that?

2   A.  That was in June, when I received --

3   Q.  June?  You had surgery in July.

4   A.  In July rather.  I'm sorry.  It was like around September

5   or so we went into -- I had asked, could we please go in a

6   private room so I could talk to him.  I said, look, I'm in deep

7   financial problems right now, is there any possible way -- I

8   can't make these things.  I got an opportunity to make a couple

9   of bucks.  Is there any possible way you can give me all the

10  instruction sheets and what I got to do, what I can do?  He

11  said, yeah.  He said, I'll help you out with that.  So, he gave

12  me the instruction sheets.  He gave me this stuff to take home.

13  We went back and did the therapy.

14  Q.  Let me show you, and it's not been marked yet --

15          MR. HOFMANN:  Your Honor, by way of explanation, it's

16  part of another exhibit that is marked and that is agreed to be

17  admissible.

18          MR. FORDE:  No objection, your Honor.

19          THE COURT:  What number is it?

20          MR. HOFMANN:  I'm going to mark this as Plaintiff's

21  Exhibit 61.

22          THE COURT:  Why don't you identify it for the record.

23          MR. HOFMANN:  I'll identify it and then ask him about

24  it.  It's four pages of physical therapy instructions.  I'm

25  going to ask him are these the instructions he received.

1            THE COURT:  You have offered it and Mr. Forde has no

2     objection to it?

3            MR. FORDE:  No objection.

4            THE COURT:  All right.  Exhibit 61 admitted.

5            (Plaintiff's Exhibit 61 received in evidence)

6     Q.  Let me show you Exhibit 61.  Take a look at this, Mr.

7     Hicks.  Can you tell us what those four pages are?

8     A.  These are the exercises that he had showed me how to do.  I

9     did them in his office and he marked off the ones that he

10    wanted me to do and how many times.  He said, do what you can

11    tolerate to do to a point.  Don't overdo it, but do everything

12    that you have to do here as much as you can do.

13    Q.  Are these the exercises you were doing twice a day?

14    A.  Yes, it is.

15    Q.  We are going to get into more details about going to work.

16    You did get some work in 2009?

17    A.  Yes, I did.

18    Q.  While you were still under Dr. Lisser's treatment, correct?

19    A.  Yes, I did.

20    Q.  When you were at work, were you working on boats?

21    A.  Yes.

22    Q.  What would you do with respect to your physical therapy?

23    A.  I continued to do it.

24    Q.  Where and how?

25    A.  In our engine room we had a weight bench, a bicycle, a

C94rhic6                         Hicks - direct

1    treadmill, and an area where you can do exercises.  A lot of

2    the guys would go down there.

3    Q.  Did you bring your band with you?

4    A.  Yes, I went down and did the exercises with the band and

5    some bicycling.

6    Q.  Did you work in 2010 as well while still under Dr. Lisser's

7    care?

8    A.  I had to.  Yes.

9    Q.  While you worked during 2010, before June of 2010, did you

10   continue, while working on the boats, to do your exercises?

11   A.  Yes, I did.

12   Q.  Do you recall seeing Dr. Lisser in December of 2009?

13   A.  Yes.

14   Q.  What complaints, physical complaints, did you give to him

15   at that time?

16   A.  I had told him that I was still having a problem with the

17   shoulder.  I said, look, obviously there's something not right.

18   He said let me -- go ahead.  Sorry.

19   Q.  Tell me what complaints you had to Dr. Lisser?

20   A.  I couldn't lift my arm over my shoulder-chest area.

21   Q.  Tell me what happened if you did or if you tried?

22   A.  I'd get a lot of pain and I could feel the joint itself

23   crack.

24   Q.  What did he prescribe to you to do?

25   A.  He said do whatever -- no more than 10 pounds you can lift,

C94rhic6                          Hicks – direct

1   he says, if you can tolerate it.  Do whatever you can possibly

2   tolerate, and that's what I did.

3   Q.  Did you see Dr. Lisser?  Did he continue you on physical

4   therapy?

5   A.  Yes.

6   Q.  Did you see Dr. Lisser again in January of 2010?

7   A.  Yes.

8   Q.  What were your complaints to him about your physical

9   condition at that time?

10  A.  Same thing.  My shoulder, I wasn't able to lift it, and I

11  had explained to him.  And he had felt that something was going

12  on, obviously, at this point.

13  Q.  Did he recommend that you continue with physical therapy?

14  A.  Yes.  He said continue doing the stretches, whatever you

15  can tolerate to do, try to strengthen it.

16  Q.  Did you see Dr. Lisser again in April of 2010?

17  A.  Yes, I did.

18  Q.  At that time what were your complaints?

19  A.  I still had the crackling in the one joint and I couldn't

20  go above this point in my head.

21  Q.  Were you suffering from any feelings of pain?

22  A.  Yes.

23  Q.  When would you experience pain?

24  A.  When I would get it above my shoulder area.

25  Q.  Let's turn to the period about seven months, eight months

C94rhic6                         Hicks - direct

1  after your surgery, in the spring of 2010.

2  A.  Yes.

3  Q.  You still owned your house in Middletown?

4  A.  Yes.

5  Q.  Did you do any work around the house?

6  A.  I putzed around doing what I would tolerate.  I planted a

7  shrub.

8  Q.  You recall doing that one day, right?

9  A.  Yes.

10 Q.  What was the shrub, do you recall?

11 A.  It was a Christmas tree we had gotten in, I'm embarrassed

12 to say this, December and we were going to plant it outside.  I

13 finally got around to it back then.

14 Q.  What did you do with respect to planting this tree?

15 A.  My son Stephen, he went outside.  There was a tree there.

16 He took that one out and he redug the hole for me.  At that

17 particular point he brought the tree over to the hole site.

18 What I did was I had put the tree down into the hole right

19 there.

20        Well, before I did that, I should say there was dirt,

21 some dirt and some mulch that was right around that area.  My

22 grandson Charles was helping me out, dig the hole, as you will

23 see on the video.  We were taking out dirt, doing that

24 together.  Then I put the tree down into the hole, and then I

25 buried it with the dirt again.

C94rhic6                          Hicks - direct

1   Q.  What tools did you use?

2   A.  I had a spade shovel, a long spade shovel.

3   Q.  Can you describe the movements that you recall you made

4   with the shovel.

5   A.  Yes.  It was like this, digging the hole.  I was doing this

6   as I was taking it.  I was pushing the dirt out that was left

7   in the hole (indicating).

8   Q.  Did these motions cause you any extreme pain?

9   A.  No.  It was really tolerable on my lower end.  As long as I

10  stay in that area, I'm fine.

11  Q.  Were the motions you were doing similar to the motions you

12  were doing while you did physical therapy?

13  A.  Yes.

14          MR. FORDE:  Your Honor, could we take down the board?

15          THE COURT:  All right, so McGinis can have a clear

16  line of sight.

17  Q.  Is it correct that you did the planting of that little

18  Christmas tree on April 15, 2010?

19  A.  Yes.

20  Q.  On April 26, 2010, did you see Dr. Lisser again?

21  A.  Yes.

22  Q.  At that time what were your complaints?

23  A.  Still had the same problem.  I wasn't able to go over my

24  chest area.  Like I can bring my arm right up to there, that's

25  where.  Then if you could feel this, if you feel it -- they are

C94rhic6                          Hicks - direct

1   welcome to feel it -- I still have the tear.

2            MR. HOFMANN:  Indicating on the record that Mr. Hicks

3   raised his arm somewhat to the right side.

4   Q.  You showed Dr. Lisser this problem?

5   A.  Yes, I did.

6   Q.  Did Dr. Lisser at that point recommend you have any further

7   testing?

8   A.  He said that I think we need to look into this with an MRI.

9   Q.  That was at the visit of April 26th, correct?

10  A.  Yes, sir.

11           THE COURT:  Mr. Hofmann, in about three or four

12  minutes we will take our afternoon break, our mid-afternoon

13  break, to give you a runway for that.

14           MR. HOFMANN:  It may be a better time right now,

15  Judge.

16           THE COURT:  Ladies and gentlemen of the jury, we will

17  take a short break again now, stretch our legs.  When we come

18  back in about seven minutes or so, we'll go straight through

19  till 5:00, and then we will end promptly at 5 o'clock today for

20  the day.  Again, remember not to talk to each other about

21  anything you have heard or anyone else.

22           THE CLERK:  All rise as the jury leaves.

23           (Jury not present)

24           THE COURT:  Before we take our own break, is there

25  anything that anyone would like to raise?

C94rhic6                         Hicks - direct

1            MR. HOFMANN:  No, your Honor.

2            MR. FORDE:  No.

3            THE COURT:  Let's take a five-minute break.

4            (Recess)

5            (Jury present)

6            THE COURT:  Mr. Hofmann, you may continue.

7            MR. HOFMANN:  Thank you, your Honor.

8    BY MR. HOFMANN:

9    Q.  Where we last left off, we were talking about the April 26,

10   2010, visit to Dr. Lisser.

11   A.  Yes, sir.

12   Q.  You indicated, I believe, that he had recommended an MRI

13   for your right shoulder, correct?

