HOFMANN & SCHWEITZER
Attorneys for Plaintiff
360 West 31st Street, Suite 1506
New York, NY 10001-2727
Tel: 212-465-8840

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
CIRO CHARLES HICKS,

                             Plaintiff,          11 Civ. 8158 (KBF)

       -against-

VANE LINE BUNKERING, INC.,
and the TUG PATRIOT, In Rem,

                             Defendants,
--------------------------------------------------------x

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF APPLICATION FOR ATTORNEYS FEES

     The following constitutes plaintiff's memorandum of law in support of his application for attorneys fees to be assessed against the defendant for the negligent, unreasonable and wilful and wanton failure to pay a reasonable rate of maintenance to plaintiff and for its unreasonable termination of cure.

## STATEMENT OF FACTS

     The court, of course, is familiar with the allegations of the complaint, the proofs adduced at trial, and the findings of the jury. In summary, Charles Hicks, the plaintiff, was a tug boat mate injured on April 21, 2009 on the job while employed by Vane Line Bunkering, Inc. on its tugboat PATRIOT.

     On that day, as the vessel and its tow proceeded down the James River towards Newport News Virginia, just before entering the Chesepake Bay, Mr. Hicks performed a task by himself on the stern of the boat where he manually pushed a 200+ pound type

of pulley, called a 'donut', several feet up a 10" diameter steel pipe, known as a "Texas bar" which was fitted from one side of the stern of the tug boat to the other.  The Texas bar is shaped sort of like a flattened, upside down "U" and connects on either side to the rails of the boat. It then rises up about 6-7 feet over the deck.  The boat's towing winch, from which runs the heavy steel cable used to tow barges, is several feet forward of the Texas bar on the stern of the boat. The towing wire runs from the towing winch over the Texas bar, which is designed to hold the towing wire up so it does not chafe on the stern rail of the boat.  To keep the towing wire from chafing on the Texas bar, the wire is placed in the round 'donut' pulley which can slide back and forth along the Texas bar, and which can roll on that bar as the wire in it stretches and contracts during the towing operation. Towing wires cost $10,000 or more, and if the wire breaks, it can cause the company to sustain significant economic loss, and more importantly, could lead to a towed gasoline or oil barge breaking loose leading to a potential terrible disaster such as a collision, property damage, explosion, etc.  For this reason, the towing wire must be protected.

The donut pulley, when not engaged with a towing wire, rests in the crotch formed where the Texas bar connects to the side of the boat, at about waist height.  The steel donut, which weighs some 200+ lbs, must, one way or the other, be lifted up and along to the center of the Texas bar where the towing wire extends from the winch out over the bar, over the stern of the boat and to the barge being towed.

There are two means of lifting the donut up the Texas bar.  The first is to manually lift the donut, which is physically difficult because of its weight and size.  The

other method, which is the typical one followed, is to first have the tow wire put out to the barge and allow the wire to rest on the Texas bar, and then maneuver the stern of the boat so that the tow wire slides along the bar to the side of the bar where it connects to the boat's railing, which is where the donut is resting.  The wire then will ride up the lip of the donut and settle in its notch.  The stern of the tugboat is then maneuvered back in the other direction so that the wire, in the donut, rides back up the Texas bar.  The wire and donut move together up the Texas bar to the bar's center, which is the position where it will stay as the barge behind the tug is towed.

Mr. Hicks testified that on the day of the incident, the captain was at the controls of the boat on the stern of the boat.  The captain, Bruce Comiskey, was having difficulty maneuvering the wire into the donut, so he and Mr. Hicks discussed how they would get the wire into the donut which was becoming a critical necessity as they were about to be towing a barge into the potential heavy seas to be encountered in the Chesepeake Bay. Captain Comiskey either directed Mr. Hicks, or Mr. Hicks volunteered, to go down to the stern and manually push the donut up the wire.  Mr. Hicks testified that he expected to get help moving the wire from the deckhand, Glenn Scroggins, or the vessel's engineer, Mark Johnson, who Hicks said was on deck at the time.  Mr. Hicks testified that when he asked the deckhand to assist, the deckhand refused because it was too dangerous.  He said that the engineer refused to assist because he said he had been told by the captain not to do deckhand's work, which would include issues with the tow wire.

Accordingly, Mr. Hicks took it upon himself to try to push the donut into position, and in so doing, felt a tremendous pain in his shoulder, believing it to be

3

dislocated.  He let the donut go, and asked the engineer to pull down on his arm to relocate the shoulder in its socket.  He testified that he then went into the vessel's galley to allow the pain to pass.

Mr. Hicks testified that Captain Comiskey observed the events and knew of the injury.  Mr. Hicks testified, further, that the engineer, Mark Johnson, was right by where Mr. Hicks was, and observed Mr. Hicks moving the donut by himself without lending assistance.

Captain Comiskey admitted that he was operating the controls of the boat from the stern 'doghouse' operating station at the time when the tow wire was made up to the barge. However, Captain Comiskey denied that he saw Mr. Hicks try to move the donut himself, and said it would be 'crazy' for him to order or allow Mr. Hicks, or anyone, to try to move the donut by himself.  He further testified that he only learned about the incident late that evening, or the following morning.  At that time, he told Mr. Hicks to fill out an accident report concerning his injury.

On cross-examination, Captain Comiskey admitted he remember next to nothing about the events of April 21, 2009.  He conceded the only things he knew were those that were recorded in the vessel's log and what he read in the accident report, the sign-off sheet completed by Mr. Hicks and the other crewmembers and his own emails regarding the reported incident. Thus, his recollections and testimony were suspect.

Mark Johnson testified by deposition that he knew nothing at all about Mr. Hicks's being injured or that he observed Mr. Hicks even attempt to move the donut by himself.  He did not recall assisting Mr. Hicks with his dislocated shoulder.  On cross-

examination, Mr. Johnson admitted he remembered next to nothing about anything that occurred during the trip in April 2009, thus his recollections and testimony were suspect.

Deckhand Glenn Scroggins testified by deposition that he was unaware of anything happening to Mr. Hicks during that trip until he saw the injury report in the sign-off sheet all the crew completed when they left the vessel. On cross-examination, Mr. Scroggins also admitted he remembered next to nothing about anything that occurred during the trip in April 2009, thus his recollections and testimony were suspect.

Lastly, Deckhand Vincent Lusardi was called by plaintiff and testified that on the day of the incident, April 21, 2009, he recalled seeing Deckhand Scroggins come into the galley and say he was getting off the stern of the boat because the wire was out and it was dangerous.  Mr. Lusardi stated that he went out the galley door and stood by the towing winch and observed that the wire was out over the Texas bar, but it was not fitted into the donut, which was lying off to the side of the Texas bar. He stated that he observed the boat being maneuvered back and forth as if the operator was trying to catch the donut in the wire and pull it up the Texas bar.  He admitted that his prior testimony, given at deposition, was likely correct that the boat's operators that day never got the wire into the donut.  Shortly after observing these things, he went into the galley.  He testified that shortly thereafter, he was on the bridge of the tug, and that Mr. Hicks was at the wheel.  Mr. Hicks complained to him that he had hurt his shoulder.  Mr. Lusardi stated that what Mr. Hicks told him was consistent with what was written in the sign-off sheet and accident report, that Mr. Hicks had hurt his shoulder pushing up the donut on the Texas bar.

