HOFMANN & SCHWEITZER
Attorneys for Plaintiff
360 West 31st Street, Suite 1506
New York, NY 10001-2727
Tel: 212-465-8840

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
CIRO CHARLES HICKS,

                     Plaintiff,         11 Civ. 8158 (KBF)

      -against-

                                     AFFIRMATION IN SUPPORT
VANE LINE BUNKERING, INC.,         OF APPLICATION FOR
and the TUG PATRIOT, In Rem,         AN ATTORNEY'S FEE

                       Defendants,
--------------------------------------------------------x

      PAUL T. HOFMANN, pursuant to 28 U.S.C. §1746, hereby affirms under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

      1.      I offer this affirmation as a petition for a fee pursuant for the successful representation of Ciro Charles Hicks in obtaining for him maintenance and cure benefits in this action in the face of the unreasonable denial thereof by the defendant, Vane Line Bunkering, Inc.

      2.      The following is a description of my credentials.  I am a Rutgers College graduate, class of 1975, and I graduated from New York Law School in June, 1981. In that year I became admitted to practice in the State of New Jersey, and the federal District Court therein.  In January, 1982, I was admitted to the bar of the State of New York, and shortly thereafter, to the United States District Courts for the Southern and Eastern Districts. Subsequently I have been admitted to the bars of the United States

Supreme Court and the United States Courts of Appeal for the Second, Third and Fourth Judicial Circuits. I have appeared before each of those appellate courts as well as the New York State Court of Appeals, and the Appellate Division of the First and Second Departments of the New York Supreme Court.  I have tried cases in the Southern and Eastern Districts of New York, five counties in New York, three counties in New Jersey and the Federal District Court there, and in Federal District Courts in Pennsylvania, North Carolina and Florida, that I recall.

3.      I have been a guest lecturer, on several occasions, on maritime topics to the American Association for Justice (AAJ) formerly the Association of Trial Lawyers of America (ATLA).

4.      I have also lectured at the Tulane Law School Fall Admiralty seminar and the Tulane Law School Admiralty Law Journal published my article "An Analytical Framework for Maritime Preemption Cases Involving Wrongful Death Damages - the Legacy of Miles, Yamaha, Amtrak and Others."

5.      I have been a guest lecturer to the University of Glasgow (Scotland) Law School, on comparative judicial procedures.

6.      I have served as the Chairman of the Admiralty Section of the Association of Trial Lawyers of America, after having been, in successive years, Secretary, Vice-Chair and Second Vice-Chair of the Section.

7.      In 2004, I was lecturer to the New Jersey State Bar Association in a joint CLE course on Aviation and Admiralty Law.

8.      Most recently, I presented to the Admiralty Section of the American

Association for Justice a lecture on the use of the International Safety Management Code ('ISM Code') to prove liability in maritime accidents at the 2008 Annual Convention in Philadelphia.

9.      I continue to be on the Admiralty Section's Executive Committee. In the past year I have given lectures on the average of twice a year in my chosen field of admiralty law.

10.     In the past three years I have been a guest lecturer once a year to the New York County Lawyers Association Admiralty Section.

11.     I am an officer in the Marine Torts and Limitation of Liability Section of the Maritime Law Association ("MLA") of the United States, by far the country's largest and most comprehensive admiralty law organization.

12.     In 2012 I lectured to the MLA on the effect of the Supreme Court's recent decision in *Stewart v. Dutra Construction*, a case having wide ranging consequences on what under maritime law constitutes a vessel in navigation, and who is entitled to Jones Act or Longshore Harbor Workers Compensation Act coverage.

13.      My first employment was as an associate attorney in the law firm of Phillips & Cappiello from 1982 until 1989, when I became a junior partner in the firm that became Phillips Cappiello Kalban Hofmann & Katz, P.C.  That firm was general counsel to the National Maritime Union, one of the two major deep sea maritime unions. Our firm also represented the affiliated NMU Medical and Benefits Plans.