14   A.  Yes, sir.

15   Q.  Did Dr. Lisser, to your knowledge, request authorization

16   for that MRI from Vane?

17   A.  Yes, he did.

18   Q.  Did Vane give the authorization?

19   A.  No, they refused.

20   Q.  Did something intervene to -- withdrawn.  Did there come a

21   time after the April 26, 2010, visit with Dr. Lisser that Dr.

22   Lisser told you that he would no longer continue to treat you?

23   A.  Yes.

24   Q.  Did there come a time after that April 26th visit that Vane

25   Brothers or Vane Line Bunkering advised you that they were no

C94rhic6                        Hicks - direct

1   longer going to provide you with maintenance and cure?

2   A.  Yes.

3           MR. HOFMANN:  I'm going to offer Plaintiff's Trial

4   Exhibit 41.

5           MR. FORDE:  No objection, your Honor.

6           THE COURT:  Plaintiff's Exhibit 41 admitted.

7           (Plaintiff's Exhibit 41 received in evidence)

8   Q.  Showing you a letter dated May 13, 2010, Trial Exhibit 41,

9   is this a letter that Vane Brothers/Vane Line Bunkering

10  provided you advising you that they were no longer authorizing

11  medical treatment?

12  A.  Yes.

13  Q.  Did they also tell you that they were stopping the $15 a

14  day maintenance?

15  A.  Yes, sir.

16  Q.  Charles, you can put it down.  Did you have a conversation

17  with Dr. Lisser in June of 2010 in which he advised you that he

18  was no longer going to treat you?

19  A.  Yes.

20  Q.  Did Dr. Lisser tell you what was the reason for that?

21  A.  Vane had sent them a video of me planting the shrubbery in

22  my yard.  Myself, people from Vane, and Dr. Lisser were

23  supposed to be -- I'm sorry.

24  Q.  You said that Vane sent the video to Dr. Lisser?

25  A.  Yes, sir.

C94rhic6                          Hicks – direct

1   Q.  I'm asking about the conversation you had with Dr. Lisser.

2   What did Dr. Lisser say to you?

3   A.  He told me that I'm cutting you off because they ain't

4   going to pay for nothing, so there's no way I'm going to

5   continue on to treat you.

6   Q.  Did he tell you that in his opinion he thought that you

7   could perform the work of a tugboat mate for Vane?

8   A.  Yes.

9   Q.  In the letter that was provided to you of May 13th,

10  attached to it was an orthopedic note from Dr. Lisser telling

11  you that he had reviewed the video and a job analysis, physical

12  capacity/physical requirements analysis that had been provided

13  to him, is that correct?

14  A.  Yes, sir.

15  Q.  I'm going to review some of the things on here.  First of

16  all, was that analysis provided to you as part of this letter?

17  A.  Yes, it was.

18  Q.  This job analysis indicates that in your work as a tugboat

19  mate, you never pick up objects more than 21 pounds.  Is that

20  accurate as far as a physical description of the duties you

21  have as a mate?

22  A.  No.

23  Q.  Tell us, tell the jury, what jobs you do in which in the

24  routine of your activities you would pick up weights 21 pounds

25  or more.

C94rhic6                          Hicks – direct

A.  At the beginning of every tour we get groceries, grub.  We have to bring that aboard.  That's maybe 20 cases of water, cases of milk, meat.  It just goes on and on.  Then we have to put on 25-gallon pails of oil, hydraulic oil.  If you need lines, you order them.  You have to pull them on board on the dock.

There's Cables, you always have to have a spare set of cables.  Shackles wear out.  You have to get shackles, engine parts.  Everybody pitches in.  Nobody's above anything at that particular point.  Everybody pitches in to bring the supplies on the vessel.

There's times that the barge is 40 feet in the air, the deckhand is on the lower deck, he's trying to maintain getting a line up.  He's got to pass the line to me.  I got to throw the line to the barge itself because he's got to stay there to tie it off right away.

Q.  How much do the lines weigh that you may have to handle?

A.  Pulling them up, they could be roughly anywheres from 60 to 80 pounds on deadweight.  That's as long as they're not wet.

Q.  What about the other things you have to carry?  What about hooking up the towing gear?

A.  You have to hook up the towing shackle.  That's about this big with a 2-inch pin in it.  That thing roughly weighs up to 80 to a hundred pounds that has to be lifted.  The toe end, you also have to lift that up with the cable to pull that and get

C94rhic6                          Hicks – direct

1    it in position.

2    Q.  Would you have to carry weights of more than 21 pounds?

3    A.  Yes, sir.

4    Q.  Explain in what circumstances you would have to carry

5    weights of more than 21 pounds.

6    A.  You would have to assist out and help with the shackles.

7    You would have to go to the towing machine, whatever shackle

8    you're going to use to tow, you have to grab that.  You have to

9    grab the cables and the wire, pull that to you and try to

10   shackle all this together.  You have to put cables up on the

11   barge.

12   Q.  This job analysis says that you would never have to carry

13   something 21 pounds or more.  Is that accurate?

14   A.  No.

15        MR. HOFMANN:  Your Honor, it's in evidence, and I will

16   point out that there is nothing on here about climbing ladders.

17   Q.  Do you have to climb ladders?  You already described how

18   often you have to climb a ladder, right?

19   A.  Yes, sir.

20   Q.  Did you attempt to discuss with Dr. Lisser his decision to

21   stop treating you?

22   A.  Yes.

23   Q.  Did you tell him about the work you do as a mate on the

24   vessels?

25   A.  Yes.

C94rhic6                          Hicks - direct

1   Q.  What was his response?

2   A.  He said, well, they told me that the max that you would

3   have to pick up is 10 pounds, it would be rare for you to even

4   do that.  I said, Dr. Lisser, that's not true.  There's times I

5   have to -- somebody falls over who weighs 200 pounds, who's

6   going to grab him right away?  It depends on who's on watch to

7   see it.  I tried to explain all of this to him, what our

8   physical duties are as a mate.

9   Q.  His response was?

10  A.  I'm not getting in the middle of this between you and Vane.

11  They stopped treatment, they ain't going to pay me no more, and

12  that's the end of it, that's all I could tell you.

13  Q.  Did there come a time when Vane, because you had suffered

14  the shoulder injury, terminated your employment with that

15  company?

16  A.  Yes.

17          MR. HOFMANN:  Your Honor, I offer Plaintiff's Trial

18  Exhibit 33.

19          MR. FORDE:  No objection, your Honor.

20          THE COURT:  Plaintiff's Exhibit 33 admitted.

21          (Plaintiff's Exhibit 33 received in evidence)

22  Q.  This letter was sent to you on July 24, 2009, correct?

23  A.  Yes, sir.

24  Q.  This is only three weeks after you have had the surgery,

25  right?

C94rhic6                          Hicks – direct

1   A.  Yes, sir.

2   Q.  Come September, October, November of 2009, Charles, what

3   was your financial condition?

4   A.  I was in foreclosure proceedings.

5   Q.  Can you tell the jury what were your monthly expenses for

6   your mortgage and your household upkeep?  First of all, I'll

7   ask you this.  What was your mortgage payment at the time?

8   A.  It was 4200.  That was including the taxes and the

9   insurance.

10  Q.  You had utility payments that you had to make, right?

11  A.  Yes, sir.

12          MR. FORDE:  Objection, your Honor.

13          THE COURT:  Overruled.

14  Q.  What was your average monthly sewer bill?

15  A.  Roughly I believe it was around 23 something and change.

16          THE COURT:  Maybe you can add them all together.

17          MR. HOFMANN:  I will.

18  Q.  I can help by saying did you have sewer, water, electric,

19  and trash bills?

20  A.  Yes, I did.

21  Q.  In total were the utility bills approximately $867 a month

22  on average?

23  A.  Yes, they were.

24  Q.  Were your mortgage plus utilities about $5,060 per month?

25  A.  Yes, thereabouts.

C94rhic6                          Hicks – direct

1    Q.  You had your two sons living with you, so you were

2    responsible for one-third of each, right?

3    A.  Yes, sir.

4    Q.  Your portion of the bills would be about $1690 a month,

5    correct?

6    A.  Yes, sir.

7    Q.  How much would you estimate, based on when you went

8    shopping for food, was your food cost per week?

9    A.  I would say roughly about on an average of 200, between 100

10   to 200.

11   Q.  I'm just talking about for yourself now.  I'm not talking

12   about for the rest of the family.

13   A.  I would say roughly around a hundred.

14   Q.  So about 400 a month?

15   A.  Yeah, about $400 a month.

16   Q.  In addition to the 1690, your expenses were about 2,090 a

17   month?

18   A.  Yes, sir.

19   Q.  When you received that letter from Vane, what happened to

20   the offer from Vane to pay you that $3512 a month?

21   A.  They had stopped it.

22   Q.  After how many months?

23   A.  They only gave it to me for three months.

24   Q.  That was it, right?

25   A.  Correct.

C94rhic6                          Hicks - direct

1    Q.  Did they continue to pay you the $15 a day for a period of

2    time?