The jury found that as a result of Mr. Hicks's attempt to manually lift the donut by himself he suffered a right shoulder injury.

Mr. Hicks did report the injury and filled out an accident report.  In that the crew change was scheduled for the following morning, he left the vessel when the new crew took over.

He testified that the company provided a van to drive them from Virginia to Philadelphia and during the ride he received a call from a Vane Line employee who asked why he did not see a doctor of their choice in Philadelphia. He told her that he wanted to get home and see his own doctor.

At home, he saw his own doctor, Dr. Bernard Murphy, who had operated upon his knee many years earlier. Dr. Murphy diagnosed a possible tear of the rotator cuff in the shoulder, gave plaintiff an injection and suggested that a MRI would be helpful to assist diagnose his condition. Mr. Hicks asked Dr. Murphy to defer any further treatment until he had served his next hitch on the Patriot, and requested the doctor to make him Fit For Duty because he did not want to be found disabled which he feared would cause him to lose his job.  Dr. Murphy agreed, but advised Mr. Hicks that if he was not better in 2 weeks time, further medical investigation would be necessary.  Reluctantly, Dr. Murphy supplied Mr. Hicks with a Fit for Duty ("FFD") status slip. Mr. Hicks then sent the FFD slip to Vane Line, but the company rejected it, and required Mr. Hicks to see its own doctors to determine whether Mr. Hicks's injury would prevent him from handling the rigors of the job.

Vane sent Mr. Hicks to a medical clinic operated by Concentra Medical Centers

6

(NJ) in Edison, New Jersey, which was under contract with Vane to provide employee physical examinations. The company doctor at Concentra examined Mr. Hicks and stated that in his opinion the injury was too severe and thus, would prevent Mr. Hicks from being able to perform the rigors of his job as tug boat mate. He made plaintiff Not Fit For Duty, and advised Mr. Hicks to seek medical attention from an orthopedist after he had an MRI performed of his shoulder.

Vane Line provided the Concentra doctors with a form that stated that for a worker to be cleared by it for work on its boats as a mate, the candidate would have to be able to pass testing by the facility that included lifting a 40 lb. weight overhead for at least two repetitions. It also required the candidate to safely perform a climbing test wherein the worker had to safely climb and descend a 20 foot ladder. This same test was passed by Mr. Hicks in September 2008 when he was initially hired by Vane.

In that the company doctor determined he was not fit for duty, Mr. Hicks returned to Dr. Murphy, who referred him to his partner, Dr. Steven Lisser, who specializes in shoulder injury cases. Dr. Lisser examined Mr. Hicks, reviewed a MRI of the shoulder performed on May 20, 2009, and determined that Mr. Hicks needed surgery. The company approved the surgery which was performed at Riverview Medical Center in Red Bank, New Jersey on July 1, 2009.

On July 23, 2009, only three weeks after the surgery to repair the on-the-job injury, Vane Line terminated Mr. Hicks's employment, despite knowledge that the recuperation period would be about 6 months. There was a clear motivation for Vane to terminate the employment, as they could then stop paying fringe benefits, such as

7

medical insurance.  As to medical insurance, Vane advised Mr. Hicks that he could continue under Vane's insurance policy so long as he paid the premiums, as required under COBRA.  Vane so advised Mr. Hicks of this by letter.  Mr. Hicks testified that he paid the COBRA premium for a period of months thereafter.

An injured seaman, under maritime law, is entitled to be paid what is known as 'maintenance', which is a payment by his employer of the seafarer's actual reasonable costs of food and lodging while he recuperates and until he reaches maximum medical improvement.  It has some similarity to workers compensation in that regard, except that it is not administered or overseen by a government oversight agency, and instead of having a set scale of benefits, the employer is required by law to pay the actual reasonable costs of food and lodging.  Enforcement of the seafarer's rights to maintenance and cure can only be obtained through a lawsuit in court. See, e.g., *Vaughn v. Atkinson*, 369 U.S. 527 (1962).  Plaintiff proved at trial that his actual costs for food and lodging (taking into account contributions from his two emancipated sons who lived in his home) was approximately $67/day.  Vane Line, arbitrarily, paid Mr. Hicks only $15/day during the period of time that it paid this benefit.  On cross-examination of its claims adjustor as to why Vane only paid $15/day, Bill Neubrand admitted that the reason they paid $15/day was because that was the amount his predecessor in that job paid when Mr. Neubrand took over the job eight years earlier.  He simply continued that arbitrary practice. When he was asked had he ever inquired what was the status of the law as to the amount a seaman's employer was required to pay, he conceded he had made no such inquiry.

As a result of his deteriorating financial condition caused in part by being paid only $15/day in maintenance, Mr. Hicks's house was put into foreclosure.  Struggling to meet his bills, he found that he could not make his current payments, or arrears that had accrued, on his mortgage, plus pay for utilities and food and his health insurance premiums which were his responsibility under COBRA.  Accordingly, he dropped his health insurance because the premiums were too expensive.

In late 2009, because he had no income, and was only receiving maintenance of $15/day, Mr. Hicks was forced to return to work part time despite his badly injured shoulder that had not fully healed post-surgery.  In order to get the part-time work, he felt compelled to make misrepresentations on his employment applications, denying that he had the shoulder injury that occurred while working for Vane Line. He believed that no other maritime employer would hire him because 1) he had a still symptomatic, un-healed, disabling shoulder injury and 2) he was making a tort claim against his former maritime employer.

Starting shortly after the surgery, Mr. Hicks was prescribed and partook of physical therapy that was paid for by the company.  He continued receiving physical therapy at Dr. Lisser's office for over 6 months, and he did physical therapy twice a day at home doing exercises prescribed by Dr. Lisser and the physical therapist.  He gained improved function and strength over the first few months of therapy, but despite this treatment, his shoulder's functional recovery and pain decrease reached a plateau by January 2010.  By that time, Dr. Lisser had advised him that he could do activities around the house as tolerated.  The difficulties he continued to experience, however, was

that he had pain and weakness when lifting his arm up overhead.  He had trouble lifting heavy weights, as well. In other planes, his motion was quite normal and only moderately painful.

On April 15, 2010, a warm spring day, Mr. Hicks was in his front yard with his 4 year old grandson planting a little pine tree.  The weight of which, with root ball, one can estimate was about 20 lbs.  He had his 25 year old son dig a hole in which he intended to plant the tree.  As part of the process, Mr. Hicks moved the bush into the hole, picking it up with his left arm, the non-injured upper extremity.  He and his grandson then threw topsoil around the base of the bush.  Mr. Hicks used  a large spade.  He opened up the burlap bag surrounding the root ball, and worked the tree into the hole previously dug, spreading topsoil around it.  He took frequent rest stops, and all the time that he did this work, Mr. Hicks kept his arm down low, and never worked with his arm overhead.  He carried the tree with his un-injured arm, and after doing the work, he carried the shovel and other tools away using his left arm.

Unbeknownst to him, all the while he did this the company had him under surveillance and videotaped this light outdoor work, which he was able to tolerate, because it was work not done in an overhead position, involved no climbing, and did not involve heavy lifting, which are all of the physical activities that he was disabled from doing.