14.      In 1992, I became a full member of that firm, with three other partners. In January 1994, the firm became Cappiello Hofmann & Katz, with myself, and two

other partners, all of whom practiced in the field of maritime law.  Several years later I

became the sole shareholder and senior partner of the firm, with responsibilities for

management, business development, case handling and supervision of the younger

attorneys on staff. The firm was called Hofmann & Associates for several years until I

took on a partner, Timothy Schweitzer, and now the firm is called Hofmann &

Schweitzer. In the many years that I have worked in this firm and its predecessors, the

majority of my experience has been in the field of maritime law.   I have been trial

counsel on a large number of federal and state trials, averaging approximately two trials

per year.  I have completed at least 40 trials to verdict in my career, and have personally

represented more than 400  clients to the completion of their claims.

15.	The firm of Hofmann & Schweitzer, and its predecessors, has a well-

respected, national reputation in the field of maritime labor law and personal injury law.

I personally have testified before the United States Senate on issues related to the Death

on the High Seas Act. I further have advised former Congressman Jim Oberstar's staff

on several maritime matters involving seafarers' rights.

16.	In other matters where I have had attorneys fees awarded to me or my

firm for client representation, I have been awarded substantially the equivalent as I ask

herein. In a recent maritime wage class-action concluded more than five years ago, the

United States District Court for the Southern District considered appropriate a fee

application for my services of $450/hour, based on the complexity of the case, the nature

and quality of the representation, the risk assumed by my firm in representing the clients

and other relevant considerations.

4

17.     Currently, I feel that my application for $650 an hour, as a partner with 31 years experience is eminently fair.

18.     I also request an award for the time spent by my firm's paralegal/investigator, Mr. Louis Parise, who assisted me in much of the work on this file. His billing rate of $150/hour is also eminently fair. Mr. Parise is a fully licensed private investigator. Further, he has been a maritime paralegal and investigator for over 35 years, and knows much about the workings of seamen, longshoremen, harbor workers and their appropriate claims for benefits. Obviously many hours of work were expended by secretaries and other staff at my firm, but I consider that work to be covered by my firm's overhead, and I do not ask the Court for reimbursement of their time.

19.     Annexed as exhibit 1 is a listing of the hours of work, and the labors performed in this claim for which my firm seeks compensation. The description comes directly from the firm's computer-maintained time sheets. The entries are contemporaneously made at, or shortly after, the time the work is performed. The hours listed are directly related to the proceedings and trial before the OWCP, and all matters preliminary to the settlement or trial of this action.

20.     The total hours invested on this matter for which compensation is sought, and the total sum for that compensable time is:

| Personnel | Hours: | Rate: | Total Fees Sought |
|-----------|--------|-------|-------------------|
| Paul T. Hofmann | 281.2 | $650 | $182,780 |
| Louis Parise | 43.20 | $150 | $6,480 |

21.     The following are reimbursable expenses sought for costs solely incurred

5

with respect to the proceedings before the court:

| | | |
|---|---|---|
| - Transcript of testimony at trial of Mr. Neubrand | | $135.94 |
| - Deposition Expenses: | Mark Andrew Johnson | $347.00 |
| | Bruce Comiskey | $573.50 |
| | Vincent Lusardi | $479.00 |
| | Vincent Lusardi (videographer) | $488.70 |
| | Glenn Scroggins | $329.50 |
| | Robert Roosevelt | $207.00 |
| | Dr. Charles Rizzo | $1,614.90 |
| | Total: | $4,366 |
| -Document reproduction: | | $201.02 |
| -Medical Records: | | $1,043.31 |
| -Fees for Reports and Testimony, Dr. Rizzo: | | $4,600 |
| -Filing fees, Southern and Eastern Districts: | | $700 |
| -Process Service: | | $179.90 |
| Total reimbursable expenses: | | $10,899.77 |

Annexed as Exhibit 2 are copies of invoices for the major items listed above[1].