3    A.  Yes, sir.

4    Q.  That was until that may date, May 2010, in the letter?

5    A.  Yes, sir.

6    Q.  You were in foreclosure, they cut off these benefits.  What

7    did you decide you had to do for you and your family?

8    A.  At this point I had no alternative but to seek work.

9    Q.  In the year 2009 did you work?

10   A.  Yes, I did.

11   Q.  In the tugboat industry?

12   A.  Yes, I did.

13   Q.  In total approximately how many weeks did you work in 2009?

14   A.  I think it was just a couple of weeks in 2009.

15   Q.  What income did you earn, approximately, from working in

16   2009 after your surgery?

17   A.  It was about 7,000 and change.

18   Q.  Who did you work for, do you recall?

19   A.  Miavondi, and I worked for Village Dock and also Great

20   Lakes.

21   Q.  Did you work for Donjon Witte?

22   A.  Yes, I did, also Donjon.

23   Q.  Did you work for KT Marine a couple of days?

24   A.  Yes.

25   Q.  In 2010 were you still in the same financial boat?

1    A.  Yes.

2    Q.  To use a bad metaphor.  Did you work in 2010, prior to June

3    of 2010, when Dr. Lisser told you he wouldn't treat you?

4    A.  Did I work prior to?

5    Q.  From January 1, 2010, until June of 2010, did you work?

6    A.  Yes.

7    Q.  For whom?

8    A.  I worked for Great Lakes.

9    Q.  What kind of job were you doing for Great Lakes?

10   A.  I was down in -- they were doing a dredging job down in Sea

11   Isle City -- towing barges.  Actually, being honest with you, I

12   was on the fire watch.

13   Q.  What is a fire watch?  What does that mean?

14   A.  Somebody's got to be up to maintain and secure that the

15   boat is safe.  So I worked from 12:00 midnight to 7:00 in the

16   morning.

17   Q.  Was the dredging operation going on during those hours?

18   A.  No.

19   Q.  Did you have to climb ladders or do any of the physical

20   labor for Great Lakes that you were doing for Vane Brothers?

21   A.  No, not at all.  I was just doing a fire watch tour there.

22   Q.  Did you work for other employers in the year 2010 after

23   June of 2010?

24   A.  Yes.

25   Q.  Can you tell us who those employers were.

C94rhic6                              Hicks - direct

1   A.   KT Marine and I also work for Village Dock.

2   Q.   In September of 2010, did you work for a company called

3   Atlantic Sounding?

4   A.   Yes.  Weeks, I'm sorry.  Yes, Atlantic Sounding.

5   Q.   They are an affiliate of Weeks Marine?

6   A.   Yes, they are.

7   Q.   In 2010 is it true that you earned about $58,500 in income?

8   A.   Yes, it is.

9   Q.   In 2011 did you work?

10  A.   Not a lot, no.  Well, yeah, I did work.  I worked for

11  Weeks.  That's actually Atlantic Sounding.

12  Q.   Did you also work for KT Marine?

13  A.   Yes, I did.

14  Q.   Did you work for a company called Northeast Remsco?

15  A.   Northeast Remsco and Caldwell Marine.

16  Q.   Did you work for?

17  A.   Yes.

18  Q.   Did you work for a company called Dann Ocean Towing?

19  A.   Yes, I did.

20  Q.   Approximately how much income did you earn in 2011?

21  A.   About 58.

22         MR. HOFMANN:  Your Honor, we will stipulate that Mr.

23  Hicks earned $67,000 approximately at these various jobs.

24  Q.   $67,000?

25  A.   Yes, 67.

1          THE COURT:  All right.

2    Q.  You worked for a lot of different companies, Mr. Hicks,

3    during the period after July of 2009, correct?

4    A.  Yes.

5    Q.  What is your relationship with these companies now?

6    A.  Each one of them said, look, Charlie, you got to get

7    better.  Get this arm fixed up.  At that point we'll take a

8    look at you again.

9    Q.  Did they terminate your services or ask you not to come

10   back?

11   A.  Yes.  They asked me -- they said, look, Charlie, we can't

12   use you in this.  God forbid something happens, what are you

13   going to be able to do?

14   Q.  What sort of problems were you having doing this work?

15   A.  I can't work out on deck, that's number one.  I can't do

16   any climbing or jumping around.

17   Q.  When we talk about helping out on deck, what sort of jobs

18   with these various companies that you worked for were you asked

19   to do that you felt you couldn't do?

20   A.  Delivering parts, climb a ladder, help out pulling the

21   cables, putting them on above the dredging units.

22   Q.  Did any of the jobs require you to handle lines?

23   A.  Oh, yes.

24   Q.  For whom?  For which company?

25   A.  Every one of them.

C94rhic6                         Hicks - direct

1  Q.  Did you have difficulty handling lines with your shoulder?

2  A.  Yes.

3  Q.  What sort of difficulty?  Tell the jury.

4  A.  If I try to throw a line, my arm tends to -- you have to

5  use a lot of force to throw it over, so you end up putting a

6  lot of strain on my arm itself.

7  Q.  Are you right-handed or left-handed?

8  A.  Right-handed.

9  Q.  So you would throw with your right hand, right?

10  A.  Oh, yes.

11  Q.  Did you work for a company called Dann Ocean Towing?

12  A.  Yes, I did.

13  Q.  When did you work for them?

14  A.  I don't know the exact dates.  I believe it was back in

15  February.

16  Q.  I'm talking about in 2011, did you work for Dann Ocean

17  Towing?  Let me suggest to you, did you work in September of

18  2011 for Dann Ocean Towing?

19          MR. FORDE:  Objection.

20  A.  Yes.

21          THE COURT:  Overruled.

22  Q.  What did you do to get the job with Dann Ocean towing?

23  A.  I filled out an application.  I just sent it in.  In return

24  what they did was I had some references down there of the

25  companies that I had worked for.  I had sent it in to them.

C94rhic6                          Hicks – direct

1     Probably about a week or two later they had given me a call

2     back.

3     Q.  Did there come a time when for Dann Ocean Towing you were

4     requested to fill out a questionnaire that involved giving

5     answers as to your physical capacity, physical duties, physical

6     abilities?

7     A.  Yes.

8     Q.  And whether you had any claims against other employers?

9     A.  Yes.

10    Q.  Did you answer truthfully?

11    A.  No.

12    Q.  Can you tell the jury why.

13    A.  Honestly, at 61 you put down one blemish on that paper,

14    there's 500 guys behind you at 30 that will come right in.

15    They won't give it to you.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

1    Q.  Were there other companies that you worked for that you

2    mentioned that you also failed to disclose that you had this

3    right shoulder injury?

4    A.  Yes.

5    Q.  Is the reason the same that you failed to disclose?

6    A.  Yes.  You just can't put anything derogatory on these

7    things.

8    Q.  Charles, do you want to return to work?

9    A.  Without a doubt.

10   Q.  I'm sorry?

11   A.  Without a doubt.

12   Q.  What is it you need now to be able to physically handle the

13   job?

14   A.  If I could get the surgery, get this thing patched up, I'd

15   be able to return back to work and get a full-time steady job.

16   Q.  Why haven't you had the surgery?

17   A.  They won't give it to me.

18   Q.  Why haven't you gotten it on your own?

19   A.  I don't have any medical insurance, that's No. 1.  No. 2, I

20   can't afford to put it out of my pocket.  I mean I tried.  I

21   tried going to Charity Care; they won't do it.

22        I tried -- I even went to Dr. Charlie Rizzo, and I

23   asked him.

24        I says, Doc, is there any possible way you would give

25   me the surgery and I'll pay it little by little?

1              He said, I can't do it.  It's against practice.

2              So they refused to do it.

3    Q.  As part of your benefit package with Vane, did you have

4    medical insurance?

5    A.  Yes.

6    Q.  And when you were terminated, did you keep that medical

7    insurance?

8    A.  Yes, to a certain point, but I couldn't afford it anymore.

9    Q.  So you let it drop?

10   A.  I had no alternative.

11   Q.  You mentioned Dr. Charlie Rizzo.

12   A.  Yes.

13   Q.  Who is Dr. Rizzo?

14   A.  He's an orthopedic surgeon.

15   Q.  Had you had any treatment from him in the past?

16   A.  Yeah.  When I broke my knee, he was the guy that fixed it.

17   Q.  Did you come under treatment with Dr. Rizzo for your right

18   shoulder?

19   A.  Well, after I went to doctor --

20   Q.  After Dr. Lisser, did you come under --

21   A.  Yes.  I went back to see Charlie for the right shoulder.

22   Q.  When you say "Charlie," are you talking about --

23   A.  Dr. Rizzo.

24   Q.  Did Dr. Rizzo recommend, as did Dr. Lisser, that you have

25   an MRI of your shoulder?