On April 24, 2010, he saw his surgeon, Dr. Lisser, at a scheduled appointment. After his physical examination, the surgeon and physical therapist were so concerned that his condition was not improving that Dr. Lisser ordered a new MRI of the shoulder, and asked Vane Line to approve payment for it.  In response to the request, Vane Line, however, protested.  They had obtained the video of the outdoor tree planting, and requested that their nurse case manager, Theresa Smith, be allowed to show the doctor the video, in order to attempt to persuade the doctor that Mr. Hicks was a malingerer.

Incredibly, the doctor invited the nurse case manager to his office to show him the videotape, without inviting Mr. Hicks to attend to explain what he was doing, or to discuss whether there was any inconsistency between the work he did in the video and his physical complaints and findings during his medical examinations.  Thus, he was not presented the opportunity to explain to Dr. Lisser and Ms. Smith that his physical problems with lifting and working with his arm overhead were not shown in the video of him doing the tree planting.  In the entire videotape, which runs for 25 minutes, Mr. Hicks is never seen doing any overhead movement, heavy lifting or ladder climbing. Thus, there was nothing within the videotape that was inconsistent with his physical complaints.

In conjunction with showing him the video, Vane also gave Dr. Lisser a misleading document which Vane represented to the doctor showed the physical requirements of a Vane Line tug boat mate.  The form erroneously stated that the physical requirements of a tugboat mate never require any lifting over 20 lbs.  The form makes no mention of any climbing requirements, or any of the normal duties of a tugboat

mate, such as, at times, handling lines, carrying heavy stores, climbing vertical ladders as much as 30 feet in length, carrying of heavy equipment such as 90 pound shackles, etc.

The company then asked Dr. Lisser if he had an opinion, based on the contents of the form and what he saw in the video, whether he felt Mr. Hicks was able to return to work on a tugboat as a mate. Dr. Lisser, apparently in a fit of pique at his patient not getting physically better said Mr. Hicks was fit for duty based upon his review of the physical requirements form he was presented and what he saw Mr. Hicks do in the videotape, wherein Mr. Hicks arguably picked up *with his left hand* items that weighed 20 lbs. Dr. Lisser then cut off all further medical care to Mr. Hicks.

In May 2010, Dr. Lisser saw Mr. Hicks in his office and told him that he was terminating his care, stating that Mr. Hicks was fit for duty.  Mr. Hicks told him that he cannot handle all of the normal physical requirements of a tugboat mate that involve much more strength, mobility and ability then was listed on the form that the company gave Dr. Lisser. He pointed out he was injured lifting the heavy donut, that he has to climb multi-story vertical ladders, has to be involved in rescue of overboard persons, all things that his shoulder injury prevented him from doing safely.  Dr. Lisser refused to listen, saying he did not want to get in the middle of a dispute between Mr. Hicks and the company.  Of note, Vane Line had paid Dr. Lisser approximately $70,000 for medical treatments to Mr. Hicks.

Mr. Hicks and his counsel, thereafter, made numerous attempts to contact Dr. Lisser in order to have him review the actual activities of a tugboat mate, so that he might understand that Mr. Hicks's ongoing shoulder problems rendered him not fit to

perform safely his duties for Vane Line.  This is confirmed by Dr. Lisser's admission

that Mr. Hicks's counsel, Paul T. Hofmann, sought to discuss the situation with him, but

he refused to see Mr. Hofmann.  In the exhibits admitted at trial is a letter from counsel

to Dr. Lisser in which is explained the kind of heavy work Mr. Hicks would be required

to do with photographs of equipment worked with by tug boat mates, yet Dr. Lisser

refused to change his position.

Since Vane Line, under false pretenses, had Dr. Lisser declare Mr. Hicks fit for

duty, in May 2010, Vane Line terminated the measly $15/day maintenance it was paying,

leaving the plaintiff with nothing to live on from the company, and without any further

medical care for his ongoing shoulder injuries.

At trial, Dr. Lisser agreed that the strenuous physical therapy he had prescribed to

the patient for 6 months, and which Mr. Hicks performed on a daily basis, included

doing exercises that had Mr. Hicks performing the exact same physical motions of the

arm and shoulder that Mr. Hicks was seen performing using the shovel in the video.

Thus, his statement that Mr. Hicks's actions in the video were inconsistent with being

not fit for duty is erroneous, because Dr. Lisser made Mr. Hicks not fit for duty while he

had Mr. Hicks performing those very same motions in physical therapy.  The only factor,

therefore, which could have been used by Dr. Lisser to change his mind was his review

of the false and misleading job physical demands document Vane provided him, which

falsely stated that as a mate Mr. Hicks would never have to lift more than 20 pounds and

further, which omitted notifying Dr. Lisser that mates often have to climb substantial

heights on vertical ladders and carry heavy equipment and materials in awkward

positions.

Dr. Lisser conceded that as of April 24, 2010 Mr. Hicks was still disabled from attempting to lift 50 lbs., which, if it was a requirement of his job that he be able to do so, he would be not fit for sea duty. What Vane Line failed to advise Dr. Lisser was that it is a job requirement for Vane Line mates to be able to lift 50 - 70 pounds or more, to carry heavy weights in awkward positions and to climb long ladders. These requirement are stated within the Vane Line company Operations Manual.  Vane Line never advised Dr. Lisser of these physical requirements, and thus, even if he honestly believed that Mr. Hicks could perform lifting of 20, or even 40 pounds, he certainly would not have determined that Mr. Hicks was fit for duty, if he had been told Mr. Hicks' job required lifting of 50-70 pounds or more. It was Vane Lines's wilful deception that led, in part, to Dr. Lisser finding Mr. Hicks "fit for duty", with the concomitant termination by Vane Line of Mr. Hicks' maintenance and cure.

Of significance, Dr. Lisser never reviewed the videotape with the jury to point out anything therein of Mr. Hicks's physical activities that day that Dr. Lisser found to be inconsistent with a diagnosis of a recurrent rotator cuff tear, or inability to do heavy physical tugboat mate's work.

When asked why he did not advise Dr. Lisser of the company operations manual requirement showing the 50-70 pound, or more, lifting requirement for tugboat mates, Bill Neubrand, the claims adjustor essentially said, "I don't know". Also of significance, Mr. Neubrand never reviewed the videotape with the jury to point out anything therein of Mr. Hicks's physical activities that day that Mr. Neubrand felt showed that Mr. Hicks's

activities were the equivalent of <u>all</u> those activities Mr. Hicks would be called upon to do as a tugboat mate.  It is to be recalled that Mr. Neubrand had extensive experience in the maritime business, and in particular, the tug and barge towing industry.

Thereafter, Mr. Hicks went to see another orthopedist who had treated him in the past, Dr. Charles Rizzo, who like Dr. Lisser is a shoulder specialist.  In August 2010 Dr. Rizzo examined Mr. Hicks and clinically diagnosed that Mr. Hicks had a recurrent tear of the rotator cuff.  Mr. Hicks then borrowed money to obtain an MRI, the same one originally prescribed, then rescinded by Dr. Lisser.  The MRI was performed on October 22, 2010, which confirmed a major recurrent tear of the rotator cuff.  Dr. Rizzo then strongly recommended revision shoulder surgery and testified that the recurrent tear likely occurred during the physical therapy Mr. Hicks had received after the July 2009 surgery.