BACKGROUND OF CASE

22. In this case, more than three years have passed since Mr. Charles Hicks was injured while working for the defendant. Because of the defendant's refusal to pay maintenance and cure fairly and reasonably to Mr. Hicks, plaintiff was required to try the case to a jury before the Honorable Katherine B. Forrest, District Judge, on September 4 through September 7, 2012. On September 7, 2012 the jury rendered a verdict in which it found for the defendant, Vane Line Bunkering, Inc., on plaintiff's cause of action seeking compensatory damages under either the Jones Act and vessel unseaworthiness

---

1 We are unable to reproduce the following receipts: (1) for $119.95 to Guaranteed Subpoena, Inc., (2) for $69.98 for medical records from Nova Medical Records and (3) $350 for the Clerk of the Eastern District for filing fee. These receipts are in storage and could not be retrieved in time for the motion. However, the charges appear on the "paid" ledger of the firm.

doctrine. However, on his numerous claims seeking maintenance and cure, and compensatory and punitive damages, the jury found that plaintiff was entitled to be paid additional maintenance from April 22, 2009 to present in the amount of $77,000, and into the future until April of 2013, in the amount of $16,000. The jury found that no past cure payments were due but future cure payments of $97,000 are due plaintiff, which is the approximate amount of medical bills Dr. Lisser, his physical therapy department and the hospital where surgery was performed charged.

23.     The jury also determined that the defendant's termination of payments of maintenance and cure after May 2010 was unreasonable, and further, that the termination of maintenance and cure payments, or its failure to pay a higher rate of maintenance than $15/day, was wilful and wanton.  As a result, the jury awarded plaintiff $132,000 for past pain and suffering and $123,000 in punitive damages. Total damages awarded amounted to $445,000.

24.     Immediately before trial, in settlement negotiations plaintiff offered in writing to settle the entire case for $475,000, and invited defendant to make a counter offer.  The final firm settlement offer from defendant was $100,000.

25.     Plaintiff seeks attorneys fees at the rate of $650/hour for 281.20 hours of labor worked by Hofmann & Schweitzer partner Paul T. Hofmann[2] and $10,899.77 in

---

[2]     Plus the additional time counsel will expend replying to the opposition to this motion, and opposing any motions by defendant, plus other related work entering judgment and bringing on enforcement proceedings. If an appeal is filed, as has been threatened, compensation will be sought to fend off the appeal. A supplemental application shall be submitted for those items of work.

7

costs for the successful representation of the plaintiff, along with pre-judgment interest upon the compensatory awards of $322,000 from April 22, 2009 to present (3-5/12 years (3.4167 years)) at .3% (using 90 Day AA Financial Commercial Paper Interest Rate for the three year period from December 31, 2009 through December 31, 2011 for a total of $3300.

26.    Plaintiff also seeks compensation for 43.2 hours of work at $150/hour for the time invested by paralegal Louis Parise, who assisted Mr. Hofmann in many of the aspects of the case.

### ATTORNEY WORK PERFORMED

27.    The hours I spent, less than 300, is a reasonable number considering the scope and complexity of the issues raised. The following is a general summary of the tasks that counsel had no choice but to perform in order ultimately to prevail.

28.    It is to be noted that the initial work related to this case did not begin until late June 2009.  By that time, plaintiff had been injured, and was required to undergo reconstructive surgery. The company was only willing to pay $15/day in maintenance, which was already driving plaintiff into poverty. We began our investigation, and fact gathering regarding his medical condition immediately.

29.    Our office first intervened with defendant on July 21, 2009 advising of our representation and requesting maintenance to be paid.  Two days later, Mr. Hicks was fired. We continued to demand maintenance to be paid, and we gathered further medical information. We followed his recovery and assisted him with his medical insurance and COBRA rights since he had been terminated by his employer. We assisted

8

him with his claim for disability benefits, which were cut off because of his impoverished state had led him to returning to work, which gave the disability carrier the excuse to terminate those benefits, leaving Mr. Hicks with only his $15/day.  These efforts involved numerous conversations with plaintiff, his wife, his employer and its agents, his disability insurance carrier, his health insurance carrier, witnesses, other employees, etc.