C94VHIC7                          Hicks - direct

| | |
|---|---|
| 1 | A.  Yes, he did. |
| 2 | Q.  Did you eventually get an MRI of your shoulder? |
| 3 | A.  Yes. |
| 4 | Q.  And how did you obtain that? |
| 5 | A.  It's embarrassing, but I'll tell it. |
| 6 |         My sons lent me the money. |
| 7 | Q.  And when did you have the MRI? |
| 8 | A.  Back in -- I believe it was in June. |
| 9 | Q.  If I suggest to you it was October 21st -- |
| 10 | A.  Yeah, I'm sorry.  My brain is thinking of June.  Back in -- |
| 11 | it was in October. |
| 12 | Q.  2010? |
| 13 | A.  Yes, sir. |
| 14 | Q.  After having that MRI, did Dr. Rizzo recommend any course |
| 15 | of treatment for you? |
| 16 | A.  He said that I needed to have the rotator cuff done again. |
| 17 | Q.  How much did the MRI cost? |
| 18 | A.  It was 600. |
| 19 | Q.  And where was it performed? |
| 20 | A.  Middletown Imaging on Route 35 in Middletown. |
| 21 | Q.  I want to talk to you now about some of your prior health |
| 22 | problems that you may have had prior to working for Vane. |
| 23 |         Let's talk about your right shoulder. |
| 24 |         Had you ever had a right-shoulder injury prior to |
| 25 | April of 2009? |

1   A.  No.  Never.

2   Q.  Had you ever had any right-shoulder discomfort or pain for

3   which you got treatment prior to April of 2009?

4   A.  Yeah.  Arthritis in the shoulders.

5   Q.  When did you have treatment from anybody for your right

6   shoulder?

7   A.  It was by Dr. Hypplite up into about -- somewheres in the

8   area 2005.

9   Q.  Dr. Hypplite, who is Dr. Hypplite?

10  A.  Our general practitioner.

11  Q.  Family doctor?

12  A.  Yeah.

13  Q.  You were treated, you said, in 2005 by Dr. Hypplite for

14  right shoulder pain; is that right?

15  A.  Yeah.  I had arthritis in the joints.

16  Q.  What happened with respect to your right shoulder, did it

17  improve?  And, if so, how?

18  A.  Yeah, I had gotten a lot better from it.

19  Q.  Now, I think you mentioned that you had a fractured knee.

20  A.  Correct.

21  Q.  How did that happen?

22  A.  I fell off a roof.

23  Q.  Doing what?

24  A.  I was -- I went up to check on somebody, one of my sons.

25  As I came -- somebody moved the ladder.  As I came down, the

C94VHIC7                          Hicks - direct

1   ladder collapsed; I went with it.

2   Q.  Was it at a job or at home?

3   A.  Yes, at a job site.

4   Q.  What other injuries did you suffer in that fall from the

5   roof?

6   A.  My heel ripped off my foot.

7   Q.  Did you have treatment for your ankle?

8   A.  Yes.

9   Q.  What treatment did you have for your ankle?

10  A.  They did a fusion on my -- back of my heel.

11  Q.  Of which ankle?

12  A.  My left.

13  Q.  Which knee was involved in this?

14  A.  Right knee.

15  Q.  And have you had further -- when did that accident happen?

16  A.  I believe it was in '98.

17  Q.  And since '98, did you have further surgery done on your

18  right knee?

19  A.  Yes.

20  Q.  What was that?

21  A.  They did a knee replacement.

22  Q.  And when was that?

23  A.  That was back in 2003.

24  Q.  Have you also had surgery to your spine in the past?

25  A.  To my -- well, my neck fusion, yes.

C94VHIC7                          Hicks - direct

1    Q.  When was that?

2    A.  That was in '92, 1990, '92.

3    Q.  Has your left shoulder been operated on in the past?

4    A.  Yeah.

5    Q.  Tell us when.

6    A.  At that same time, with the -- right after the fusion, a

7    couple years later they did a cleanout, rotator cuff cleanout.

8    Q.  Is this around 1992?

9    A.  Yes, sir.

10   Q.  All right.

11           Now, after you had the left shoulder rotator cuff

12   repair in '92, did you return to work in the tugboat industry?

13   A.  Yeah.

14   Q.  After you had the cervical fusion, did you return to work?

15   A.  Yes.

16   Q.  After you had the ankle fusion or the heel fusion in 1998,

17   did you return to work?

18   A.  Without a doubt.

19   Q.  After you had your knee surgery and your knee replacement,

20   did you always return to work?

21   A.  Yes, sir.

22   Q.  If you had the surgery, do you intend -- on your right

23   shoulder, do you intend to return to work?

24   A.  Yes, sir.

25   Q.  Now, since -- I'm going to return to your working for Dann

1  Ocean Towing in 2011.

2  A.  Yes, sir.

3  Q.  Did you suffer an accident working for Dann Ocean Towing?

4  A.  Yes.

5  Q.  Just briefly tell the jury what happened.

6  A.  I went back on the stern.  I went climbing up the ladder.

7  Q.  Where were you?  Where were you?  Stern of what?

8  A.  Stern of the tug.

9      I went back to the stern of the tug to release the

10 wire, and actually pulling the stern line to tighten it up.  I

11 went back to control the stern line.  I pulled it up.

12      To go back into the pilot house, you have to climb up

13 a ladder.  As I went up the ladder, my right arm started to

14 give way, and I felt a lot of pressure.  So I grabbed with my

15 left arm.  And as I grabbed, I fell, and I just twisted around

16 and fell into the pilot house.

17 Q.  And did you suffer an injury?

18 A.  Yes.

19 Q.  What injury did you suffer?

20 A.  My left arm.

21 Q.  And as a result of that, did you seek medical attention?

22 A.  Yes, I did.

23 Q.  What medical attention did you seek?

24 A.  I just went to the local emergency clinic to have them take

25 a look at it, see if -- well, actually, the company sent me to

C94VHIC7                              Hicks - direct

1    St. Vincent's in Staten Island.  They looked at it and they

2    said, Go home and ice it.  Here's a script for this medication,

3    and that.  And they sent me on my way.

4    Q.  Did you then seek medical attention from a doctor in order

5    to get a either fit or not fit-for-duty slip?

6    A.  Yes, I did.

7    Q.  And what did you get?

8    A.  She gave me a fit-for-duty slip.

9    Q.  What happened to that job?

10   A.  They fired me.

11   Q.  Did you thereafter see Dr. Rizzo with respect to ongoing

12   complaints you had in the left arm?

13   A.  In the left arm?

14   Q.  Yes.  Dr. Rizzo, after you fell on the Dann Ocean Towing

15   vessel.

16   A.  No, not on the left arm.

17   Q.  Do you recall -- all right.

18   A.  I'm trying -- yes, I did call Dr. Rizzo.

19   Q.  What is the condition of your left arm now?

20   A.  It's getting better.

21   Q.  Now, I'd like to show you what we've marked as Exhibit --

22   Trial Exhibit 30.

23            MR. FORDE:  No objection, your Honor.

24            THE COURT:  All right.

25            Plaintiff's Exhibit 30, admitted.

1          (Plaintiff's Exhibit 30 received in evidence)

2   Q.  Mr. Hicks, is Exhibit 30 your W-2s for your earnings from

3   Vane Line Bunkering for 2008 and 2009 for the months you

4   worked?

5   A.  Yes, it is.

6          MR. HOFMANN:  And, your Honor, if I may just briefly

7   read the gross pay for the year 2008 is listed as $23,919; and

8   for 2009, I think I may have said 19 -- I don't know.

9          Let me start all over again.

10          For the year 2008, it shows $23,919.  And for 2009, it

11   shows gross wages of $28,175.

12   Q.  Mr. Hicks, you earned that $23,919 from September through

13   December for Vane; is that right?

14   A.  Yes, sir.

15   Q.  And the other figure for 2009 -- I apologize for walking

16   back and forth.  The $28,175 was from January 1st, 2009 through

17   April 21st, 2009; correct?

18   A.  Yes, sir.

19          MR. HOFMANN:  Your Honor, I'd like to offer Trial

20   Exhibit 29.

21          MR. FORDE:  No objection, your Honor.

22          THE COURT:  All right.

23          Plaintiff's Exhibit 29, admitted.

24          (Plaintiff's Exhibit 29 received in evidence)

25   Q.  Mr. Hicks, is Exhibit 29 a group of four of your pay stubs

C94VHIC7                          Hicks - direct

1    working for Vane?

2    A.  Yes, sir.

3    Q.  And at the time that you were working for Vane when you

4    were injured, is it true you were earning $416.57 a day when

5    you worked as a tugboat mate?

6    A.  Yes, sir.

7         THE COURT:  Did you get paid just for those days that

8    you worked or were you paid -- you were two weeks on, two weeks

9    off.

10        THE WITNESS:  Yes, ma'am.

11        THE COURT:  Did you get paid for just the two weeks

12   that you were actually working?

13        THE WITNESS:  Only when you worked.  The other two

14   weeks are nothing.

15        THE COURT:  Was it through Saturday and Sunday when

16   you were on here two weeks?  Is it 14 days straight?

17        THE WITNESS:  Yes.  We started on a Wednesday, and

18   worked for two weeks.