Dr. Rizzo further testified that in light of the clinical and radiological findings of a rotator cuff tear, it would be reasonable to limit Mr. Hicks to lifting no more than 10-20 pounds and no overhead lifting or climbing.  He testified that as of the date of his testimony (May 29, 2012) Mr. Hicks had not reached maximum medical improvement, nor had he done so as of April 26, 2010, when Vane Line cut him off from medical care. Dr. Rizzo further testified that Mr. Hicks would not reach maximum medical improvement until after the shoulder surgery rotator cuff tear repair he recommended and six month of post-surgery physical therapy.

Dr. Lisser conceded that prior to testifying he reviewed the same October 22, 2010 MRI that Dr. Rizzo had reviewed  and that it showed recurrent tearing, but he then

15

said that it could be a false findings. This was simply not incredible, and his failure to review the films for the jury, and rebut the clear interpretation of the MRI films made by Dr. Rizzo all the more highlighted the lack of trustworthiness of anything that Dr. Lisser said.

In October 2010 Mr. Hicks developed an  infection around his heart, a condition called pericarditis, and was hospitalized for two weeks from October 25 to November 5, 2010.  During that hospitalization, he advised the doctors of his ongoing right shoulder pain.  An orthopedic consult was requested, and it turned out that the orthopedist on call was Dr. Lisser's partner, Dr. Steven Friedel.  Dr. Friedel knew nothing about Dr. Lisser cutting off Mr. Hicks's treatment, or that Dr. Lisser had rescinded his own request for an MRI.  Dr. Friedel obtained the October MRI results and saw that the study revealed the recurrent tear to the shoulder rotator cuff. He recommended Dr. Lisser resume treating Mr. Hicks, and consider surgical repair. These consultation notes are in Dr. Lisser's file, yet Dr. Lisser ignored those recommendations, and Vane continued to refuse to authorize treatment, even after Mr. Hicks's counsel advised Vane Line that even Dr. Lisser's partner did not agree that Mr. Hicks had reached maximum medical improvement.

On several occasions in late 2010 and early 2011, counsel for Mr. Hicks sent to Vane Line Dr. Rizzo's office records and recommendations for surgery, the October 2010 MRI and report, Dr. Friedel's recommendations and an analysis of the surveillance videotape advising that the work that Mr. Hicks's disability prevents him doing, overhead lifting and climbing, was not exhibited in the videotape. Counsel, on Mr. Hicks's behalf, requested Vane to reconsider the termination of maintenance and the

16

cut-off of medical care.  Vane Line refused the requests and, through counsel, advised that this matter has to be tried in court.

Mr. Hicks currently is 3-1/2 years post-injury, and 3-1/4 years post failed surgery. He continues to need surgery in order to function at his job as a tug boat captain or mate. He does not have the money to pay for the surgery, having even sought Charity Care through the State of New Jersey, but he was turned down.

In that defendant continued to deny Mr. Hicks maintenance and cure, plaintiff was required to try the case to a jury before the Honorable Katherine B. Forest, District Judge, on September 4 through September 7, 2012.  On September 7, 2012 the jury rendered a verdict in  which it found for the defendant, Vane Line Bunkering, Inc., on plaintiff's cause of action seeking compensatory damages under either the Jones Act and vessel unseaworthiness doctrine. However, on his numerous claims seeking maintenance and cure, and compensatory and punitive damages, the jury found that plaintiff was entitled to be paid additional maintenance from April 22, 2009 to present in the amount of $77,000, and into the future until April of 2013, in the amount of $16,000. The jury found that no past cure payments were due but future cure payments of $97,000 are due plaintiff, which is the approximate amount of medical bills Dr. Lisser, his physical therapy department and the hospital where surgery was performed charged.

The jury also determined that the defendant's termination of payments of maintenance and cure after May 2010 was unreasonable, and further, that the termination of maintenance and cure payments, or its failure to pay a higher rate of maintenance than $15/day, was wilful and wanton.  As a result, the jury awarded plaintiff $132,000 for past pain and suffering and $123,000 in punitive damages. Total damages awarded amounted to $445,000.

Immediately before trial, in settlement negotiations plaintiff offered in writing to settle the entire case for $475,000, and invited defendant to make a counter offer.  The final firm settlement offer from defendant was $100,000.

Plaintiff seeks attorneys fees and costs for the successful representation of the plaintiff, along with pre-judgment interest upon the compensatory awards of $322,000 from April 22, 2009 to present (3-5/12 years (3.4167 years)) at .3% (using 90 Day AA Financial Commercial Paper Interest Rate for the three year period from December 31, 2009 through December 31, 2011 for a total of $3300.

Plaintiff seeks attorneys fees in the amount of $189,260 to be added to the judgment, plus additional amounts for working on the post-trial petition.  He seeks $650/hour for time invested by firm partner, Paul T. Hofmann, and $150/hour for the time invested by paralegal Louis Parise, who assisted Mr. Hofmann in many aspects of the client's presentation.

POINT I:          ENTITLEMENT TO ATTORNEYS FEES FOR THE
                  UNREASONABLE FAILURE TO PAY MAINTENANCE AND CURE

It is axiomatic that if a vessel owner unreasonably refuses to pay maintenance

and cure to a seaman, the seaman is entitled to reasonable attorney fees and costs

awarded by the court. *Vaughn v. Atkinson*, 369 U.S. 527, 531 (1962); *Deisler v.*

*McCormack Aggregates,Co.*, 54 F.3d 1074, 1087 (3rd Cir. 1995); *Rodriquez-Alvarez v.*

*Bermuda Star Lines*, 898 F.2d 312 (2d Cir. 1990); *Incandela v. American Dredging*

*Company*, 659 F.2d 11 (2d Cir. 1981).

Here, there was a jury finding of not only unreasonableness in its failure to

provide maintenance and cure, there was also a finding of wilful and wanton action on

defendant's part.

The jury found that defendant arbitrarily paid only $15/day for maintenance

instead of paying the actual rate for food and lodging the plaintiff incurred. See,

*Rodriquez-Alvarez v. Bermuda Star Lines*, 898 F.2d 312 (2d Cir. 1990); *Barnes v.*

*Andover Co.*, 900 F.2d 630, 633 (3d Cir.1990); *Vaughan v. Atkinson*, 369 U.S. 527, 531

(1962); *Calmar S.S. Corp. v. Taylor*, 303 U.S. 525, 528 (1938); *Hall v. Noble Drilling,*

*Inc.*, 242 F.3d 582, 585 (5th Cir.2001). The jury also found that the cut off of medical

'cure' was arbitrary and capricious. See, e.g. *Morales v. Garijack, Inc.*, 829 F.2d 1355,

1358 (5th Cir. 1987); *Gaspard v. Taylor Diving & Salvage Co.*, 649 F.2d 372, 374 n.3

(5th Cir. 1981) cert. denied, 455 U.S. 907 (1982). They obviously found that any

reliance on Dr. Lisser's opinion was unwarranted, either because of his incompetence or

upon the intentional misleading of the doctor by defendant in advising him of the

physical requirements of the job. See, *Breese v. Awi, Inc.*, 823 F.2d 100, 104-105 (5th Cir. 1987).  (Total reliance on the opinion of a physician hired by the shipowner, or on the opinion of an attorney hired by the shipowner, without independent consideration of the facts, does not necessarily constitute a reasonable investigation.); *Holmes v. J. Ray McDermott & Company, Inc.*, 734 F.2d 1110 (5th Cir. 1984).

Thus, the court will award attorney fees and costs to plaintiff.