30.     In September 2009 our office filed a complaint in the Eastern District of New York for Mr. Hicks claim for maintenance and cure, attorneys fees and punitive damages, as well as for compensatory damages under the Jones Act and general maritime law.

31.     Over the next 11 months, we took depositions, exchanged documents and proceeded with discovery. The issues had become much more intense by June 2010, because by that time defendant had cut off all maintenance and cure to plaintiff.

32.     We assisted Mr. Hicks as best we could with finding some medical attention to address his injured shoulder.  Mr. Hicks continued to find part-time employments because of his destitute situation, despite his significant shoulder disability. We assisted Mr. Hicks in obtaining loans to help him cover his bills.

33.     Because his medical condition was in flux, it was decided by plaintiff and defendant that it was in both parties' interest to voluntarily discontinue the Eastern District action. It was hoped that Mr. Hicks would accumulate sufficient sea time at the part-time employments he was obtaining through his union that he would be found eligible by his union for medical benefits under its medical plan.  This way, it was

hoped, he could get the surgery he needed, and we would litigate the denial issues at a later time. It was hoped that Mr. Hicks could return to work full time after he was eligible for the medical insurance and had the second surgery on his shoulder. That plan fell through when Mr. Hicks was essentially black-listed by the employers under contract with his union as they learned about his shoulder disability and his lawsuit against Vane Line Bunkering.

34.     In late 2011, after many attempts to get the defendant to reinstate maintenance and cure, and after substantial further investigation and case development, plaintiff filed this action in the Southern District of New York, and the case was assigned to the Honorable Katherine Forrest.

35.     The court had the parties ready the case for trial by June, 2012, and we intensely completed all further discovery, prepared all pre-trial papers and took several *de bene esse* depositions. The court adjourned the trial on its own motion, and re-set the trial for the first week in September, 2012.

36.     The trial lasted four days with the verdict in plaintiff's favor on all of the maintenance and cure issues.

37.     During the whole time we had ongoing and extensive communications with our client as to the course of his disability, work capacity and financial hardships.

38.     As the court is aware from the volume of evidence adduced, some 60 exhibits were admitted into evidence, and the extent of the witness trial testimony, extensive preparation of the case was planned and carried out by both counsel. The plaintiff was involved in the taking or defending of eight depositions of witnesses, many

out of which were taken out of state. (Depositions of Roosevelt, Scroggins, Lusardi and Dr. Rizzo all were out of state depositions).

39.     Substantial document discovery was obtained and reviewed which was particularly helpful to the preparation of the case and ultimate favorable outcome.

40.     Plaintiff's counsel drafted and served numerous document requests, and carefully reviewed several thousand pages of corporate documents, medical records and reports and earnings information documents.

41.     Plaintiff's counsel fully responded to all of defendants' discovery requests.

42.     The trial itself was a grueling four day affair, requiring substantial expenditure of resources, both in terms of costs and attorney time. During the four days of trial, plaintiff's counsel prepared and put on or cross-examined eight witnesses, two of whom were medical experts, all the while assisting the court with ongoing briefing of the several novel legal issues that arose concerning maintenance and cure, and the damages to which a seafarer is entitled due to the denial thereof.  There are several novel issues raised in this matter upon which the Second Circuit has not ruled regarding maintenance and cure law. Additionally, although the injury causing event was not overly dramatic, learning about and being able to teach a jury about this novel area of maritime labor is an art that I have worked hard to master.  I was able to educate this jury and explain the evidence in this difficult field of technology, with its particularly arcane jargon.

43.     It is submitted that throughout this litigation I provided excellent

11

advocacy, both written and oral, on complex legal and factual issues. I was well prepared at all times, and presented plaintiff's position clearly and forcefully. Maritime litigation, as the court observed, is a complex, adversarial process in which expert representation is critical to a claimants' interests.

44.     From my experience, few attorneys are willing to represent seaman claimants.  There is no regulated insurance company to deal with. There is no guaranty of success, and cases are often difficult to bring to court because many seafarers are uneducated, inarticulate and totally cowed by the business world of courts and such. Thus, it takes special attorneys to handle these cases.