19        THE COURT:  For 14 days.

20        THE WITNESS:  Yeah.  We changed crew on Wednesday.  It

21   was 14 days straight, and 24 hours a day.

22   BY MR. HOFMANN:

23   Q.  Now, Charles, in October of 2010, did you suffer a medical

24   problem that required you to be hospitalized?

25   A.  Yes.

C94VHIC7                         Hicks - direct

1   Q.   And where were you hospitalized?

2   A.   Riverview Medical Center.

3   Q.   And what was the medical problem you were treated for?

4   A.   I woke up -- I was treated for an infection around the

5   heart.

6   Q.   You were in the hospital from October 25th, 2010 until

7   November 5th, 2010?

8   A.   Yes, sir.

9   Q.   When you were there, did you have medical insurance at that

10  time?

11  A.   No.

12  Q.   And do you have a medical bill from the hospital for that

13  hospitalization?

14  A.   123,000.

15          MR. HOFMANN:  Your Honor, I offer Plaintiff's Trial

16  Exhibit 48.

17          THE COURT:  Any objection?

18          MR. FORDE:  No objection, your Honor.

19          THE COURT:  All right.

20          Plaintiff's Exhibit 48, admitted.

21          (Plaintiff's Exhibit 48 received in evidence)

22  Q.   This is the certified copy of the medical bill for that

23  hospitalization.

24          Has that bill been paid, Mr. Hicks?

25  A.   No, sir.

C94VHIC7                          Hicks - direct

1   Q.   And why has it not been paid?

2   A.   My medical insurance lapsed.

3   Q.   Are you able to afford to pay the bill?

4   A.   No.  With the COBRA, I couldn't even do it.

5   Q.   Well, did you have COBRA insurance in October of 2010?

6   A.   No, I didn't.

7   Q.   Once you get patched up, do you have a plan as to how long

8   you wish to continue to work?

9   A.   My father was in the industry till he was 82.  I ain't

10  going that long.  I'll go to maybe 70 tops.

11  Q.   Now, I want to show you briefly a couple of videos,

12  Charles.

13           MR. HOFMANN:  Your Honor, I'm going to offer -- I'm

14  going to offer Exhibit 45, with your permission, your Honor.

15           THE COURT:  Is that Defendant's Exhibit 45?

16           MS. FARRAR:  It's a defendant's exhibit, your Honor.

17           THE COURT:  All right.

18           MR. HOFMANN:  Yes, Defendant's Exhibit 45.

19           MR. FORDE:  Obviously, we don't object.

20           THE COURT:  All right.

21           There's no objection then.

22           All right.

23           Defendant's Exhibit 45 is admitted.

24           (Defendant's Exhibit 45 received in evidence)

25           MR. HOFMANN:  If I may just give a little background.

1          It's just a demonstration of Texas bar, the doughnut,

2     and men doing what they are going to do.

3          (DVD played)

4     Q.  Charles, you saw the videotape.

5          Is that the work you were trying to do by yourself?

6     A.  Yes.

7     Q.  Would you agree that that should be a two-man job?

8     A.  Yes.

9     Q.  And you sought to have somebody assist you; correct?

10    A.  Yes, I did.

11         THE COURT:  Mr. Hofmann, how much more -- just to give

12    us an idea -- you think you've got with Mr. Hicks?

13         MR. HOFMANN:  About two minutes, your Honor.

14         THE COURT:  Okay.

15         MR. HOFMANN:  What I would like to do is offer

16    Plaintiff's Exhibit 52, which is the videotape of the

17    surveillance.

18         MR. FORDE:  No objection, your Honor.

19         THE COURT:  All right.

20         Plaintiff's Exhibit 52, admitted.

21         (Plaintiff's Exhibit 52 received in evidence)

22         MR. HOFMANN:  And all I wish to do, your Honor, is

23    play about 30, 40 seconds, skip around, just to show little

24    snippets of it without -- defendants not having the right to

25    play the whole thing.  It's 25 minutes of him doing that work.

1          MR. FORDE:  Your Honor, we would object to that.

2          It was discussed that we were going to play the whole

3     thing.  And this is the first time we're learning that he was

4     just going to play snippets.

5          THE COURT:  These things are normally handled outside

6     of your hearing, but in the interest of time, I'm going to

7     allow him to skip, Mr. Hofmann to skip around in the interest

8     of time.

9          The entirety of Plaintiff's Exhibit 52 has now already

10    been admitted in evidence.  The jury will have all of the

11    exhibits that are admitted in evidence in the jury room with

12    you.  Anything that's been actually admitted into evidence, you

13    will have in the jury room with you, and you can review or look

14    at the entirety of any of those documents or the entirety of

15    the video in the jury room or have it played for you.

16         And also, of course, Mr. Forde, you can play the

17    entirety or other portions during your cross-examination of the

18    witness when it comes to that, which sounds like it will follow

19    almost immediately after this.

20         So let's go ahead and proceed with his few seconds,

21    and then turn over the witness.

22         MR. HOFMANN:  I will then have one minute of

23    questioning.

24         THE COURT:  All right.

25         So one minute and one minute.

C94VHIC7                          Hicks – direct

1            MR. HOFMANN:  Yes.

2            (DVD played)

3    BY MR. HOFMANN:

4    Q.  Is that you, Mr. Hicks?

5    A.  Yes.

6    Q.  With your left arm on your hip?

7    A.  Yes.

8    Q.  Is that your grandson on the little bicycle?

9    A.  Oh, you better believe it.

10   Q.  Is that your son with his shirt off?

11   A.  Yes, my son Steven.

12   Q.  Is that your wife?

13   A.  Yeah, my wife Jan.

14   Q.  Okay.

15           (DVD played)

16   Q.  Is this you, Charlie?

17   A.  Yes, it is.

18   Q.  I'll just play a minute or so of it.

19           Have you seen this tape before, Charles?

20   A.  Yeah, once before.

21           (DVD played)

22   Q.  What arm did you use to pick up the tree?

23   A.  Left arm.

24           (DVD played)

25   Q.  What are you doing there?

C94VHIC7                         Hicks - direct

1   A.  I was cutting some of the top -- I think the ropes they had

2   around the trunk to loosen up the sack on it.

3            (DVD played)

4   Q.  Now, are you using that shovel?

5   A.  Yes.

6            (DVD played)

7   Q.  And this was moving the topsoil, as you said before?

8   A.  Yes.

9            (DVD played)

10           MR. HOFMANN:  All right, your Honor.

11           That's all I wanted to play at this point.

12           THE COURT:  All right.

13  Q.  And that's the videotape that Dr. Lisser indicated he

14  reviewed when he cut you off, right?

15  A.  Yes.

16  Q.  As you sit here today, Charles, could you tell the jury

17  what are your current complaints with respect to your right

18  shoulder?

19  A.  My problem is I can't get it above my chest line, like

20  right here.  I get it up to that point, I start to feel

21  tightness in the arm and a sharp pain.  And you still can hear

22  the click and you can feel it.  When you put your thumb on it,

23  you feel it.

24  Q.  And has that been pretty much the same since you got hurt

25  on the boat?

C94VHIC7                    Hicks – direct

```
 1   A.  Yes, sir.

 2              MR. HOFMANN:  I have nothing further at this time,

 3   your Honor.

 4              THE COURT:  All right.

 5              Thank you, Mr. Hofmann.

 6              Mr. Forde.

 7              MR. FORDE:  Yes.  I'd like to play the whole video of

 8   Mr. Hicks from beginning to end, if that's all right.

 9              THE COURT:  All right.

10              Is there any portion of it that you feel we could just

11   sort of skip, like the beginning part on the bike?

12              MR. FORDE:  Probably start somewhere around there,

13   you're right, your Honor.

14              THE COURT:  Why don't we just go to the shrub or

15   something.

16              MR. FORDE:  Well, hang on.  I've got to talk to my

17   technical guy.

18              THE COURT:  I don't want to unduly truncate it, but

19   unless he's pushing the bike...

20              (Pause)

21              THE COURT:  You're making us sea sick again?  That's

22   okay.

23              MR. FORDE:  Just play it.  It's just easier.  And I

24   don't want to waste the jury's time anymore.

25              THE COURT:  Mr. Forde, I'm not trying to truncate if
```

C94VHIC7                          Hicks - direct

1   you want to play the whole thing, but I'm just thinking, if you

2   could skip over the beginning part.

3         MR. FORDE:  I understand.  It's just that logistically

4   I don't see how we could do this quick enough, so that it's

5   just easier to play the whole thing and then be done with it.

6         (DVD played)

7         MR. FORDE:  Just note, your Honor, that it's amazing,

8   clocks are almost in sync.

9         (DVD played)

10  CROSS-EXAMINATION

11  BY MR. FORDE:

12  Q.  Mr. Hicks, while we're watching it -- silent movies are not

13  my favorite -- how long approximately were you working in the

14  yard that day?

15  A.  Actually, as long as this was.  Actually, my son Steven dug

16  the hole for me, and -- the kid with no shirt on.  And however

17  long this was, 25 minutes.