POINT II:        FEE SHIFTING, GENERAL PRINCIPLES

Courts traditionally determine a fee award based on a "lodestar" calculation, which is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). Although the Second Circuit has since adopted a "presumptively reasonable fee" approach in place of the term "lodestar," see *Arbor Hill Concerned Citizens' Neighborhood Ass'n v. County of Albany and Albany Bd. of Elections,* 522 F.3d 182, 190 (2d Cir. 2008),  *Simmons v. New York City Transit Auth.*, 2009 WL 2357703, at *1 (2d Cir. Aug. 3, 2009), the characteristics of the analysis are similar. The district court, under both descriptives, in exercising its considerable discretion, is to bear in mind all of the case-specific variables that courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate. The Court must consider: (1) the number of hours actually spent by counsel and other personnel "that are deemed reasonably necessary to a successful outcome for the client," and (2) a reasonable hourly rate for counsel. See *Davis v. City of New York*, 2011 WL 4946243, at *2 (S.D.N.Y. Oct. 18, 2011).

"[T]he fee applicant bears the burden of establishing entitlement to an award and

documenting the appropriate hours expended and hourly rates." *Hensley*, 461 U.S. at 437. In light of the purposes underlying fee-shifting statutes, fees awarded "are not to be linked to the dollar value of the claim." *Clover v. Shiva Realty of Mulberry, Inc.*, 2011 WL 1832581, at *4 (S.D.N.Y. May 13, 2011). Indeed, in the appropriate circumstance, the purpose of fee-shifting statutes "is to generate attorneys' fees that are disproportionate to the plaintiff's recovery," thereby assuring that rights violations' claims of modest cash value can attract competent counsel. *Millea v. Metro-North R.R. Co.*, 658 F.3d 154, 169 (2d Cir. 2011).

There is no rule requiring proportionality between the amount of fees requested and the damages recovered See, *Kassim v. City of Schenectady*, 415 F.3d 246, 252 (2d Cir.2005). The court there reasoned that a rule calling for proportionality between the fee and the monetary amount involved in the litigation would effectively prevent plaintiffs from obtaining counsel in cases where deprivation of substantial federal rights (such as in the maritime claims presented here) caused injury of low monetary value. The court has stated that "we have repeatedly rejected the notion that a fee may be reduced merely because the fee would be disproportionate to the financial interest at stake in the litigation." *Quaratino v. Tiffany & Co.*, 166 F.3d 422 (2d Cir.1999).

There is no requirement that attorney's fees should be determined as a function of the damages awarded; indeed, they may, and often do, exceed the damages awarded by orders of magnitude. See *City of Riverside* v. *Rivera,* 477 U.S. 561, 578 (1986):

> A rule of proportionality [between damages and attorney's fees] would make it difficult, if not impossible, for individuals with meritorious civil rights claims but relatively small potential damages to obtain redress from

the courts. * * * In order to ensure that lawyers would be willing to represent persons with legitimate civil rights grievances, Congress determined that it would be necessary to compensate lawyers for all time reasonably expended on a case.

To determine what is a reasonable fee, the Second Circuit, in *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany,* 522 F.3d 182, 190 (2d Cir.2008) noted with approval the tests stated within *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974), abrogated on other grounds by *Blanchard v. Bergeron*, 489 U.S. 87, 92–93 (1989) wherein the Fifth Circuit discussed twelve factors to be considered: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Arbor Hill*, 522 F.3d at 186 n. 3.

Fees for post trial work are properly recovered. *Weyant v. Okst*, 198 F.3d 311, 316-317 (2d Cir. 1999). (Plaintiff was entitled to reasonable attorney's fees and costs in connection with successful opposition to defendant's post judgment motions and filing of fee applications).

### A.    Analysis of *Johnson* Factors

As the *Johnson* factors provide a good roadmap for determining a fee

application's reasonableness, the relevant factors from that case are discussed below

### 1.    The time and labor required

The *Johnson* court explained that, "[a]lthough hours claimed or spent on a case

should not be the sole basis for determining a fee, they are a necessary ingredient to be

considered," and the district court should consider whether the hours expended were

reasonably necessary. *Id.* at 717 (internal citation omitted). Counsel has annexed to his

affirmation a listing of the hours spent and the work performed dedicated to this case.

The hours spent, less than 300, is a reasonable number considering the scope and

complexity of the issues raised. The following is a general summary of the tasks that

counsel had no choice but to perform in order ultimately to prevail.

It is to be noted that the initial work related to this case did not begin until late

June 2009.  By that time, plaintiff had been injured, and was required to undergo

reconstructive surgery. The company was only willing to pay $15/day in maintenance,

which was already driving plaintiff into poverty. We began our investigation, and fact

gathering regarding his medical condition immediately.

Our office first intervened with defendant advising of our representation and

requesting maintenance to be paid.  Two days later, Mr. Hicks was fired. We continued

to demand maintenance to be paid, and we gathered further medical information. We

followed his recovery and assisted him with his medical insurance and COBRA rights

since he had been terminated by his employer. We assisted him with his claim for

disability benefits, which were cut off because of his impoverished state had led him to returning to work, which gave the disability carrier the excuse to terminate those benefits, leaving Mr. Hicks with only his $15/day to pay his bills.

In September 2009 our office filed a complaint in the Eastern District of New York for Mr. Hicks claim for maintenance and cure, attorneys fees and punitive damages, as well as for compensatory damages under the Jones Act and general maritime law.

Over the next 11 months, we took depositions, exchanged documents and proceeded with discovery. The issues had become much more intense by June 2010, because by that time defendant had cut off all maintenance and cure to plaintiff.

We assisted Mr. Hicks as best we could with finding some medical attention to address his injured shoulder. Mr. Hicks continued to find part-time employments because of his destitute situation, despite his significant shoulder disability. We assisted Mr. Hicks in obtaining loans to help him cover his bills.

Because his medical condition was in flux, it was decided by plaintiff and defendant that it was in both parties' interest to voluntarily discontinue the Eastern District action. It was hoped that Mr. Hicks would accumulate sufficient sea time at the part-time employments he was obtaining through his union that he would be found eligible by his union for medical benefits under its medical plan. This way, it was hoped, he could get the surgery he needed, and we would litigate the denial issues at a later time. It was hoped that Mr. Hicks could return to work full time after he was eligible for the medical insurance and had the second surgery on his shoulder. That plan

fell through when Mr. Hicks was essentially black-listed by the employers under contract

with his union as they learned about his shoulder disability and his lawsuit against Vane

Line Bunkering.

In late 2011, after many attempts to get the defendant to reinstate maintenance

and cure, and after substantial further investigation and case development, plaintiff filed

this action in the Southern District of New York, and the case was assigned to the

Honorable Catherine Forrest.

The court had the parties ready the case for trial by June, 2012, and we intensely

completed all further discovery, prepared all pre-trial papers and took several *de bene*

*esse* depositions.

The court adjourned the trial on its own motion, and re-set the trial for the first

week in September, 2012.

The trial lasted four days with the verdict in plaintiff's favor on all of the

maintenance and cure issues.

This summary is given to outline what is detailed in the attached time sheets to

the Hofmann affidavit.

During the whole time we had ongoing and extensive communications with our

client as to the course of his disability, work capacity and financial hardships.