45.     Seafarers are vulnerable to depredations of shipowners.  The ill and injured blue collar seaman workers do not even have a state or federal agency to provide recourse for an employer's denial of maintenance and cure. Seaman *necessarily must* rely on experienced maritime trial litigators who bring cases in court because that is their only recourse. An attorney with substantial experience and subject-matter knowledge of maritime law gained through years of practice in this specialization, similar to those who practice in other esoteric fields, should be awarded a rate comparable to what expert specialists in other fields representing businesses or affluent individuals command when their services are similarly in demand.

46.     The large number of hours I dedicated to this case has precluded work on other matters.

47.     Here, I believe I am entitled to a substantial fee because I have not been paid a penny to date, even though the case was signed up originally more than three

12

years ago.  I know that I am good at what I do for a living, and I reasonably expect substantial compensation for the success I bring to my clients. My fee-generated revenue for the Hofmann & Schweitzer law firm for the three years from 2009 through 2011 averaged $1,543,000/year.  Assuming 2100 'billable hours' per year, this has generated an average of $745/hour in fees for time I have worked on cases.  This is significantly higher than the $650/hour fee I am requesting here.

48.     In general, in seaman's cases, there is no liability insurance, so the defendant is required to pay the claim itself (with eventual reimbursement from a Protection and Indemnity Insurance club).  This fact in itself makes every case adversarial, as any payments directly affect the defendant's profit, which they fight to keep as high as possible.  Further, as to maintenance and cure issues, there is no regulatory agency to act as an arbiter of a denial of benefits.  Thus, litigation is required, which many attorneys seek to avoid because of the time and effort of trial work without any guaranty of a fee, or return of costs advanced.  For sound business reasons, these factors make attorneys very selective about the cases they take.  The within case, like many Jones Act cases, was highly contested. The defendant's defenses were myriad, including that the accident did not happen, and if it did happen, it was all the plaintiff's fault.  Further, obviously the defendant denied the extent of the injury.  It discovered many misrepresentations the plaintiff had made, which gave it a good-faith basis to call the plaintiff a liar to the jury, which often resonates in today's anti-plaintiff environment.

49.     Further, one defense which presented a substantial hurdle was that since the plaintiff was a supervisor on the vessel, and he failed to obtain his subordinates'

13

assistance, he failed in his duty to the boat and to himself. Many experienced maritime attorneys might have decided not to take this case.  I took the risk.

50.     The court should look to the fee rates for experienced litigators in New York, which for litigation partners with my experience, which is 31 years in total, 30 years as a professional litigator. Attached is a scholarly survey of attorney fee rates in the New York metropolitan area.  What can be seen is that average attorney fee rates for partners with comparable years of experience in the New York net reported areas in about $750/hour.  See, "The 2012 Real Rate Report", An Analysis and Report on Law Firm Rates, Trends and Practices, TyMetrix, 2012, pgs. 33, 86, 89, 91, 93, 95, 98, 101, 103-105, annexed as exhibit 3.

51.     Awards by the court are another measure of reasonableness. Two areas of fee shifting substantive law similar to that presented in this admiralty case is the field of Fair Labor Standards Act litigation and employment/civil rights litigation.  Each field involves workers and their claims against employers, each results often in involved civil litigation, complex trials, with many witnesses and documents. The seaman's personal injury field particularly involves complex matters of engineering, mechanics, admiralty rules and regulations, medical issues, monetary damages all in an esoteric specialized field. Fees awarded recently in this district to attorneys with comparable backgrounds are clearly in the $650/hour range sought.  See Memorandum of Law, pages 32-33, for discussion of recent fee awards in the Southern District of New York.

52.     The extent of my experience and knowledge is exemplified in the myriad of cases I have handled which have resulted in reported decisions. Below is a non-

exclusive list of many of the major cases I have handled which resulted in reported

decisions.  Of course, not all resulted in victory for my clients, which shows the nature

of the risk that handling contingency fee cases involves. But the selections shows the

diversity of maritime law and personal injury litigation topics with which I have

developed expertise.