18        (DVD played)

19  Q.  While doing that yardwork, did your shoulder bother you at

20  all?

21  A.  I'm sorry, I wasn't paying attention.  I apologize.  I know

22  it's silent, but I was still watching.

23  Q.  So while you were working out there on April 15, 2010, was

24  your shoulder bothering you at all?

25  A.  I had some discomfort.  Not a lot at all.

1          (DVD played)

2          THE COURT:  Is this back at the beginning around?

3          MR. FORDE:  Did it flip back around?  It's beginning.

4          Okay.  Thank you, your Honor.

5    Q.  Okay.

6          Mr. Hicks, did you have medical coverage paid by Vane?

7    A.  Yes.

8    Q.  From all the way up to the point when Dr. Lisser listed you

9    as fit for duty; is that correct?

10   A.  I really don't remember.  And I'd be -- did I have medical

11   coverage?  I probably did.  I was paying for it at some

12   portion.

13   Q.  Well, at one point in time you were offered COBRA; is that

14   correct?

15   A.  Yes, sir.

16   Q.  And then you had 60 days to opt for that COBRA; is that

17   correct?

18   A.  Yes, sir.

19   Q.  And you did not opt for the COBRA; is that correct?

20   A.  No, I opt for the COBRA.

21   Q.  Is it your testimony today that Vane did not pay for your

22   medical all the way through till the date of when Dr. Lisser

23   listed you fit for duty?

24   A.  Yeah, they paid for that.

25   Q.  So when you applied for the job at Vane, you had a physical

C94VHIC7                              Hicks - cross

1   where you were describing that you were being tested dragging

2   things around and what have you; is that correct?

3   A.  Yes, sir.

4   Q.  So that when you applied for Dann, did you also have a

5   similar test?

6   A.  Dann Ocean Towing?

7   Q.  Yes.

8   A.  Nothing.

9   Q.  However, you did receive a fit-for-duty when you applied

10  for Dann, when it was a physical; is that correct?

11  A.  No, sir.

12  Q.  When you went and applied to Dann Towing, you did see a

13  doctor?

14  A.  Yes, sir.

15  Q.  And that doctor cleared you to work for Dann; is that

16  correct?

17  A.  I had gotten a fit-for-duty.  I don't know if it was Dann

18  or not.  I don't really remember.

19  Q.  When you filled out your -- I'm going to show you what has

20  been previously marked as Plaintiff's Exhibit D-42.

21          THE COURT:  Defendant's Exhibit 42?

22          MR. FORDE:  Yes.

23          MR. HOFMANN:  I just want to compare, Judge.

24          No objection.

25          THE COURT:  All right.

C94VHIC7                          Hicks - cross

1              Defendant's Exhibit 42, admitted.

2              (Defendant's Exhibit 42 received in evidence)

3              MR. FORDE:  May I approach the witness?

4              THE COURT:  You may.

5    BY MR. FORDE:

6    Q.  Mr. Hicks, what is Exhibit D-42?

7    A.  It's an application for Dann Ocean Towing.

8    Q.  And that is -- and that is in your handwriting; is that

9    correct?

10   A.  Yes, sir.

11   Q.  So in Exhibit D-42, you were required to list on Page 3

12   employment for at least the past ten years, with the last or

13   present employer listed first; is that correct?

14   A.  Yeah, listed employment of last ten years, present employer

15   list first.  KT Marine.

16   Q.  Okay.  You did not list Vane, did you?

17   A.  No.

18   Q.  Now, on this job application on Page 4, you list Great

19   Lakes; is that correct?

20   A.  Yes, sir.

21   Q.  Now, turning to the application for employment with Vane,

22   which has been previously marked as Exhibit D-1A.

23             MR. HOFMANN:  No objection.

24             MR. FORDE:  May I approach the witness?

25             THE COURT:  You may.

1          What is this 40?

2          THE DEPUTY CLERK:  1A.

3          THE COURT:  I'm sorry, 1A.

4          Defendant's Exhibit 1A, admitted.

5          (Defendant's Exhibit 1A received in evidence)

6   Q.  First off, what is this document, D-1A?

7   A.  It's a application that I believe Dann Ocean Towing gave me

8   when I was there.

9   Q.  D-1A, the second document I gave you.

10  A.  This was application for employment.

11  Q.  Was this the application for employment for Vane?

12  A.  I guess it is, if you say so.  I don't see their name on

13  here on the top.  I trust you.

14          MR. HOFMANN:  Look at the date.

15  Q.  Yeah, look at when you signed the last page.  See below

16  where it says "for personal departmental use only"?  Does that

17  refresh your recollection that this was the application for

18  Vane Brothers?

19  A.  Yeah, I signed this.

20  Q.  Do you see just below where you signed it under reference

21  check it has the Vane Brothers Company, Vane Line Bunkering,

22  Vane Brothers Marine Safety, etc.?

23  A.  Oh, yeah.  I'm sorry.  Yes.  Right there.

24  Q.  So that is the application for employment for Vane Lines;

25  correct?

C94VHIC7                         Hicks - cross

1   A.  Yes, sir.

2   Q.  And is this your handwriting; correct?

3   A.  Yes, sir.

4   Q.  Now, in the area of employment experience, on Page 3, you

5   list Enco, where you were employed from 2005 to 2008.

6   A.  Yes, sir.

7   Q.  And Henry Marine?

8   A.  Yes, sir.

9   Q.  2005 to 2007; correct?

10  A.  Yes, sir.

11  Q.  Both -- you worked for the same person, but under a

12  different entity; is that correct?

13  A.  No.  Enco and Henry Marine are two different companies.

14  Q.  Okay.  But you referenced in a telephone number the same

15  identical number for each one; correct?

16  A.  Yes, sir.

17  Q.  Now, you worked full-time for Enco from 2005 to 2008; two

18  weeks on, two weeks off?

19  A.  No.

20  Q.  With respect to Henry Marine, did you work from 2005 to

21  2007, two weeks on, two weeks off?

22  A.  No.

23  Q.  Now, I noticed that in your turning to the Exhibit D-42,

24  neither one of these companies have been listed on your

25  application for Dann Towing; is that correct?

C94VHIC7                          Hicks - cross

1   A.  Yes, sir.

2   Q.  And is it also correct that Great Lakes is not listed on

3   your Vane Line job application?

4   A.  No.  That was back in -- never mind.

5   Q.  Now, I'm going to show you what has been previously marked

6   as Exhibit D-41.

7                THE COURT:  Any objection?

8                MR. HOFMANN:  No.

9                THE COURT:  Are you going to offer this, Mr. Forde?

10               MR. FORDE:  Yes, your Honor.

11               THE COURT:  All right.

12               Defendant's Exhibit D-41 into evidence, admitted.

13               (Defendant's Exhibit 41 received in evidence)

14   Q.  What is Exhibit D-41?

15   A.  Dann Ocean Towing.

16   Q.  If I may, I'm giving you bad copies of these things.  Let

17   me switch this one out.  It's got a color sticker.

18               THE COURT:  All right.

19   Q.  And that's in your handwriting; is that correct?

20   A.  Yes, it is.

21   Q.  And this is a post offer of employment information; is that

22   correct?

23   A.  Yes, it is.

24   Q.  Turning to Item 17 on Page -- on the last page -- first

25   off, that's your signature on the bottom; is that correct?

C94VHIC7                              Hicks - cross

1    A.  Yes, it is.

2    Q.  And it's dated 9/12/2011; is that correct?

3    A.  Yes, sir.

4    Q.  Under Item 17, it lists -- it states:  Have you ever been

5    temporarily or permanently injured or disabled while working

6    for a previous employer?

7    A.  Yes.

8    Q.  You checked off no; is that correct?

9    A.  Yes, sir.

10   Q.  And under that it also said:  If yes, explain on the back

11   of this page.  Is that correct?

12   A.  Yes, sir.

13   Q.  No. 18, Item 18:  Have you ever received workers

14   compensation or maintenance payments.  Is that correct?

15   A.  Yes, sir.

16   Q.  And you checked off no.

17   A.  Yes, sir.

18   Q.  And that, too, has:  If yes, explain on the back of this

19   page.  Is that correct?

20   A.  Yes, sir.

21   Q.  And No. 19:  Have you ever sued or filed a complaint

22   against a former employer for any reason?

23           And you checked off no.  Is that correct?

24   A.  Yes, sir.

25   Q.  And again, it has:  If yes, please explain on the back of

1    this page.  Is that correct?

2    A.  Yes, sir.

3    Q.  Now, you listed on your Dann Ocean Towing as one of your

4    places that you worked for was Great Lakes.  And it was during

5    the period of 2004 to 2005; is that correct?

6    A.  Yes, sir.

7    Q.  Okay.  But that's not the first time you ever worked for

8    them; is that correct?

9    A.  No.

10   Q.  You actually worked for them back in 1991; is that correct?

11   A.  Yes, sir.

12   Q.  And back in 1991, you got injured on a Great Lakes tug and

13   barge on the sand scale; is that correct?

14   A.  Yes, sir.

15   Q.  And you saw a doctor with respect to that injury; is that

16   correct?