As the court is aware from the volume of evidence adduced, some 60 exhibits

were admitted into evidence, and the extent of the witness trial testimony, extensive

preparation of the case was planned and carried out by both counsel. The plaintiff was

involved in the taking or defending of eight depositions of witnesses, many of which

were taken out of state. (Depositions of Roosevelt, Scroggins, Lusardi and Dr. Rizzo all were out of state depositions).

Substantial document discovery was obtained and reviewed which was particularly helpful to the preparation of the case and ultimate favorable outcome.

Plaintiffs drafted and served numerous document requests, and carefully reviewed several thousand pages of corporate documents, medical records and reports and earnings information documents.

Plaintiff fully responded to all of defendants' discovery requests.

The trial itself was a grueling four day affair, requiring substantial expenditure of resources, both in terms of costs and attorney time. During the four days of trial, plaintiff prepared and put on or cross-examined eight witnesses, two of whom were medical experts, all the while assisting the court with ongoing briefing of the several novel legal issues that arose concerning maintenance and cure, and the damages to which a seafarer is entitled due to the denial thereof.

In addition to an attorney's time, a prevailing party's paralegal's time is also to be compensated. *Missouri v. Jenkins*, 491 U.S. 274, 285 (1989). Here, the time invested by Hofmann & Schweitzer's paralegal, Louis Parise, is sought to be compensated. Plaintiff will waive seeking compensation for the time of other office staff and attorneys, as that time was not recorded in the firm's time records.

### 2.      The novelty and difficulty of the questions

As the *Johnson* court explained, "[c]ases of first impression generally require more time and effort on the attorney's part. Although this greater expenditure of time in

research and preparation is an investment by counsel in obtaining knowledge which can be used in similar later cases, he should not be penalized for undertaking a case which may 'make new law.' Instead, he should be appropriately compensated for accepting the challenge." 488 F.2d at 718.

Here, there are several novel issues that have not been heard by the Second Circuit regarding maintenance and cure law.

### 3.    The level of skill required to perform the legal service properly

In determining a reasonable fee, "[t]he trial judge should closely observe the attorney's work product, his preparation, and general ability before the court. The trial judge's expertise gained from past experience as a lawyer and his observation from the bench of lawyers at work become highly important in this consideration." *Johnson*, 488 F.2d at 718.

It is submitted that throughout this litigation plaintiffs's counsel provided excellent advocacy, both written and oral, on complex legal and factual issues. Counsel was well prepared at all times, and presented plaintiff's position clearly and forcefully. Maritime litigation, as the court observed, is a complex, adversarial process in which expert representation is critical to a claimants' interests.

From counsel's experience, few attorneys are willing to represent seaman claimants.  There is no regulated insurance company to deal with. There is no guaranty of success, and it is often a difficult case to bring to court because many seafarers are uneducated, inarticulate and totally cowed by the business world of courts and such. Thus, it takes special attorneys to handle these cases.

Seafarers are vulnerable to depredations of shipowners. The ill and injured blue collar seaman workers do not even have a state or federal agency to provide recourse for an employer's denial of maintenance and cure. Seaman *necessarily must* rely on experienced maritime trial litigators who bring cases in court because that is their only recourse.

An attorney with substantial experience and subject-matter knowledge of maritime law gained through years of practice in this specialization, similar to those who practice in other esoteric fields, should be awarded a rate comparable to what expert specialists in other fields representing businesses or affluent individuals command when their services are similarly in demand.

### 4. The preclusion of employment by the attorney due to acceptance of the case

*Johnson* discusses this topic "involves the dual consideration of otherwise available business which is foreclosed because of conflicts of interest which occur from the representation, and the fact that once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes." *Johnson*, 488 F.2d at 718.

The large number of hours counsel has dedicated to this case has precluded work on other matters.

### 5. Whether the fee is fixed or contingent

The Fifth Circuit in *Johnson* next reasoned that a district court can look to a fee agreement to help determine what the attorneys' expectations were, as a means of

28

measuring the value they attached their own time. *Johnson*, 488 F.2d at 718.

Here, plaintiff's counsel is especially entitled to a substantial fee because he has not been paid a penny to date, even though the case was signed up originally more than three years ago.

This factor also involves the expectations of the attorney. Plaintiff's counsel has shown to the court that his fee-generated revenue for the Hofmann & Schweitzer law firm for the three years from 2009 through 2011 averaged $1,543,000/year.  Assuming 2100 'billable hours' per year, this has generated an average of $745/hour in fees for time worked on cases.  This is significantly higher than the $650/hour counsel is requesting here.

**6.      The experience, reputation, and ability of the attorneys**

The Court also should consider the experience, reputation, and ability of the attorneys requesting the fee award. 488 F.2d at 718-719.

In the affirmation of Paul T. Hofmann is outlined his substantial maritime law and federal and state litigation experience, appellate experience and general reputation throughout the nation.

**7.      The undesirability of the case**

This factor is relevant here because what was involved is a personal injury claim brought by a seaman against his employer. In general, in seaman's cases, there is no liability insurance, the defendant is required to pay the claim itself (with reimbursement from a Protection and Indemnity Insurance club).  This fact in itself makes every case adversarial, as any payments directly affect the defendant's profit.  Further, as to

maintenance and cure issues, there is no regulatory agency to act as an arbiter of a denial of benefits.  Thus, litigation is required, which many attorneys seek to avoid because the time and effort of trial work without any guaranty of a fee, or return of costs advanced. For sound business reasons, attorneys representing injured claimants must be very selective of the cases they take.  A majority of trials result in defense verdicts, despite their merits.  The within case, like many Jones Act cases, was highly contested. The defendant's defenses were myriad, including that the accident did not happen, and if it did happen, it was all the plaintiff's fault.  Further, obviously the defendant denied the extent of the injury.  It discovered many misrepresentations the plaintiff had made, which gave it a good-faith basis to call the plaintiff a liar to the jury, which often resonates in today's anti-plaintiff environment.

Further, another substantial hurdle was the defense that since the plaintiff was a supervisor on the vessel, and he failed to obtain his subordinates' assistance, he failed in his duty to the boat and to himself. Many experienced maritime attorneys might have decided not to take this case.  Plaintiff's counsel took the risk.

### 8.   The nature and length of the professional relationship with the client

The Fifth Circuit next observed that "[a] lawyer in private practice may vary his fee for similar work in the light of the professional relationship of the client with his office." *Id*. The present case, however, is not one with an institutional client. Rather, it involves representing an individual who never before was represented by plaintiff's attorney.

### 9.    Awards in similar cases

Importantly, "[t]he reasonableness of a fee may also be considered in the light of awards made in similar litigation within and without the court's circuit." *Id.* It is clear that the hourly rates that plaintiff here requests are consonant with rates that courts in the Second Circuit have approved for excellent litigation in specialized fields.

### A.    Reasonable Hourly Rates in the Southern District of New York

*Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984) placed the burden on the fee applicant to produce evidence of the relevant market and the rate charged in that market. Thus, initially "the burden is on the fee applicant to produce satisfactory evidence -- in addition to the attorney's own affidavits -- that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Camacho v. Bridgeport Financial, Inc.*, 523 F.3d 973, 980 (9th Cir. 2008), quoting *Blum v. Stenson*, supra at page 16, 465 U.S. at 895 n.11.