*Deisler v. McCormack Aggregates, Co.*, 54 F.3d 1074, 1087 (3rd Cir. 1995) (decision upholding awards of maintenance and cure, compensatory damages and attorneys fees).

*Brogan v. United New York Sandy Hook Pilots' Association, Inc.*, 213 F.Supp.2d 432 (D.N.J. 2002) (upholding award to pilot injured during boarding procedure).

*Abbud v. City of New York*, 1997 WL 633463 (S.D.N.Y. 1998) affd 159 F.3d 1345 (1998) (regarding interplay of maritime and New York Labor Law)

*Olsen v. James Miller Marine Service, Inc.*, 791 N.Y.S.2d 92 (1st Dept. 2005) (injured dockbuilder who fell through hole on a barge entitled to assert cause of action under Labor Law § § 240 and 241, along with cause of action against the vessel owner for 905(b) negligence)

*Cammon v. City of New York*, 95 N.Y.2d 583 (2000) *rehearing denied*, 96 N.Y.2d 793 (Ct. App. 2001) (seminal case from New York Court of Appeals finding maritime construction workers covered by LHWCA may assert causes of action against landowners under New York Labor Law)

*Eriksen v. Long Island Lighting Co.*, 236 A.D.2d 439 (2d Dept. 1997) (Precursor to *Cammon* obtained in Appellate Division, upon which *Cammon* analysis was built.)

*Becker v. Poling Transportation Corp.*, 356 F.3d 381 (2d Cir. 2004) (Applying novel Restatement of Torts provisions to claim of seaman badly burned in a barge explosion)

*Garner v. Energy Transportation Corporation,*1996 U.S. App. LEXIS 15368 (2d Cir. 1996) (seaman's personal injury claim wherein defendant's counsel challenged every aspect of

*Marcic v. Reinauer Transportation* , 397 F.3d 120 (2d Cir. 2005) (decision regarding whether a seaman's contract setting a minimum of $15/day permits the seaman to prove in court a higher amount, as a matter of contract interpretation)

*Dahingo v. Royal Caribbean Cruises, Ltd.*, 312 F.Supp. 2d 440 (S.D.N.Y. 2004). (Class action decision under Seaman's Wage Act holding that late filed claims appropriately rejected, but that timely, unsigned claims can be signed and resubmitted)

*Wesley v. City of New York*, 2010 N.Y. App. Div. LEXIS 6815 (1st Dept. 2010) Seaman ferry worker injured through unseaworthy chainfall system. One of handful of decisions finding that unseaworthiness can be determined in plaintiff's favor on motion for summary judgment)

*Razo v. Nordic Empress Shipping, Inc.* 2009 U.S. App. LEXIS 23713 (3d Cir. 2009), (affirming *Razo v. Nordic Empress Shipping, Inc.*, 2008 U.S. Dist. LEXIS 57618 (D.N.J. 2008)).  (Filipino seaman sued vessel owner, Nordic Empress Shipping, Inc. and his separate employer, Royal Caribbean Cruises, Ltd. for injuries resulting from a defective lifeboat which fell some 60 feet to the water below with him and several other crewmembers in it. The court held that seaman's arbitration clause with employer did not apply to separate subsidiary shipowner)

*Harrison v. State of New York,* 88 A.D.3d 951 (2d Dept. 2011). (Did fall of a 150-200 pound generator from edge of wall along pier unto a tugboat properly invoke protections of New York Labor Law § 240)

*Lee v. Astoria Generating Co., L.P.*, 55 A.D.3d 124 (1st Dept. 2010) reversed by *Lee v. Astoria Generating Co., L.P.*, 13 N.Y.3d 382, *cert. denied* --- U.S. ----, 131 S.Ct. 215 (2011) (whether a barge nearly permanently affixed to the land, used as a power plant, and not having been moved in past decade constitutes a vessel in navigation)