17   A.  Yes, sir.

18   Q.  And that's the injury you received the fusion in your

19   spine, and you also received permanent nerve damage in your

20   left arm; is that correct?

21           MR. HOFMANN:  I'm going to object to the compound.

22           THE COURT:  All right.

23           Why don't you take them one at a time, Mr. Forde.

24           MR. FORDE:  Okay.

25   Q.  It was during that -- while working for Great Lakes, that

C94VHIC7                        Hicks - cross

1    you injured your cervic which required surgery and fusion of

2    several --

3              THE COURT:  Vertebrae.

4    A.  Four, five, six.

5              MR. FORDE:  Thank you.

6    Q.  Huh?

7    A.  Four, five, six.

8    Q.  Okay.

9              And it's also this injury that you -- I mean this

10   incident on Great Lakes that you suffered permanent nerve

11   damage in your left hand -- left arm; is that correct?

12   A.  That I don't know about.  I don't remember that part.

13   Q.  Do you remember the part where you claimed that your

14   injuries were due to an incompetent mate?

15   A.  Yes, sir.

16   Q.  And that you had a doctor that testified that you were

17   permanently disabled and would frequently be subject to losing

18   your balance?

19             MR. HOFMANN:  Objection.

20             THE COURT:  Overruled.

21   A.  At that time, yes.

22   Q.  And you retained counsel and commenced a lawsuit against

23   Great Lakes; is that correct?

24   A.  Yes, I did.

25   Q.  And in that lawsuit, you claimed that you could no longer

1    work, and you ultimately settled for about $750,000; is that

2    correct?

3          MR. HOFMANN:  Objection.

4          THE COURT:  Overruled.

5    A.  Yes, I -- we settled for 750.

6    Q.  Okay.

7          And in that Great Lakes lawsuit, you claimed to need

8    receive maintenance and cure; is that correct?

9    A.  I don't remember what it was they asked for.

10   Q.  In this matter, you are suing Vane for what, in effect, is

11   negligence due to an incompetent crew; is that correct?

12   A.  I wouldn't say incompetent.  I would say negligent in not

13   doing what they had to do.

14   Q.  Well, in the Great Lakes case, you alleged that the mate

15   was supposed to be helping you out on a two-man job

16   disconnecting two sand barges; is that correct?

17         MR. HOFMANN:  Objection, your Honor.

18         THE COURT:  Overruled.

19   A.  The mate was brand-new on the boat.  Two days.  He just

20   started steering.  They put him on the boat.  And they put

21   another guy out on the barge.  They sent me out to work on the

22   barge.

23   Q.  Okay.

24         You are alleging in this current matter that it was a

25   new captain on the boat, and that he was incompetent in

C94VHIC7                        Hicks - cross

1   operating the tow winch; is that correct?

2   A.  On what we were doing up in there?

3   Q.  Yes.

4   A.  No, that's not correct.

5           THE COURT:  Mr. Forde, just for your planning

6   purposes, we are going to end in four minutes for the day; not

7   before, but not after, exactly four minutes from now.

8           MR. FORDE:  I'll get a couple more questions in.

9           THE COURT:  All right.

10  BY MR. FORDE:

11  Q.  In 19 -- on October 6th, 1995, you were in an automobile

12  accident in which you received personal injury and hurt your

13  neck; is that correct?

14          MR. HOFMANN:  Objection, your Honor.

15          THE COURT:  Overruled.

16  A.  Not -- something about it.  I had a sprain on the neck and

17  whiplash at that time.

18  Q.  And you sued -- you commenced a lawsuit in that case; is

19  that correct?

20  A.  Yes, I did.

21  Q.  Okay.

22          And you received compensation or some sort of a

23  settlement in that case; is that correct?

24  A.  Well, for the car damages and the loss of work.

25          THE COURT:  I don't think you need to go into the

1    amount.

2             MR. FORDE:  It was a one shot.

3             THE COURT:  Right.  Just to make sure.

4    Q.  That same day you also sued your wife in that car accident;

5    is that correct?

6    A.  Sued my wife in that car accident?

7    Q.  Yes.

8    A.  No.

9    Q.  On 11/28/1995, you were in another automobile accident

10   alleging personal injury.  Did you commence a lawsuit in that

11   case?

12   A.  No.

13            MR. HOFMANN:  Objection, your Honor.

14            THE COURT:  Overruled.

15   Q.  In September 1998, you fell off the roof of your house,

16   right?

17   A.  Customer's house.

18   Q.  Okay.  Customer's house.

19            You sued your wife.

20   A.  Yes.

21   Q.  You sued the manufacturer of the ladder, right?

22   A.  Correct.

23   Q.  You sued Home Depot, I guess, for selling you the ladder?

24   A.  Well, they bundled it all up, because that's what you have

25   to do, according to the law.

C94VHIC7                           Hicks - cross

1   Q.  In that one, you hurt your neck and your back and your

2   foot; is that correct?

3   A.  Yes.

4   Q.  You also claimed workers compensation for Mom's Three Sons,

5   Inc., located at Five Chanowich Court, your home address; is

6   that correct?

7   A.  That's my wife.

8            MR. HOFMANN:  Again, objection, your Honor.

9            THE COURT:  Overruled.

10           One minute.

11           MR. FORDE:  One minute.

12           I might be able to get one more of these.

13  Q.  On February 10, 2002, you got into another auto accident

14  where you sued MTS Construction Corporation; is that correct?

15  A.  No, that's not correct.

16  Q.  Did you claim workers compensation on that one?

17  A.  No.

18  Q.  Did you complain about neck and back pain?

19           MR. HOFMANN:  Objection, your Honor.

20           THE COURT:  To which question?

21           MR. HOFMANN:  The previous question.

22           THE COURT:  Well, he said no, that's not correct.  So

23  I think it's okay.

24           Overruled.

25           THE COURT:  Why don't we have the court reporter --

1    why don't you restate the question -- oh, we're at 5 o'clock.

2            Save that question for tomorrow.

3            MR. FORDE:  Saved.

4            THE COURT:  All right.

5            Ladies and gentlemen of the jury, we are going to

6    adjourn for the evening.  We'll pick up tomorrow morning at

7    9:30.  So we'll start the testimony promptly at 9:30.  If you

8    could be here a few minutes before that and get yourself all

9    ready so we can waltz you out at 9:30, that would be very

10   helpful.  So we could then just go until 12:45 again.

11           We'll have a break in the mid morning, and then we'll

12   take a lunch from 12:45 to 2, right, Joe?  Then we'll go from

13   then until -- I've got -- I have to go to an induction for a

14   new judge at 4 o'clock, so I've got about 20 minutes, takes me

15   20 minutes.  I run down, run back.  So we'll try to time our

16   mid afternoon break for that, and come back and then go till 5.

17           All right.  So that's the schedule for tomorrow.

18           And, again, don't talk to anybody about this case.

19   Don't talk to each other.  Keep an open mind.  There's still a

20   lot of evidence to come in.

21           Thank you very much.

22           (Jury excused)

23           THE COURT:  All right.  You can step down, Mr. Hicks.

24           (Witness excused)

25           THE COURT:  Why don't you all be seated.

1          I just want to make sure we all know where we're going

2    and if there are any issues to raise.

3          First, Mr. Hofmann, I just want to make sure I

4    understand the basis and nature of the objections which I was

5    overruling that you were raising to the various lawsuits.

6          MR. HOFMANN:  If I may.

7          THE COURT:  Sure.

8          I was assuming that you were doing a 403 objection.

9          MR. HOFMANN:  It's first on relevance.

10          THE COURT:  All right.

11          Well, it goes to credibility.

12          All right.

13          Anyway, give me your basis.

14          MR. HOFMANN:  I would like to discuss that.

15          What credibility issue is being resolved?

16          THE COURT:  I'm not going to actually debate.  You

17    tell me your bases, and I'll tell you whether or not I feel

18    comfortable with my ruling.

19          401, overruled.

20          Give me the next one.

21          MR. HOFMANN:  May I at least make a record, your

22    Honor?

23          THE COURT:  Sure.

24          MR. HOFMANN:  A man having car accidents and injuring

25    other parts of his body is not relevant.  He's never said that

C94VHIC7

```
1   he never had car accidents.  And to attempt to besmirch his
2   credibility by saying that he's had car accidents and perhaps
3   brought workers comp claims or personal injury claims in court
4   somehow affects his credibility here with this industrial
5   accident is too far afield for it to be relevant.  And so the
6   prejudice of this line of questioning, in my opinion, greatly
7   outweighs --
8           THE COURT:  Okay.  So that's a 403.
9           Mr. Hofmann, I'm not trying to give you a hard time.
10  For the record, I want to make sure we've got everything clear.
11          MR. HOFMANN:  I'm just making my record.
12          THE COURT:  So 401 and 403.
13          MR. HOFMANN:  Right.
14          THE COURT:  All right.
15          Mr. Forde, do you want to say anything?
16          MR. FORDE:  Well, it is going towards his credibility.
17  It's also going towards a pattern.  There's case law out there
18  that allows these type of -- while generally, you know, they
19  are not allowed in, this is a lot.  I mean this establishes a
20  pattern that may actually establish something that I think --
21  the Second Circuit has ruled recently that it's -- was it
22  recently?  Credibility and pattern under *Tomaino v. O'Brien*,
23  315 Fed. Appx. 359-361, 2009.  359 at 361.
24          We got other Second Circuit cites under 404(b).
25  Evidence of other acts is not admissible to prove character of
```

C94VHIC7

a person in order to show action performing therewith.  It may,

however, be admissible for other purposes.  And that case is

*Houtly v. City of New York*, 837 FTD 587 at 593 (2d. Cir.