But once such evidence in support of the claimed rate is produced, "[t]he party opposing the fee application has a burden of rebuttal that requires submission of evidence to the [fee-awarding tribunal] challenging the accuracy and reasonableness of the . . . facts asserted by the prevailing party in its submitted affidavits." *Camacho*, 523 F.3d at 980.

The 9th Circuit explained in *Moreno v. City of Sacramento*, 534 F.3d 1106, 1116 (9th Cir. 2008):

> [T]he burden of producing a sufficiently cogent explanation [for reductions in a fee request] can mostly be placed on the shoulders of the losing parties, who not only have the incentive, but also the knowledge of

the case to point out such things as excessive or duplicative billing practices. If opposing counsel cannot come up with specific reasons for reducing the fee request that the district court finds persuasive, it should normally grant the award in full, or with no more than a haircut.

To determine a reasonable hourly rate the Court "looks to the prevailing market rates in the relevant community." *Perdue v. Kenny A.*, -- U.S. --, 130 S.Ct. 1662, 1672 (2010). The prevailing market rate is "the rate prevailing in the relevant community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Farbotko v. Clinton County of New York*, 433 F.3d 204, 208 (2d Cir. 2005). "The rates used by the court should be current rather than historic hourly rates." *Reiter v. MTA New York City Transit Auth.*, 457 F.3d 224, 232 (2d Cir. 2006) This is because current rates provide appropriate compensation since "compensation received several years after the services were rendered—as it frequently is in complex ... litigation is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed[.]" *Missouri v. Jenkins*, 491 U.S. 274, 283 (1989).

The court should look to the fee rates for experienced litigators in New York, which for partners with Mr. Hofmann's experience, 31 years in total, 30 years as a professional litigator, is approximately $725. See, "The 2012 Real Rate Report", An Analysis and Report on Law Firm Rates, Trends and Practices, TyMetrix, 2012, annexed as exhibit 2 to Hofmann affidavit.

Awards by the court are another measure of reasonableness. Two areas of fee shifting substantive law similar to that presented in this admiralty case is the field of Fair Labor Standards Act litigation and employment/civil rights litigation. Each field

involves workers and their claims against employers, each results often in involved civil

litigation, complex trials, with many witnesses and documents.

The seaman's personal injury field particularly involves complex matters of

engineering, mechanics, admiralty rules and regulations, medical issues, monetary

damages all in an esoteric specialized field.

Fees awarded recently in this district to attorneys with comparable backgrounds

and experiences are represented by the following:

-In *Clover v. Shiva Realty of Mulberry, Inc.*, 2011 WL 1832581 (S.D.N.Y. 2011) a civil rights case, the court awarded $500 per hour for a partner with approximately 23 years experience in employment law.

-In *Finch v. New York State Office of Children and Family Servs.*, 2012 WL 695419, at *5 (S.D.N.Y. March 5, 2012) the court awarded a solo practitioner with 42 years experience in civil rights matters an hourly rate of $450.

-In *Scott v. City of New York*, 2011 WL 867242, at *1 n.2, 6 (S.D.N.Y. Mar. 9, 2011), vacated on other grounds by 643 F.3d 56 (2d Cir.2011) a solo practitioner's awarded hourly rate was set by the court at $550 in a FLSA collective action.

-In *Rozell v. Ross-Holst*, 576 F. Supp. 2d 527 (S.D.N.Y. 2008), the court awarded rates of $600/ hour for senior partners with comparable experience as plaintiff's counsel here.

-In *Gurung v. Malhotra*, 2012 WL 983520, at *11 (S.D.N.Y. March 16, 2012) awarding $450 for senior partner.

-In *Torres v. Gristede's Operating Corp.*, 2012 WL 3878144 (S.D.N.Y. 2012) (Crotty, J.) the court awarded senior partners handling the litigation $650/hour.

-In *United States* v. *Donaghy*, 570 F. Supp. 2d 411, 432 (E.D.N.Y. 2008) the court awarded $600-$750 per hour for partners.

Fees awarded in this district to attorneys with less comparable backgrounds and

much less trial experiences are represented by the following:

-In *Robinson v. City of New York*, 2009 WL 3109846 an employment retaliation case, the court granted a request for attorneys' fees at a rate of $500 and $450 per hour for the two lead lawyers.

-In *Anthony v. Franklin First Financial, LTD.*, 2012 WL 546668, at *2-3 (S.D.N.Y. Feb. 21, 2012) in an employment law case, the court awarded an hourly rate of $350 to attorneys who had 8 and 10 years experience.

-In *Allende v. Unitech Design, Inc.*, 783 F. Supp. 2d 509, 514 (S.D.N.Y. 2011) the court awarded $450 for a partner with only 10 years experience.

Of course, a district court may rely on its own knowledge of hourly rates in the market. *Miele v. New York State Teamsters Conf. Pension & Retirement Fund*, 831 F.2d 407, 409 (2d Cir.1987).

**10.    The amount involved and the results obtained**

Although degree of success can affect a fee award under federal remedial statutes (*Hensley*, 461 U.S. at 434), courts sensibly recognize that "counsel's time will [often] be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." *Id.* at 435. The same standard applies to claims for attorney's fees under the FLSA and § 1988. See *Hensley*, 461 U.S. at 433 n.7

As discussed in *Clarke v. One Source, Inc.*, 2002 WL 31458238, at *6 (S.D.N.Y. Nov. 1, 2002) "An attorney is entitled to recover for time spent working on both the successful claims and the intertwined unsuccessful claims ... In this case, although Plaintiff was successful on only one of seven legal claims, all claims were part of a common core of facts such that it is impossible to allocate the attorney's time to each of the separate theories."

34

In the case at bar, it is virtually impossible to separate the hours dedicated to the Maintenance and Cure Claim from the Compensatory Damages claim (Jones Act/Unseaworthiness), but that should not be a deterrent to the court awarding fees for all the work plaintiff's counsel performed for Mr. Hicks.

The defendant may argue that plaintiff had 'limited success' in this matter and that a discount from the amount sought should be applied.  Neither proposition is correct.

In *Hensley v. Eckerhart*, 461 U.S. 424 (1983) the Supreme Court defined the conditions under which a plaintiff who prevails on only some of his claims may recover attorney fees under fee shifting statutes, in particular, the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. Specifically, it provided for a two-step inquiry focused on the following questions: First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?

*Hensley*'s first prong requires a trial court to conduct an examination of the hours counsel expended on each claim in the case, weeding out work done on unrelated unsuccessful claims from any award. Under the second Hensley inquiry, the fact finder must then consider whether the success obtained on the remaining claims is proportional to the efforts expended by counsel. When an injured party obtains "excellent results, his attorney should recover a fully compensatory fee." 461 U.S. at 435. When a party achieves "only partial or limited success," however, then compensation for all of the

35

"hours reasonably expended on the litigation as a whole ... may be an excessive amount." *Id.* at 436.

Hensley does instruct that if successful and unsuccessful claims share a common core of facts or are based on related legal theories, then a court should simply compute the appropriate fee as a function of degree of success. *Hensley*, 461 U.S. at 434-35. In sum, if the claims are interrelated, a court is to skip the first *Hensley* inquiry and move to its second. *George Hyman Construction v. Brooks*, 963 F.2d 1532, 1537 (D.C.Cir. 1992).[1]

When successfully and unsuccessfully litigated issues are inextricably interrelated, *Hensley* permits and award of attorneys fees on time spent on all issues if he succeeds on a major interrelated issue.