*Aragona v. State of New York*, 74 A.D.3d 1260 (2d Dept. 2010) (reversing summary judgment for defendant and applying certain provisions of the New York Industrial Code in construction workers' injury claim in bridge construction project)

 *Rodriquez-Alvarez v. Bermuda Star Lines*, 898 F.2d 312 (2d Cir. 1990)(seaman entitled to actual costs of food and lodging for maintenance rate, attorneys fee awardable for failure to provide proper maintenance and cure) Alvarez-Rodriquez

*Aggarao v. MOL Ship Management, Inc.*, 675 F.3d 355 (4th Cir. 2012) (Filipino seafarer rendered paraplegic on ship in U.S. harbor not entitled to sue in the United States due to arbitration clause incorporated in his contract)

*Olsen v. Reinauer Transportation Companies, L.P.*, 300 A.D.2d 76 (1st Dept. 2002) (holding that Shipowner's Limitation of Liability Act cannot be raised as a defense in state court as there is no admiralty jurisdiction)

*Angeles v. Norwegian Cruise Lines, Inc.*,  2002 WL 1997898, S.D.N.Y., 2002)

(holding that seafarer's contract alleged arbitration clause not enforceable if no proof that seafarer signed agreement)

    *Guenther v. Sedco, Inc.*, 1998 WL 898349 (S.D.N.Y. 1998) (Denying defendants motion to dismiss seafarers class action under Seaman's Wage Act)

    *Calcaterra v. City of New York*, 45 A.D.3d 270 (1st Dept. 2007) (construction worker generally assigned to work barge could be considered a seaman for Jones Act purposes)

    *Coppinger v. Metro-North Commuter Railroad*, 861 F.2d 33 (2d Cir. 1988) (Railroad worker's civil rights action not preempted by Railway Labor Act)

    53.    The seaman's personal injury field particularly involves complex matters of engineering, mechanics, admiralty rules and regulations, medical issues, monetary damages and an esoteric specialized field. Because of the manner in which the defendant defended the case, virtually all of the tasks performed by plaintiffs' counsel would have been necessary even if the negligence and unseaworthiness count had not been presented. To take one obvious example, defendants asserted from the start that Mr. Hicks did not suffer an injury on its vessel.  Further, after April 26, 2010, it claimed that Mr. Hicks had no medical problems attributable to the incident which it denied occurred. Thus, the medical issues of injury and causation were elemental from the beginning, and intricately intertwined with every claim and defense made.

    54.    I choose to work in a small firm, and to help working men and women in their claims against employers and third parties who cause them injury.  With my experience and knowledge, I could easily work at a large corporate type firm, but I am happy not doing so. Because I choose to represent individuals, not companies, I should not be punished by not being awarded comparable fees to those at large firms with

higher overheads. I have my mother's painting on the wall, not a Picasso as those firms do.  There is no reason that attorneys at smaller firms, with equal competence, knowledge and skill, should be awarded less in fees than larger firm attorneys.

55.     In this matter I was much more successful for my client, relatively, than was counsel in Scott v. City of New York, where the court awarded counsel $550/hour after a substantial (30%) cut for failing to succeed on many of the claims.  Here, the last formal offer to the plaintiff was $100,000, with a mention the night before the trial began that counsel would recommend $125,000, but he did not have the authority for it.  The jury verdict in total is $435,000, more than 400% higher than the last offer.  In contrast, in *Scott*, the plaintiffs obtained much less than they sought, which led to only a 30% reduction in the fees requested.

56.     In light of the fact that plaintiff succeeded in obtaining compensatory damages for pain and suffering, plus proved total damages of $435,000, under a *Hensley* analysis of the extent of success the litigation obtained, no reduction in the fee request should be made, as all of the issues were intimately interrelated and plaintiff was extremely successful.

## CONCLUSION

57.     In sum, therefore, as counsel for plaintiff, I request an award of $189,260, for attorney's fees, to date, plus $10,899.77 in expenses, to date, with the right to supplement this application for future work performed.


Dated: September 21, 2012                    _____/s/Paul T. Hofmann_____
                                                          Paul T. Hofmann