Circuit 1988).  *Young v. Calhoon*, 1995 Westlaw 169020,

(S.D.N.Y. 1995).  And it's also admissible showing prior

injuries that might be relevant.  And that would be *Brewer v.*

*Jones*, 222 Fed. Appx. 69-71.  I might have screwed up that

cite.  Second Circuit 2007.

MR. HOFMANN:  Will you try it again, Jim.

MR. FORDE:  Oh, sorry.

222 Fed. Appx. 69, 69-71, (2d Cir. 2007).

(Continued on next page)

C94rhic8

1        Finally, your Honor, they opened the door with the

2   Dann application showing that he lied and that he never had any

3   litigation.  I think I have a right to keep pursuing it.

4        THE COURT:  Here is my ruling.  I, number one, find

5   that it is relevant.  It certainly goes to the issue of

6   credibility.  The jury will do with it what they do with it.

7   I'm not suggesting that it shows that the witness lacks

8   credibility, but I think it goes fairly to the issue of whether

9   or not the witness is credible in all that he says.  They may

10  find that it is so or not so, as they see fit.

11       Under 403 I don't believe that its relevance is

12  substantially outweighed by the danger of unfair prejudice.

13  There is certainly not going to be any confusion of issues or

14  misleading the jury, so the question is whether or not it is

15  outweighed by unfair prejudice.

16       In this situation the credibility of the witness is

17  obviously the critical issue, I think, in this trial.  I

18  haven't seen the rest of the testimony that the medical

19  professionals may bring in, but it is certainly going to be one

20  of the critical issues as was stated at the various openings.

21       So I stand by my ruling.  You all made your record.

22  It is what it is.  We'll proceed.

23       Is there going to be more of this tomorrow, Mr. Forde?

24       MR. FORDE:  Yes, there is.  I'm sorry.

25       THE COURT:  There may come a point when you have made

C94rhic8

1   your point.  What I would suggest is based upon my rulings

2   today, what you do is preview with the Court tomorrow

3   generically.  I'm not asking you to give away the secrets of

4   your cross, but generically what you are going to be doing at

5   our 9 o'clock session so we can have a sense of where we are

6   going to go.  If there are going to be 20 more of these, I

7   don't know that we need to go through all of them.  If there

8   are two more, that's different.  All right?

9           MR. FORDE:  Yes, your Honor.

10          THE COURT:  Let's talk about this tomorrow at 9

11   o'clock.  How much cross-examination are you going to have with

12   this witness in addition to this?

13          MR. FORDE:  Best estimates, I would probably say an

14   additional 45 minutes to an hour.

15          THE COURT:  That will be helpful.  Next we go to Mr.

16   Rizzo's videotape deposition, Mr. Hofmann?

17          MR. HOFMANN:  Yes, Judge.  Actually, is Lusardi

18   definitely on?

19          MR. FORDE:  Lusardi is here.  He has the whole day.  I

20   thought it would make more sense if Lusardi bridged both of us.

21   That's just me.

22          THE COURT:  How would you like to do it?

23          MR. HOFMANN:  I would prefer to put on Mr. Lusardi,

24   since he is going to be here, and let him get on with his life.

25   Then we will do Dr. Rizzo's disposition.

C94rhic8

1           MR. FORDE:  I have no objection.

2           THE COURT:  We'll finish Mr. Hicks tomorrow morning

3   first thing, then do Mr. Lusardi, and after that you will

4   proceed as you see fit.  You mentioned Mrs. Hicks or the Rizzo

5   deposition.

6           Let me give you one reminder.  No one should be

7   talking or saying anything at all to the jurors.  It was

8   brought to my attention, and I'm sure this was inadvertent, I

9   attribute no bad intent to this, that I think it was Mr. Hicks,

10  or at least it was the juror believed it was Mr. Hicks, that

11  Mr. Hicks may have said to a juror after the lunch break, you

12  better hurry up and go smoke if you're going to go smoke or

13  something to that effect.

14          There may have been some misunderstanding that my

15  admonition about not speaking to any jurors applies to the

16  parties as well as counsel.  We don't want the jurors to

17  believe that there has been any pressure put upon them to come

18  out one way or the other or any kind of relationship that's

19  been developed or not developed.  So, as a result, just to

20  prevent anybody from having any issues and discussions about

21  jurors, we make an across-the-board rule.  I just wanted to

22  give a very soft reminder to that.

23          Anything else people would like to raise?

24          MR. HOFMANN:  No, your Honor.

25          MS. FARRAR:  I have a question.  You mentioned this

C94rhic8

1   morning that you were going to discuss jury charge tomorrow

2   morning at 9:00.

3           THE COURT:  Thank you for reminding me.  I had been

4   going through one last piece, and it has to do with attorney's

5   fees.  There is a portion of the charge which has been used in

6   the past that relates to if there is a finding of willfulness,

7   will we awarded attorney's fees.  I am convinced that if

8   willfulness is found, which would be a special question on the

9   verdict form, attorney's fees are awardable.  I don't think it

10  is up to the jury at this point in time to put down the amount

11  of attorney's fees.

12          MR. HOFMANN:  Exactly, your Honor.  I thought of this

13  and I wanted to address it.  If they answer the question in the

14  affirmative, then I think it would be for the Court.  I think

15  there are some cases recently that say that that would be an

16  issue for the Court.

17          THE COURT:  That would make the most amount of sense.

18  That is how it is typically done in other cases, where you

19  would submit your backup and we would determine what was

20  reasonable.

21          MR. HOFMANN:  Exactly.

22          THE COURT:  We will make that change.  We will

23  circulate them by email this evening.  I apologize for the

24  lateness of it, but we were going back and forth a little bit

25  on that where I was saying I'm really not convinced on this

C94rhic8

1    one.  That's why I was handing it over.  I do apologize for

2    getting it to you so late.  If we can't do all of it tomorrow

3    morning, then we'll do it at the mid-morning break.

4           MR. HOFMANN:  As to that issue of where I thought I

5    was going to be offering additional jury questions, I re-reread

6    it and then said I already covered the issue.  So I'm not

7    offering anything further.

8           THE COURT:  OK.  You may have another opportunity to

9    offer that if it turns out that we have excluded it from what

10   we have drafted.  We'll send everything by email this evening

11   very shortly.  Thank you.  We are adjourned for tonight.

12           (Adjourned to 9:00 a.m., September 5, 2012)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         INDEX OF EXAMINATION

 2    Examination of:                           Page

 3    CIRO CHARLES HICKS

 4    Direct By Mr. Hofmann  . . . . . . . . . . . .52

 5    Cross By Mr. Forde . . . . . . . . . . . . . 165

 6                         PLAINTIFF EXHIBITS

 7    Exhibit No.                             Received

 8     4 and 60   . . . . . . . . . . . . . . . . .60

 9     56   . . . . . . . . . . . . . . . . . . . .60

10     58   . . . . . . . . . . . . . . . . . . . .61

11     15   . . . . . . . . . . . . . . . . . . . .65

12     27 and 28  . . . . . . . . . . . . . . . . .67

13     2 and 3  . . . . . . . . . . . . . . . . . .68

14     5  . . . . . . . . . . . . . . . . . . . . .79

15     7A   . . . . . . . . . . . . . . . . . . . .89

16     7B   . . . . . . . . . . . . . . . . . . . .91

17     9  . . . . . . . . . . . . . . . . . . . . 105

18     8  . . . . . . . . . . . . . . . . . . . . 108

19     10, 11 . . . . . . . . . . . . . . . . . . 113

20     34   . . . . . . . . . . . . . . . . . . . 120

21     12   . . . . . . . . . . . . . . . . . . . 121

22     61   . . . . . . . . . . . . . . . . . . . 128

23     41   . . . . . . . . . . . . . . . . . . . 135

24     33   . . . . . . . . . . . . . . . . . . . 139

25     30   . . . . . . . . . . . . . . . . . . . 156
```

1    29   . . . . . . . . . . . . . . . . . . 156

2    48   . . . . . . . . . . . . . . . . . . 158

3    52   . . . . . . . . . . . . . . . . . . 160

4                    DEFENDANT EXHIBITS

5    Exhibit No.                        Received

6    45   . . . . . . . . . . . . . . . . . . 159

7    42   . . . . . . . . . . . . . . . . . . 168

8    1A   . . . . . . . . . . . . . . . . . . 169

9    41   . . . . . . . . . . . . . . . . . . 171

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25