In the present case, the jury's adverse verdict on the negligence and unseaworthiness claim should not reduce the fees awarded because the time plaintiffs' counsel spent prosecuting them is inseparable from that dedicated to the successful

---

[1]     The *Hensley* analysis was designed by the Court to apply to all federal statutes limiting fee awards to prevailing parties.' 461 U.S. at 433 n.7.  Lower courts have adopted its instructions in a wide array of statutory settings. See, e.g., *Smith v. CMTA-IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir.1984) (Employee Retirement Income and Security Act); *Citizens Council of Delaware County v. Brinegar*, 741 F.2d 584, 595 (3d Cir.1984) (Equal Access to Justice Act); *Rosebrough Monument Co. v. Memorial Park Cemetery Association*, 736 F.2d 441, 446 (8th Cir.) (attorney fees provisions for antitrust plaintiffs), cert. denied, 469 U.S. 981 (1984); *United Slate Workers Association, Local 307 v. G & M Roofing & Sheet Metal Co.*, 732 F.2d 495, 502 (6th Cir.1984) (Fair Labor Standards Act); *Erkins v. Bryan*, 598 F.Supp. 240, 245 (M.D. Ala.1984), aff'd, 785 F.2d 1538 (11th Cir.1986) (Labor-Management Reporting and Disclosure Act). *George Hyman Construction v. Brooks*, 963 F.2d 1532 (D.C.Cir. 1992) and *General Dynamics Corp. v. Horrigan*, 848 F.2d 321, 325 (1st Cir.), *cert. denied*, 488 U.S. 992 (Longshore and Harbor Workers Compensation Act Claims).

36

claims. See *Quaratino* v. *Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir.1999) ("fees may be awarded for unsuccessful claims as well as successful ones ... where they are inextricably intertwined and involve a common core of facts or are based on related legal theories"); *Lunday* v. *City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994) ("So long as the plaintiff's unsuccessful claims are not 'wholly unrelated' to the plaintiff's successful claims, hours spent on the unsuccessful claims need not be excluded from the lodestar amount.")

Three cases are particularly relevant here in determining what amount of reduction, if any, should be applied, and reveal how successful plaintiff was in the current matter.

In *Deisler* v. *McCormack Aggregates, Co.*, 54 F.3d 1074, 1087 (3rd Cir. 1995), the Third Circuit analyzed a case very similar to the current matter. There, the jury determined that defendant was not liable for plaintiff's injury under the Jones, like here, but the District Court determined that the plaintiff was entitled to maintenance and cure, and compensatory damages for the arbitrary refusal to provide these benefits, and further, attorneys fees and costs. The District Court found that it was practically impossible to segregate the work performed investigating, litigating and trying the Jones Act and the maintenance and cure claims. Thus, the trial judge apportioned the time 90 percent to maintenance and cure and 10 percent to the Jones Act case. The judge awarded 90 percent of the attorney's fees requested. The Court of Appeals affirmed, holding that the District Court's reasoning was eminently reasonable.

The district court had noted that "[g]iven the overlapping evidence on the Jones

37

Act claim and the maintenance and cure claim, it is difficult to separate out services attributable solely to the unsuccessful Jones Act claim." Nevertheless, the court held that based on its "review of the record a fair estimate of counsel time expended in attempting to prove defendant's negligence under the Jones Act is 10%." Id. at 1087.  In affirming, the Third Circuit noted that the district court must exercise its informed discretion in awarding attorney's fees. *Pawlak v. Greenawalt*, 713 F.2d 972, 977 (3d Cir.1983), cert. denied, 464 U.S. 1042 (1984). Thus, the standard of review is a narrow one. "We can find an abuse of discretion if no reasonable [person] would adopt the district court's view. If reasonable [people] could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *Silberman v. Bogle*, 683 F.2d 62, 65 (3d Cir.1982). The court went on to say that "we cannot say that the division of attorney's fees was an abuse of discretion. Although the required division of fees is difficult, our review of the record does not allow us to conclude that the district court erred in slicing the pie as it did. Accordingly, we will affirm the district court's allocation of the award of attorney's fees and costs. *Deisler*, 54 F.3d at 1087-88.

   In *Peake v. Chevron Shipping Co., Inc.*, 2004 WL 1781008 (N.D. Cal. 2004), the court was similarly faced with a Jones Act and maintenance and cure overlap case.  The court held:

"these 'maintenance and cure' issues did overlap (significantly) with nearly all of the other liability issues in this action, and the 80% figure proposed by plaintiff is appropriate here." Id.  Thus, the court attributed and awarded 80 percent of the attorney's time requested to the maintenance and cure issues.

Here, if defendant argues that plaintiff 'failed' on a portion of his claims, that is not entirely correct.  Plaintiff did receive most of the compensatory damages claimed by the jury in its compensatory pain and suffering award. To prove that portion of the claim, it was necessary to develop all of the medical evidence just as if the award had come under the Jones Act causes of action.

In *Scott v. City of New York*, 2009 WL 2610747 (S.D.N.Y.,2009) the court described one issue before it, as follows, "[o]f critical importance here, and not answered in either *Arbor Hill* or *Simmons*, is whether and how a fee request should be reduced because of plaintiffs' limited success."

The court noted that both the quantity and quality of relief obtained, as compared to what the plaintiff sought to achieve as evidenced in his/her complaint, are key factors in determining the degree of success achieved. In *Scott*, Judge Scheindlin found a 30% reduction for limited success to be in order.  That case asserted five distinct Fair Labor Standards Act ('FLSA') claims.  See, *Scott v. City of New York*, 592 F.Supp.2d at 391–92. The amount of potential damages claimed was in the multi-millions, particularly with FLSA's multiplier. However, the jury only awarded plaintiffs $900,000 in damages, having found that plaintiffs proved only two of the claims and a portion of the third. The court noted that these verdicts were a small fraction of what plaintiffs had initially sought. It found that under *Hensley*, *Kassim*, and *Arbor Hill*, a substantial reduction in the amount of fees it awarded was warranted, and it reduced the requested attorneys fee by thirty percent (30%) due to plaintiffs' limited recovery.

Plaintiff's counsel here was much more successful, relatively, than counsel in *Scott*. Here, the last formal offer to the plaintiff was $100,000, with a mention the night before the trial began that counsel would recommend $125,000, but he did not have the authority for it.  The jury verdict in total is $435,000, more than 400% higher than the last offer.  In contrast, in *Scott*, the plaintiffs obtained much less than they sought, which led to only a 30% reduction in the fees requested.

In light of the fact that plaintiff succeeded in obtaining compensatory damages for pain and suffering, plus proved total damages of $435,000, under a *Hensley* analysis of the extent of success the litigation obtained, no reduction in the fee request should be made, as all of the issues were intimately interrelated and plaintiff was extremely successful.

CONCLUSION

For the reasons stated and discussed herein the plaintiff's full fee application should be granted and added to the judgment proposed.

Dated: New York, New York
       September 21, 2012

HOFMANN & SCHWEITZER

By:   /s/Paul T. Hofmann
       Paul T. Hofmann (PH1356)
       Attorneys for Plaintiff
       360 W. 31st Street, Suite 1506
       New York, N.Y. 10001
       Tel: (212) 465-8840
       paulhofmann@hofmannlawfirm.com