# EXHIBIT 3



# The 2012 Real Rate Report™

An Analysis and Report on Law Firm Rates, Trends, and Practices



CORPORATE
EXECUTIVE
BOARD ®

WHAT THE BEST COMPANIES DO



TyMetrix | Legal Analytics



CORPORATE
EXECUTIVE
BOARD ®

WHAT THE BEST COMPANIES DO

www.executiveboard.com

**TyMetrix** | Legal Analytics

www.tymetrix.com

**REPORT EDITORS**

Trey Bradley
Senior Director, Corporate Executive Board

Brian Lee
Managing Director, Corporate Executive Board

Julie Peck
Vice President, Strategy and Marketing, TyMetrix

Bill Sowinski
Director, Decision Support Services, TyMetrix

**LEAD DATA ANALYSTS**

Brad Tingquist
Director, Corporate Executive Board

Beth Seefelt
Director, TyMetrix Legal Analytics

**CONTRIBUTING ANALYSTS AND AUTHORS**

Tracy Davis Bradley
Senior Director, Corporate Executive Board

Keith Brown
Director, TyMetrix Professional Services

Werner Hahn
Senior Analyst, Corporate Executive Board

Dr. Silvia Hodges
Director of Research, TyMetrix Legal Analytics

Pavan Jagalur
Senior Analyst, Corporate Executive Board

Aaron Kotok
Director, Corporate Executive Board

Craig Raeburn
Vice President, TyMetrix Legal Analytics

**CONTENT PUBLISHING SOLUTIONS**

Christian Bennin
Contributing Designer, Corporate Executive Board

A. Kate Harsh
Editor, Corporate Executive Board

Christie Parrish
Graphic Designer, Corporate Executive Board

**EXECUTIVE SPONSORS**

Paul Edelmann
Executive Director, Corporate Executive Board

John Weber
General Manager, TyMetrix

©2012 The Corporate Executive Board Company and TyMetrix, Inc. All rights reserved. This material may not be reproduced, displayed, modified, or distributed in any form without the express prior written permission of the copyright holders. to request permission, please contact:

| TyMetrix, a Wolters Kluwer business | Or | Corporate Executive Board |
|---|---|---|
| 20 Church Street | | 1919 North Lynn Street |
| Hartford, CT 06103 | | Arlington, VA 22209 |
| United States | | United States |
| ATTN: Julie Peck | | ATTN: Marketing |
| Vice President of Strategy and Marketing | | +1-571-303-3000 |
| +1-860-240-9673 | | |

LEGAL CAVEAT

Corporate Executive Board (CEB) and TyMetrix have worked to ensure the accuracy of the information in this report; however, CEB and TyMetrix cannot guarantee the accuracy of the information or analyses in all cases. CEB and TyMetrix are not engaged in rendering legal, accounting, or other professional services. This report should not be construed as professional advice on any particular set of facts or circumstances. Neither CEB nor TyMetrix is responsible for any claims or losses that may arise from any errors or omissions in this report or from reliance upon any recommendation made in this report.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Table of Contents

A Letter to Our Readers                                                                    1

How to Use This Report                                                                     2

Executive Summary                                                                          4

Data Used in This Report                                                                   6

Chapter 1: Real Rate Trends                                                                9
- Major US Law Firm Rates in Relation to Other Prices                                     10
- Rates Through the Recession and Recovery                                                12
- 2009 to 2011 Rate Changes at the Lawyer Level                                           14
- The Most Expensive Lawyers Are Getting More Expensive                                   16
- Rate Trends by Role: Partner, Associate, and Paralegal                                  18
- Practice Area Rate Trends                                                               20
- Rate Trends by Law Firm Size                                                            22
- Regional Rate Trends                                                                    24
- First-Year Associate Trends                                                             26
- Prevalence of Charging Different Rates                                                  28

Chapter 2: Drivers of Real Rates                                                          29
- Paying for Size?                                                                        30
- Location, Location, Location                                                            32
- Paying for Experience?                                                                  34
- Paying for Expertise?                                                                   36
- Rate Benefits from Consolidation?                                                       38
- Rates and Length of Law Firm–Client Relationship                                        40
- Revealing the True Drivers of Lawyer Rates                                              42
- The Model at Work                                                                       43

Chapter 3: Matter Analysis: An Initial Look                                               45
- Sample Analysis: Whose Time Am I Getting?                                               46
- Sample Analysis: A Look at the Cost and Duration of Selected                            48
  Litigation
- Sample Analysis: Employment and Labor Litigation                                        50

Chapter 4: International and Industry Real Rates                                           53
- Real Rates by Selected Countries                                                        54
- International Data: A Look at Selected Practice Areas in the                             56
  United Kingdom
- International Data: A Look at Selected Practice Areas in Canada                          58
- Real Rates by Selected Industries                                                       60

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

## Appendix A: Data Tables — 64
- ■ High-Level Data Cuts — 66
  - – Real Rates for Partners, Associates, and Paralegals
  - – Real Rates for Partners, Associates, and Paralegals by Role and Practice Area
  - – Real Rates for Partners and Associates by City
  - – Real Rates for Partners and Associates by Law Firm Size
  - – Real Rates for Associates by Years of Experience
  - – Real Rates for Partners by Years of Experience
  - – Real Rates for Associates by Years of Experience and City
  - – Real Rates for Partners by Years of Experience and City

- ■ Industry Analysis — 81
  - – Real Rates for Partners and Associates by Industry Group
  - – Real Rates for Partners and Associates by Practice Area for the Finance, Investments, and Banking Industries
  - – Real Rates for Partners and Associates by Practice Area for the Insurance and Health Care Industries
  - – Real Rates for Partners and Associates by Practice Area for the Manufacturing Industry
  - – Real Rates for Partners and Associates by Practice Area for the Retail Industry
  - – Real Rates for Partners and Associates by Practice Area for the Technology and Telecommunications Industries

- ■ Practice Area Analysis by City — 86
  - – Real Rates for Partners and Associates Working on Commercial and Contracts by City
  - – Real Rates for Partners and Associates Working on Corporate and General by City
  - – Real Rates for Partners and Associates Working on Employment and Labor by City
  - – Real Rates for Partners and Associates Working on Finance and Securities by City
  - – Real Rates for Partners and Associates Working on Intellectual Property by City
  - – Real Rates for Partners and Associates Working on Litigation by City
  - – Real Rates for Partners and Associates Working on Non-Insurance Company Litigation by City

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

## Appendix A: Data Tables (Continued)

- Real Rates for Partners and Associates Working on Mergers and Acquisitions by City
- Real Rates for Partners and Associates Working on Real Estate by City
- Real Rates for Partners and Associates Working on Regulatory and Government by City

- Practice Area Analysis by Country/Region ................................... 107
  - Real Rates for Partners, Associates, and Paralegals by Country/ Region
  - Real Rates for Partners, Associates, and Paralegals by Role and Practice Area for the United Kingdom
  - Real Rates for Partners, Associates, and Paralegals by Role and Practice Area for Canada

- Staffing and Workload ................................................................. 110
  - Staffing of Matters by Practice Area (Number of Timekeepers, 2007–2011)
  - Staffing of Matters by Practice Area (Number of Hours, 2007–2011)
  - Length of Matter by Practice Area (Days; 2007–2011)

- Litigation ................................................................................... 113
  - Hours Worked by Litigation Phase
  - Hours Worked by Litigation Task
  - Cost by Litigation Phase
  - Cost by Litigation Task
  - Duration (Days) by Litigation Phase
  - Staffing (Number of Timekeepers) by Litigation Phase
  - Staffing (Number of Hours) by Litigation Phase

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

t

## Appendix A: Data Tables (Continued)

- Employment and Labor Litigation     116
  - Hours Worked by Employment and Labor Litigation L200 Task
  - Hours Worked by Employment and Labor Litigation L300 Task
  - Cost by Employment and Labor Litigation L200 Task
  - Cost by Employment and Labor Litigation L300 Task
  - Staffing (Hours) by Employment and Labor Litigation L200 Task
  - Staffing (Hours) by Employment and Labor Litigation L300 Task
  - Staffing (Number of Timekeepers) by Employment and Labor Litigation L200 Task
  - Staffing (Number of Timekeepers) by Employment and Labor Litigation L300 Task

- Commercial and Contracts Litigation     119
  - Hours Worked by Commercial and Contracts Litigation L200 Task
  - Hours Worked by Commercial and Contracts Litigation L300 Task
  - Cost by Commercial and Contracts Litigation L200 Task
  - Cost by Commercial and Contracts Litigation L300 Task
  - Staffing (Hours) by Commercial and Contracts Litigation L200 Task
  - Staffing (Hours) by Commercial and Contracts Litigation L300 Task
  - Staffing (Number of Timekeepers) by Commercial and Contracts Litigation L200 Task
  - Staffing (Number of Timekeepers) by Commercial and Contracts Litigation L300 Task

## Appendix B: Methodology Notes     122

## Appendix C: Data Methodology     127

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

viii

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# A Letter to Our Readers

Welcome to *The 2012 Real Rate Report*™, the industry's only data-driven benchmark report for attorney rates and matter costs.

After publishing the inaugural edition of the *Real Rate Report* in 2010, we were pleased to see how quickly it was embraced and utilized by both corporations and law firms. Readers overwhelmingly shared with us that the *Real Rate Report* effectively filled a growing information gap and enabled them to make fact-based decisions about staffing, budgeting, and controlling the costs of legal matters. In addition, our report empowered law firms and their clients to create mutually beneficial alternative fee arrangements with greater accuracy and confidence. Finally, by providing insights based on actual invoice data and real matter costs not available anywhere else, we opened up a valuable opportunity for law firms and their clients to discuss the drivers of legal matter costs.

*The 2012 Real Rate Report* builds on our findings in 2010, with new insights and new data to draw from. The data utilized in this year's *Real Rate Report* is pulled from the TyMetrix LegalVIEW™ data warehouse, which contains more than $24 billion in legal spending data from corporations' and law firms' e-billing and time management solutions, as well as other industry sources. For this year's *Real Rate Report*, we used a subset of this data and found a great many new insights to successfully navigate the legal economy this year.

Over the past year we've received numerous suggestions on analysis and insights you would like to see, many of which have made it into this year's report. Thanks to the close collaboration between the analysis teams from Corporate Executive Board's General Counsel Roundtable and TyMetrix Legal Analytics, we believe this report will bring a valuable new and deeper level of insight to our readers.

We hope to speak to each of you about your questions and other feedback on ways to make this report and the other services we provide more valuable to you.

Thanks, and we cannot wait to have you join the conversation.

Warm regards,

Brian Lee
Managing Director
Legal, Risk & Compliance Practice
Corporate Executive Board

Craig Raeburn Jr.
Managing Director
TyMetrix Legal Analytics
TyMetrix, a Wolters Kluwer business

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# How to Use This Report

The *Real Rate Report* examines law firm rates over time; identifies rates by location, experience, firm size, areas of expertise, industry, and timekeeper role (i.e., partner, associate, and paralegal); and enumerates variables that drive rates up or down. All the analyses included in the study are derived from the actual rates charged by law firm professionals as recorded on invoices submitted and approved for payment.

Examining real, approved rate information along with the ranges of those rates and their changes over time highlights the role these variables play in driving aggregate legal cost and income. The analyses can energize questions for both corporate clients and law firm principals. Clients might ask whether they are paying the "right" amount for different types of legal services, while law firm principals might ask whether they are charging the "right" amount for legal services and whether they could generate additional income if they modified their approach.

Affirmatively or intuitively, company purchasers of law firm services usually evaluate law firm rates based on five classic value propositions,[1] which include the following:

- Quality (whether good, poor, or acceptable results are routinely achieved)
- Cost (the price, or rate, paid to achieve results)
- Service (the level of responsiveness and compliance with required processes)
- Speed (how quickly matters or tasks are resolved)
- Innovation (the application of novel solutions to issues or matters)

These value propositions are more or less important across varying practice areas, and their relative values are clearly demonstrated in this study. Delivering fast and excellent results in complicated financial matters is appropriately valued by clients more highly (with resulting higher rates) than is delivering excellent results in routine workers' compensation or real estate matters. The information in this report can assist law firms in considering whether they are properly pricing their services and can further assist in considering the profitability of alternative business models. The *Real Rate Report* can help companies align their past and future paid rates with the value propositions that return the greatest value by practice area.

---

[1] Ulrich, Dave, Jack Zenger, and Norm Smallwood, *Results-Based Leadership*, Boston: Harvard Business Press, 1999.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

**A Note on Comparability of Data**
Our $7.6 billion dataset, which covers a five-year period, is large enough to provide directionally valuable guidance. The dataset represents a statistically useful portion of the $230 billion annual US law firm services business.[2] Am Law 100 firms alone had 2010 revenues of roughly $67 billion.[3] The dataset covers approximately 120,000 billers—including about 80,000 partners and associates—spread across more than 84 US metropolitan areas. Again, this is a large enough sample to have useful analytical power, but it certainly does not come close to covering all the lawyers in the United States who work for corporate clients. The United States Bureau of Labor Statistics estimates there are more than 560,000 lawyers practicing in the United States—68,000 lawyers in the New York area alone and another 40,000 in the Washington, DC, area.[4]

---

[2] U.S. Census 2010 Service Annual Survey, http://www.census.gov/services/index.html.

[3] "The Am Law 100 At a Glance," *The American Lawyer*, May 2011: 108–117.

[4] Bureau of Labor Statistics, "Chart book: Occupational Employment and Wages, May 2010," May 2010, http://www.bls.gov/oes/2010/may/chartbook_2010.htm.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Executive Summary

In the two years since we published *The 2010 Real Rate Report,* we've seen a lot of changes: Dodd-Frank legislation and rule making, the intensification of euro zone sovereign-debt crisis, and a weak economic recovery, among others. In the legal world, however, many things remain the same. The price for an hour of a major US law firm lawyer's time has continued to rise faster than key measures of inflation, as well as many other major economic indicators. In addition, the factors we identified as being the most important for determining a lawyer's rate—law firm size and location—remain the most important. That said, our analysis found many new insights. Here are the dominant themes that emerged as we looked at the data.

### Increasing Bifurcation of the Legal Market

One theme apparent throughout the report is the increasing bifurcation of the legal market. Rates for lawyers who have traditionally commanded the highest rates are increasing faster than rates for their lower billing colleagues, suggesting a flight to quality and experience. In the "Real Rate Trends" section, we saw this manifest strongly in the analysis on region and law firm size. We also took a closer look at this phenomenon, separating lawyers into higher billing and lower billing groups, which confirmed this trend.

### Firm Size and Location Continue to Drive Lawyer Real Rates

Similar to what we found in 2010, the most important factors driving lawyer rates are the size and location of the given attorney's law firm. Location in Tier 1 legal markets (New York, DC, Boston, Chicago, Los Angeles, and San Francisco) adds approximately $161 to an individual lawyer's rate.

Experience and area of expertise—the factors that in-house lawyers often value the most—have less influence on rates, statistically. Of the different areas of expertise, only Litigation and Finance practice areas have a meaningful effect on lawyer rates. Partner status also has a significant effect on rates, adding nearly $95 on average to a lawyer's rate, regardless of experience.

### The Next Generation of Legal Talent

Since the onset of the recession, we have increasingly heard in-house counsel express their reluctance to pay for entry-level associates. Given the relative inexperience of new lawyers, general counsel often feel that they, in effect, pay for entry-level lawyers' on-the-job-training. Our data confirm that in-house counsel are limiting the use of entry-level lawyers on matters. This is justified, as our analysis also reveals that use of entry-level lawyers appears to add significant costs to matters. According to our data, using entry-level lawyers adds, on average, almost 20% to the cost of a legal matter.

### Granular Data for Benchmarking Rates and Matters

In addition to our findings, this report provides some granular data on matter staffing, cost, and duration—particularly in Appendix A—which can be useful for estimation purposes. Our hope is that this information contributes to the collective understanding of how much different types of corporate legal matters tend to cost, how they are staffed, and how long they last. In this report, we are also pleased to offer selected international and industry statistics. The Appendix also contains granular information on attorney rates across different demographic variables, which can help better estimate how much

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Executive Summary (Continued)

legal services will cost in different US and international markets.

Overall, the report suggests that the legal market is likely to see costs increase in the foreseeable future. The complexity and volume of legal work, driven in part by increasing regulation, shows no sign of abating. This, coupled with trends in rising hourly rates, which clients are willing to pay, places law firms—especially larger ones—in a position to reap benefits for years to come. As mentioned previously, the data also suggest that the legal market is increasingly bifurcating into two groups of legal providers: one with pricing power and one without.

In-house counsel have the opportunity to ensure they are getting value for their money. As the legal market moves toward greater transparency—through advances in technology, such as e-billing and matter management—in-house lawyers are in a better position to evaluate cost and quality and make better decisions on resource allocation, bringing selected work in house, sending complex matters outside, and avoiding unnecessarily "over-lawyering" legal matters.

In addition, transparency into costs—to which this report hopefully contributes—helps both in-house counsel and law firms negotiate competitive pricing based on real rates reflected in the legal market and better estimate how much various legal services will likely cost.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Data Used in This Report

The data used for *The Real Rate Report* includes $7.6 billion in fees billed for legal services in the United States during the five-year period from 2007 to 2011. The data comprise fees generated by more than 4,000 law firms and 121,000 timekeepers. Table 1 provides a summary description of the dataset. **The information is not based on surveys, sampling, or reviews of other published information but on the actual hours and fees law firm personnel billed.**

Companies participating in *The Real Rate Report* provided written consent for the use of their data. No identifying information of those companies or their law firms is contained within the report or any dataset used for the analysis. In addition, all identifying data related to law firms, matters, timekeepers, and invoices were eliminated to ensure anonymity. For additional details, please see "Anonymization of the Dataset" in Appendix C.

Once normalized and scrubbed, data were loaded into the TyMetrix reference database for detailed analyses. The anonymized information was shared with Corporate Executive Board's Legal, Risk & Compliance Practice and TyMetrix's Legal Analytics for analysis and generation of *The Real Rate Report*. For more information on data methodology, see Appendix C.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

Table 1: Overview of the US Legal Fees Data Analyzed by Corporate Executive Board and
TyMetrix

| | |
|---|---|
| FEES BILLED | $7.6 Billion (2007–2011) |
| US LAW FIRMS | 4,000+ |
| LAW FIRM ASSOCIATES | 47,000+ |
| LAW FIRM PARTNERS | 34,500+ |
| TOTAL INDIVIDUAL BILLERS | 121,000+ |
| NUMBER OF INVOICE LINE ITEMS | 24.4 Million |
| TOTAL HOURS BILLED | 27.9 Million |
| US METROPOLITAN AREAS | 84 |
| NUMBER OF COMPANIES | 62 |
| INDUSTRIES REPRESENTED | Chemical, Education, Energy, Entertainment, Finance, Health Care, Insurance, Manufacturing, Pharmaceutical, Real Estate, Recreation and Leisure, Retail, Sports, Technology, Telecommunications, Transportation, and Utilities |

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

8    The 2012 Real Rate Report

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Chapter 1
# Real Rate Trends

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Major US Law Firm Rates in Relation to Other Prices

While this report is based on five years of billing data, Corporate Executive Board has been monitoring trends in the legal market for more than a decade. Over the past 10 years, the price for an hour of a major US law firm[5] lawyer's time has continued to rise faster than key measures of inflation and many other benchmark prices, even when taking into account the recent recession. In Figure 1, we show six different US price indices indexed to their 2001 price level. We included typical economic indicators, such as the Producer Price Index and white and blue collar hourly wages. When we compared these price trends, we found that over the past decade, the hourly rates associates and partners charged at major US law firms rose by almost 50%.

Interestingly, some surveys of corporate legal departments suggest that many companies consistently underestimate how much law firm rates will increase year after year,[6] suggesting that departments should either adjust estimates upward or work to manage rates and costs more aggressively.

Law firm rates have risen faster than white collar wages (in which lawyers are included), and the amount of that increase was almost double the percent increase of these wages. Notably, from 2008 to 2009, during the heart of the US recession, law firm rates continued to rise. This is in contrast to the decreases in the Producer Price Index and GDP, both of which fell during this time.

Our hope is that the analysis in this report—based on actual fees charged by law firms—will advance the industry's understanding of the unique market of US corporate legal services.

---

[5] "Major US law firm" is defined here as the *National Law Journal* 250.

[6] General Counsel Roundtable analysis of ACC/Serengeti Managing Outside Counsel Survey (2004–2010).

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

### Figure 1: Selected US Price Indices[7]

*All Price Indices Indexed to Their 2001 Level = 100*



[7] Bureau of Economic Analysis; Bureau of Labor Statistics, US Department of Labor; Law Firms Working Group,
The Center on the Global Legal Profession, American Lawyer Media; Federal Reserve Bank of St. Louis.

[8] PPIACO, Producer Price Index: All Commodities (Broad index of company nonlabor input prices).

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Rates Through the Recession and Recovery

Figure 2 takes a closer look at rates during the recent recession and subsequent recovery.

From 2007 to 2008, the last year of the economic expansion cycle before the recession, average lawyer real rates rose steeply from $439 to $475 per hour—an increase of 8.2% (more than four times the GDP growth of the United States). Growth in lawyer rates fell sharply from 2008 to 2009 to 2.3%, roughly coinciding with the recession, which lasted from December 2007 to June 2009. Since 2009, rates have begun to grow again at a healthy pace of more than 4% per year.

Contrary to popular belief, lawyer rates have risen consistently regardless of the broader economic situation. Although rate increases did moderate briefly during the recession, rates still continued to rise. In the past two years, lawyer rates have resumed growing well past inflation.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

**Figure 2: Lawyers' Average Rates Through the Recession and the Recovery**



n = 1,466 lawyers.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

## 2009 to 2011 Rate Changes at the Lawyer Level

Figure 3 shows the distribution of changes in individual lawyer rates from 2009 to 2011. We looked at what individual lawyers charged in 2011 compared to what they charged in 2009 and found that in-house counsel approved rate increases for about 70% of timekeepers. Corporate Executive Board conversations with in-house counsel suggested that they expected rates to rise modestly during the recovery, given the continued cost pressures and increased scrutiny on legal spending. Contrary to this assumption, in-house and outside lawyers have agreed to increased rates of more than $100 for nearly one in five lawyers

from 2009 to 2011. Only 12% of lawyers in our dataset decreased rates, and just 18% held rates flat. These increases were on top of similar rate increases from 2007 to 2009.

The distribution of rate increases across the dataset demonstrates how varied rate changes have been since 2009. Given this variability, companies and law firms should carefully consider the market dynamics when changing rates at the individual lawyer level.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

**Figure 3: Individual Lawyers' Hourly Rate Changes from 2009 to 2011**
*Percentage of Lawyers Billing in Both 2009 and 2011*



n = 9,135 lawyers.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# The Most Expensive Lawyers Are Getting More Expensive

Interestingly, rates for the highest billing lawyers grew much faster than for the lowest billing lawyers. Figure 4 shows the rates for the most expensive quartile of lawyers versus the least expensive quartile of lawyers from 2009 to 2011. Rates for top quartile partners grew nearly three times as fast as bottom quartile partners, while rates for top quartile associates grew nearly five times as fast as bottom quartile associates. This finding is consistent across different comparisons of high versus low billers in the dataset (i.e., top half versus bottom half and top decile versus bottom decile).

We also took a closer look at a subset of the most expensive billers—partners charging more than $1,000 per hour. Figure 5 shows the percentage of partners charging at least $1,000 per hour from 2009 to 2011, revealing a 75% increase since 2009. From our conversations with in-house counsel, we know that before 2006, the $1,000 per hour partner was a rarity. During the recession, high-priced lawyers were reluctant to charge more than $1,000 per hour, but the most expensive lawyers now seem to be taking advantage of clients' willingness to pay more for certain types of legal expertise (largely in the area of Finance, Corporate, and Commercial matters). Interestingly, our data analysis also reveals a larger number of lawyers than anticipated charging between $900 and $1,000 per hour, suggesting that some higher-priced lawyers are still reluctant to charge more than $1,000 per hour but are willing to charge just under this threshold.

Growth in lawyer rates for lower-price lawyers has been flat across the past three years. Lawyers in this group have faced greater competition for some time from legal process outsourcers and contract attorneys, which may be moderating increases in lower-priced lawyer rates.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

## Figure 4: Higher-Billing Versus Lower-Billing Lawyers



n = 5,374 partners.

n = 3,714 associates.

## Figure 5: Percentage of Partners Billing $1,000 or More per Hour



n = 23,166 partners.

> **Profile of Partners Billing More Than $1,000**
> - Ninety-five percent are billing in Tier 1 locations (New York, Washington, DC, Boston, Los Angeles, San Francisco, and Chicago).
> - Almost one-half (41%) work in the Finance practice area; Corporate and Commercial and Contracts lawyers are also heavily represented.
> - Sixty percent of the time, these lawyers bill in increments of one or fewer hours.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Rate Trends by Role: Partner, Associate, and Paralegal

One key trend to note when assessing how rates have changed since 2009 is the relative difference in the rate increases of partners, associates, and paralegals. We examined lawyers who billed in all three years of our data—2009, 2010, and 2011—to see how rates changed. Figure 6, displaying average hourly rate increases by role from 2009 to 2011, shows that, rather than seeing consistent increases across roles, law firms sought and companies accepted higher increases in associate rates. These rate increases, though slightly lower than what we saw in *The 2010 Real Rate Report*, are still rather generous.

Junior associates (defined as having fewer than three years of experience in 2009) saw the greatest percent increase in rates with a 30.8% increase over their 2009 levels. Mid-level associates (three to fewer than seven years) and senior associates (seven or more years) saw 10.7% and 9.0% increases, respectively.

The large percentage jump in rates for junior associates is likely a result of the lockstep compensation system and client willingness to pay more after the first few years of experience when associate productivity is rapidly increasing. The rate growth for these latter two tiers of associates outpaced that of partners and paralegals.

To ensure any increase in rates is within the bounds of what was agreed on and expected, corporate clients and law firms can prepare for rate increase discussions by capturing this rate information and tracking changes over time. This type of analysis may help law firms and legal departments better understand cost drivers and forecast rate increases.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

**Figure 6: Average Hourly Rates by Role, 2009 to 2011**



n = 9,989 timekeepers (4,921 partners, 3,408 associates, and 1,660 paralegals) billing in all three years: 2009, 2010, and 2011.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

## Practice Area Rate Trends

As shown in Figure 7, lawyers in all major practice areas increased their rates, on average, since 2009. Though some practice areas' hourly rates increased more than others, all showed substantial increases. The majority of practice areas saw larger increases in rates from 2010 to 2011 than from 2009 to 2010, suggesting that work may be picking up for these practice areas.

The variance in increases since 2009 is interesting in light of the probable changing demand for outside counsel work during the economic recovery. Our research shows limited rate increases in Litigation and Real Estate and large rate increases for Regulatory and Mergers and Acquisitions. The largest percentage jump in hourly rates, however, was for Finance and Securities.

There are several potential drivers for the increase in Finance and Securities rates across the past few years. Some of this could be accounted for by increased work related to new Dodd-Frank disclosure requirements. In addition, many companies have increased borrowing given the historically low interest rates. Some companies have also engaged in share buybacks in recent years.

M&A rates continued to rise across 2009 to 2011 as they did in the 2007 to 2009 period. It is likely that the healthy increase in Regulatory and Government rates is partially driven by increased regulations stemming from the recent financial crisis.

Although legal departments are beginning to hire again, staff growth rates for in-house lawyers remain modest.[9] These staffing constraints could also be driving increased demand for some practice areas and affecting rates. It is also worth noting that, across the board, rate increases are slightly lower than the 2007 to 2009 period we examined in *The 2010 Real Rate Report*.

---

[9] General Counsel Roundtable's benchmarking data, 2008–2011, Corporate Executive Board.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

**Figure 7: Average Hourly Rates by Practice Area**





n = 11,506 lawyers who billed in 2009, 2010, and 2011.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Rate Trends by Law Firm Size

The largest rate increases since 2009 have been from larger law firms, as shown in Figure 8. In achieving such significant increases, large firms have demonstrated that clients are willing to pay a premium for large law firm work even during the tepid recovery. The percent increase for firms with more than 1,000 lawyers was double what the smallest firms in our dataset experienced.

The most substantial rate increases occurred in 2011, compared to smaller increases in 2010. Separate law firm data show Am Law 100 profits per partner and revenue per lawyer growing again in 2010 after decreasing or staying flat in 2008 and 2009.[10] Given the slow pace of the recovery, however, some of the growth in law firm profits is likely driven by firm cost control measures and higher rates.

---

[10] Johnson, Chris, "Growth Returns to the Am Law 100," *The American Lawyer*, May 2011: 84; Press, Aric and Greg Mulligan, "Lessons of the Am Law 100," *The American Lawyer*, May 2010: 93–172; Press, Aric and John O'Connor, "Lessons of the Am Law 100," *The American Lawyer*, May 2009: 107–186.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

**Figure 8: Average Hourly Rates by Law Firm Size, 2009 to 2011**



Percent Change from 2009 to 2011

n = 7,743 lawyers who billed in 2009, 2010, and 2011.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Regional Rate Trends

In our analysis, we looked at 60 metropolitan areas to determine how location impacted lawyer rates. Though most cities showed significant rate increases from 2009 to 2011, most of the substantial increases occurred in areas that were already relatively expensive.[11] Six of the top 10 (i.e., Boston, NYC, San Jose, Houston, San Francisco, and Chicago) are also in the top 10 most expensive metropolitan areas (see p. 33). Several of the bottom 10 metropolitan areas—notably Las Vegas, Tampa, Cleveland, Phoenix, and Miami— were among the hardest hit in the recent recession and housing downturn. We also found a negative correlation between metropolitan unemployment rates and rate increases across the 2009 to 2011 period (i.e., the higher the unemployment, the lower rate increases tend to be), suggesting that rate increases are driven to some extent by recent local economic activity.

---

[11] Please note that we are using the principal city of the Core-Based Statistical Area (CBSA) designation as shorthand for the entire area. Please see Appendix C for more information on CBSAs.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

**Figure 9: Changes in Average Hourly Rates by Lawyer Location, 2009 to 2011**
Top 10 and Bottom 10 Metropolitan Areas



n = 7,708 lawyers who billed from the same metropolitan area in 2009 and 2011; markets with an insufficient "n" size were excluded.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# First-Year Associate Trends

Since the recession, in-house counsel have been increasingly reluctant to pay fees for entry-level associates.[12] Given the relative inexperience of these new lawyers, general counsel often feel that they end up paying for entry-level lawyers' on-the-job training. Companies have had some success negotiating with their firms to eliminate or limit the use of entry-level associates. Figure 10 shows how the percentage that entry-level associates billed per company changed over the past three years. In 2009, 7% of all lawyer hours billed to a company, on average, were for entry-level associates. This percentage has steadily decreased to just under 3% of total lawyer hours in 2011. This trend is present across all practice areas.

The data confirm the rationale for limiting the use of entry-level associates. Figure 11 shows the results of a linear regression model used to estimate total fees for short-term litigation matters.[13] After controlling for partner and associate hours per matter, the use of entry-level associates increases a matter's cost by almost 20% on average.

The data suggests that companies are correct to question their law firms' use of entry-level associates on matters. Although rates are higher for more tenured lawyers, the net effect of higher rates is often outweighed by the efficiency gains from using more seasoned resources.

Although limiting the use of entry-level lawyers is associated with lower matter costs, companies should consider the best use of these associates rather than institute a blanket policy prohibiting entry-level associates from billing on any matter. While there are some types of activities that offer clear savings (e.g., using contract attorneys instead of entry-level lawyers for document review), some activities, such as basic legal research, can be performed effectively and efficiently by relatively junior lawyers. Figure 12 displays the five types of tasks in which entry-level associates are most commonly billing. Law firms should partner with their clients to identify the work for which their entry-level and junior lawyers will be most valuable to the outcome and cost of a matter. In addition, this finding suggests that law firms should consider exploring new methods for training new lawyers, as the traditional model for training associates may no longer be functioning.

---

[12] "Entry-level associates" include all lawyers billing as associates with fewer than two years of experience since passing the bar exam.

[13] Figures 11 and 12 control for litigation matters where at least 40 hours in total were billed to a matter by partners, associates, paralegals, and of counsel. Only matters that were opened and closed in the e-billing system between 2007 and 2011 are included in this analysis. Insurance industry matters are excluded from this analysis.

www.tymatrix.com
www.executiveboard.com
GCR2599612SYN

**Figure 10: Entry-Level Associate Hours Billed as a Percentage of Total Lawyer Hours Billed per Company**



n = 44 companies (all industries).

**Figure 11: Results of Regression Analysis—Entry-Level Associate Impact on Total Fees for Short-Term Litigation Matters**

On average, entry-level associates increase matter costs by nearly 20%.



n = 1,508 litigation matters; adjusted R² = 0.876.

**Figure 12: Average Percentage of Short-Term Litigation Matters with Entry-Level Associates Billing, by Task**



www.tymetrix.com
www.executiveboard.com
GCR2593612SYN

# Prevalence of Charging Different Rates

Table 2 shows the percentage of individual lawyers who billed different rates to different companies in 2011. The frequency and size of differences were larger than expected—larger even than what we saw in 2010. While the area that arguably requires more specific expertise—Mergers and Acquisitions—showed the highest proportion of lawyers billing companies different rates, other areas (e.g., Corporate and General) showed a lower frequency of variation. What is most striking, however, is the prevalence of charging different rates across practice areas; on average, 90% of lawyers billed different rates to different companies for similar types of work. This finding suggests that, although many companies think they are receiving the lowest available rates with law firms, many are not.

Table 3 shows the median difference in rates charged to different client companies per timekeeper by practice area. Notably, the differences were, in all cases, more than 10%. This suggests a potential opportunity for legal departments to negotiate with their law firms, depending on the type of work in a given practice area. This also suggests that many companies are not receiving the lowest available rates. It is worth noting that, across the board, the prevalence of charging different rates and the median differences were slightly higher than our data in *The 2010 Real Rate Report*.

**Table 2: Percentage of Lawyers Billing Different Rates to Different Clients in 2011 by Practice Area**

| Practice | Percentage of Lawyers |
|---|---|
| Mergers and Acquisitions | 100.0% |
| Litigation (Excluding Insurance) | 93.4% |
| Real Estate | 93.3% |
| Intellectual Property | 91.8% |
| Litigation (All) | 91.2% |
| Employment and Labor | 90.1% |
| Commercial and Contracts | 87.8% |
| Regulatory and Government | 86.5% |
| Finance and Securities | 86.1% |
| Corporate and General | 79.4% |

**Table 3: Median Difference in Rates per Lawyer by Practice Area**

| Practice | Median Percent Difference in Rates |
|---|---|
| Intellectual Property | 23.1% |
| Commercial and Contracts | 18.7% |
| Litigation (All) | 18.2% |
| Litigation (Excluding Insurance) | 18.2% |
| Employment and Labor | 16.9% |
| Real Estate | 16.0% |
| Corporate and General | 12.9% |
| Mergers and Acquisitions | 12.1% |
| Regulatory and Government | 11.3% |
| Finance and Securities | 11.1% |

n = 2,151 lawyers billing multiple clients for the same practice area work.

www.tymatrix.com
www.executiveboard.com
GCR2599612SYN

# Chapter 2

# Drivers of Real Rates

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Paying for Size?

As evident from Figures 13 and 14, associate and partner rates are positively correlated with law firm size. The data suggest companies are willing to pay a premium for lawyers who work for larger firms. Later in this report, we test this relationship, controlling for a number of other factors, such as a lawyer's experience, level, practice area, and location. Advanced statistical models indicate that after the 1,000 lawyer mark, additional lawyers are associated with little difference in average lawyer rates.

There are several reasons why companies may be willing to pay higher rates for larger law firms. Conventional wisdom suggests that larger law firms provide practice area and geographic coverage for the client's benefit—creating a one-stop shop and providing a strong rationale for the premium associated with law firm size. Other potential reasons for the large law firm premium include enhanced reputation, ability to increase staffing quickly, and opportunity to consolidate spending with fewer (larger) firms. Our data analysis also suggests that law firm size is associated with faster execution of matters, suggesting that clients may be paying for speed of resolution.

The relationship between higher rates and law firm size is not surprising considering the recent trend of large law firms growing progressively larger. In other words, if there is a premium associated with size, one would expect law firms to respond by growing larger, which they are doing.[14] From the law firm perspective, diversification can also explain the addition of attorneys to support more clients and practice areas, thereby making a firm less dependent on large clients or a single practice area.[15]

---

[14] Baker, George P. and Rachel Parkin, "The Changing Structure of the Legal Services Industry," *NC Law Review* 84 (2006): 1635–1682.

[15] Heinz, John P., Robert L. Nelson, and Edward O. Laumann, "The Scale of Justice: Observations on the Transformation of the Urban Law Practice," *Annual Review of Sociology* (2001): 337–362.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

### Figure 13: Associate Hourly Rates by Law Firm Size
*2011 Averages with Fitted Line*



n = 10,253 timekeepers at 275 law firms.

### Figure 14: Partner Hourly Rates by Law Firm Size
*2011 Averages with Fitted Line*



n = 8,956 timekeepers at 298 law firms.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Location, Location, Location

Location is one of the primary factors driving lawyer rates. The data reveal wide variations between rates in the most and least expensive US legal markets. Figures 15 and 16 highlight some of these differences by displaying the top 10 and bottom 10 markets (ranked by 2011 partner rates). The difference between the average partner rate in the most expensive market (New York) compared to the average partner rate in the least expensive market (Riverside, CA) is almost $500.[16]

Cities usually thought of as Tier 1 legal markets—New York, Washington, DC, Boston, Los Angeles, San Francisco, and Chicago—appear in the 2011 top 10 rate rankings. In addition, these cities accounted for over one-half of all lawyers in the dataset (for whom regional information was available). Concentration of attorneys in so-called "global cities" follows a similar pattern seen with other professional services, as they tend to locate in cities in close proximity to other professional service firms, financial services, and regulatory agencies.[17]

Interestingly, several cities not typically considered Tier 1 markets—San Jose, Houston, Baltimore, and Philadelphia—also appear in the top 10. The presence of San Jose is not surprising, given its importance as a technology center. Philadelphia has a strong diversified economy to support a healthy legal sector. Houston and Baltimore have recently experienced rapid growth in technology and financial service sectors and, therefore, the associated complexity of required legal services. Houston's importance as an oil and gas center also drives significant demand for specialized legal work.

Within the top 10 markets, Philadelphia displays the widest gaps between average 2011 partner and associate rates (with the average associate rate being 61% of the partner rate). Los Angeles had the smallest gap (with the average associate rate being 67% of the partner rate).

High prices of office space (measured per square foot) are correlated with high rates, suggesting that high rates, in part, could be paying for premium real estate. For example, New York and Washington, DC, had both the highest partner rates and the most expensive office space (New York: $53.84 per square foot; Washington, DC: $49.44 per square foot). However, Houston, Baltimore, and Philadelphia, in contrast, had relatively inexpensive office space compared to their relatively high average lawyer rates.[18]

---

[16] Please note that we are using the principal city of the CBSA designation as shorthand for the entire area. Please see Appendix C for more information on CBSAs.

[17] Saskia Sassen, *The Global City: New York, London, Tokyo (2nd Edition)*, Princeton and Oxford: Princeton University Press, 2001, pp. 3–36, 101–126.

[18] US Office Trends Report, 4th Quarter 2011, Cassidy Turley, http://www.cassidyturley.com.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

**Figure 15: 2011 Average Hourly Rates—Top 10 Metropolitan Areas**



n = 15,576 timekeepers (6,983 partners and 8,593 associates).

**Figure 16: 2011 Average Hourly Rates—Bottom 10 Metropolitan Areas**



n = 617 timekeepers (346 partners and 271 associates).

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Paying for Experience?

We plotted each lawyer's individual 2011 average hourly rate against his or her experience level (i.e., how many years a lawyer has practiced law). Although most rates follow a predictable trend in increasing with experience, the data displayed in Figure 17 show considerable variation for lawyers with similar levels of experience. The variation also increases with years of experience, suggesting that some lawyers are accumulating unique skills or expertise that make them more valuable in the marketplace.

The data do suggest, however, that there are underpriced billers in the legal market, as indicated by the dotted line encircling the area in the lower right-hand corner of the figure. More expensive attorneys tend to be located in some of the more expensive legal markets of New York and Los Angeles. Most of the less expensive (relative to experience) lawyers are litigation partners in smaller legal markets; however, a few of these are in Tier 1 markets.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

### Figure 17: 2011 Partner and Associate Hourly Rates by Experience



n = 18,118 lawyers (excludes lawyers working on litigation for insurance companies).

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

## Paying for Expertise?

Figure 18 shows that while 2011 partner, associate, and paralegal rates vary across practice areas, the gaps between partner and associate rates are most pronounced in Mergers and Acquisitions, Corporate, and Finance, suggesting a premium for partner-level expertise in these areas. In general, Finance, M&A, and Commercial partners commanded higher rates than partners in other practice areas.

Regarding the variation among practice area rates, concentrations of specialization in Tier 1 markets (New York, DC, Boston, Chicago, Los Angeles, and San Francisco) can explain part of the variation. For example, Finance has the highest partner rate in the dataset and the greatest concentration of lawyers in Tier 1 markets (65%). Conversely, Real Estate has one of the lowest partner rates and the lowest concentration of lawyers in Tier 1 markets (35%). Although paralegal rates vary less than lawyer rates do, practice areas requiring the most technical expertise—M&A, Finance, Regulatory, and Commercial—have higher paralegal rates.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

**Figure 18: 2011 Average Hourly Rates by Practice Area**



n = 49,528 timekeepers (19,670 partners, 19,761 associates, and 10,097 paralegals).

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Rate Benefits from Consolidation?

Many in-house legal departments have attempted to decrease their legal spending by concentrating legal spend on fewer firms—a practice known as consolidation or convergence. (In 2007, roughly 45% of legal departments surveyed had attempted consolidation.)[19] One would think that as a company increased its spending with an individual law firm, the company's ability to negotiate a lower rate would improve. However, the data reveal this does not appear to be the case. Figure 19 shows spending per company per law firm plotted against average lawyer rate charged to the same company. The downward sloping dashed line shows the expected relationship in which higher spending is associated with lower lawyer rates. However, the actual relationship is represented by the upward sloping dashed line, which reveals a positive relationship between spending and rates. This positive relationship is supported by statistical analysis and is the opposite of what is expected. (This relationship also holds when looking at the previous three years of data.)

From an economic perspective, it's probably not surprising that concentrating spending is not necessarily an effective lever for decreasing rates, as decreasing the number of potential firms from which to source legal work also limits competition. However, legal departments rank consolidation highly—second out of 29 activities—as a means to control quality, suggesting that price negotiation may not be the only or primary driver of law firm consolidation.[20] In addition, consolidation may provide value by lowering internal transactional costs and establishing closer, strategic relationships with law firms.

Some companies have had success combining consolidation with a panel mechanism in which a manageable number of firms compete for a given company's legal work. In this manner, competition is maintained while spending is consolidated.

---

[19] General Counsel Roundtable's Outside Counsel Management Survey, 2007, Corporate Executive Board.
[20] Ibid.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

Figure 19: Total Amount Paid per Firm Versus Average Lawyer Rate per Firm, 2011



n = 1,512.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Rates and Length of Law Firm–Client Relationship

While many industries reward customer loyalty with more favorable rates, our findings indicate that the length of a relationship between a client and law firm is associated with higher rates in the legal sector. Figure 20 shows average rates per company and law firm by length of relationship for 2010. The data reveal a positive correlation between length of relationship and rates: the longer the relationship, the higher rates tend to be. Although this correlation also exists when examining panel lawyers[20] across years, we have chosen to highlight differences in the same year among non-panel attorneys to control for salary increases from year to year.

There are many potential explanations for why higher rates are associated with longer law firm–client relationships. Across time, lawyers often develop company-specific expertise after working closely with companies allowing them to charge higher rates. In theory, this expertise also enables them to work faster and at an equivalent or lower overall cost than when their rates were lower. In addition, there may be a bias toward staffing matters forecasted to last longer with more experienced and specialized lawyers, who tend to cost more than other lawyers.

It is also likely, however, that over time, firms get comfortable, companies become complacent, and rates begin to creep higher. Anecdotally, we also know that law firms are often eager to provide lower rates to gain new business. It is less clear whether initial rate advantages continue. The dotted line on Figure 20 shows the average hourly rate (at the client-firm level) in the dataset. Rates for law firm–client relationships of one or two years are less than this average rate, suggesting that early on in working relationships, law firms are willing to charge lower rates. However, for relationships lasting three years and longer, rates are higher than average, suggesting that rates begin to creep higher after the first two years. The data also suggest that law firm–client relationships are "sticky," meaning clients are reluctant to change law firms because of switching costs (i.e., the work and expense involved in onboarding new law firms and helping them develop the company-specific knowledge necessary for firms to be effective).

To ensure that rates don't creep up over time, some companies have used panel mechanisms in which a manageable number of firms compete for a given company's legal work. Other companies bid out work to a number of firms on a matter level. These mechanisms help ensure competition and periodic review, which serve to keep rates lower across time and ensure a company doesn't become too dependent on a single law firm for critical work.

---

[20] A panel of lawyers is a consistent set of lawyers across years (or some other unit of time). For example, for a lawyer to be included in a panel from 2009 to 2011, that lawyer would need to have billed in all three years.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

Figure 20: 2010 Rates by Length of Law Firm and Client Relationship



n = 3,855.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Revealing the True Drivers of Lawyer Rates

Linear regression techniques identify the relative importance of different factors to an individual lawyer's rate. Figure 21 represents a statistical model with robust explanatory power. This model has an adjusted $R^2$ of 54%, meaning that roughly 54% of the variation in legal fees can be accounted for by these five variables alone.

Surprisingly, a lawyer's rate is determined more by law firm size and location than by a lawyer's own partner status, experience, or practice area. Partner status and experience are third and fourth in statistical importance behind law firm size and location, and practice area is the least statistically important variable in the model. Law firm size and Tier 1 location—the most statistically important factors in this equation—appear to have stronger effects on rates than in the 2009 data, suggesting that higher rates are increasingly associated

with larger firms in Tier 1 markets.

It is also worth noting that although Finance attorneys tend to be located in Tier 1 markets (New York, DC, Boston, Los Angeles, San Francisco, and Chicago), there is a premium associated with that practice area regardless of location.

Conventional wisdom suggests that high rates are driven by expertise (practice area) and experience. The data reveal that these factors are statistically less important than expected. When purchasing legal services from a large law firm in a Tier 1 market, in-house counsel may, in fact, be paying for access to a network of expertise and experience rather than the expertise and experience represented by the individual lawyer.

### Figure 21: Statistical Model of Lawyer Rates



n = 15,353 lawyers.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# The Model at Work

As shown in Table 4, the model from Figure 21 can be used to estimate an attorney's hourly rate based on five factors: 1) law firm size, 2) location in Tier 1 market, 3) partner status, 4) years of experience, and 5) practice in key specialty area.

Table 4 provides hypothetical examples of different attorney rates based on the statistical model. Interestingly, Lawyer C bills at a lower rate than Lawyer B, despite having 18 more years of experience. Lawyer B's location in New York, a Tier 1 market, and his law firm's large size drive his relatively high billing rate.

**Table 4: Hypothetical Rates Based on Model**

**Lawyer A**
Fifth-Year Associate



Base: $151

Non-Tier 1 Market: +$0 (Buffalo, NY)

100-Lawyer Firm: +$15

Five Years' Experience: +$17

Associate: +$0

Key Practice Area (Litigation): -$15

**Total: $168/Hour**

**Lawyer B**
Second-Year Associate



Base: $151

Tier 1 Market: +$161 (New York)

1,000-Lawyer Firm: +$150

Two Years' Experience: +$7

Associate: +$0

Non-Key Practice Area (M&A): +$0

**Total: $469/Hour**

**Lawyer C**
Partner



Base: $151

Non-Tier 1 Market: +$0 (Des Moines, IA)

300-Lawyer Firm: +$45

20 Years' Experience: +$68

Partner: +$95

Non-Key Practice Area (Corporation): +$0

**Total: $359/Hour**

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

44   The 2012 Real Rate Report

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Chapter 3

# Matter Analysis: An Initial Look

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Sample Analysis: Whose Time Am I Getting?

The next few pages highlight some matter-specific information from the data. We have focused on a few selected matter subtypes to showcase the specificity of the data whenever possible. These subtypes lend themselves to analysis within a short or medium time frame, given our five-year dataset.

Figure 22 breaks down the allocation of hours billed by type of timekeeper—partner, associate, or paralegal—for a few selected matter types. The data suggest there are a variety of different staffing profiles for different matter types. While staffing percentages are relatively similar across Employment and Labor and Commercial and Contracts litigation, Product Liability litigation matters tend to staff more heavily with paralegal hours and less with partner hours, proportionally. The Patent and Trademark practice areas tend to utilize even higher percentages of paralegal hours on matters. Product Liability, Patent, and Trademark matters tend to be more complex and more document intensive than Employment and Commercial matters, which explains the greater proportion of paralegal hours.

Specific matter staffing benchmarks can help legal departments and law firms plan their resource allocation strategies across different matter types. (Appendix A contains more detailed staffing benchmarks.)

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

**Figure 22: Average Percentage of Hours Billed per Matter by Role and Matter Type**
*Selected Matter Types*



Percentage of Hours Billed per Matter

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Sample Analysis: A Look at the Cost and Duration of Selected Litigation

Figures 23 and 24 provide the ranges of costs and duration for three different types of litigation—Employment and Labor; Commercial and Contracts; and Product Liability—for matters opening and closing within the 2007 to 2011 period. For these three types of litigation, 75% of the time, companies can expect to pay up to $83,000 in legal fees and take as much as 500 days (nearly 17 months) to resolve matters.

In addition, our research indicates that a small minority of large matters is responsible for a disproportionate share of legal spend, suggesting more careful attention is needed for these exceptional cases to control costs. Specific matter cost and duration ranges provide estimates for forecasting, budgeting, and case resolution. (Appendix A contains more detailed cost and duration benchmarks.)

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

**Figure 23: Distribution of Total Matter Cost for Selected Litigation**
*25th, Median (Indicated by Dot), and 75th Percentiles*



**Figure 24: Distribution of Duration of Matters in Days for Selected Litigation**
*25th, Median (Indicated by Dot), and 75th Percentiles*



www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Sample Analysis: Employment and Labor Litigation

To show the power of the data, we selected one type of litigation, Employment and Labor, to show task-level data. Figure 25 examines the cost distributions for Employment and Labor litigation tasks by Uniform Task-Based Management System (UTBMS) code. Dispositive motions and depositions tended to be the most expensive of the Employment and Labor litigation tasks examined. They also displayed the greatest variability in time and cost of the different tasks, which makes them difficult to predict. Expert discovery tends to be the least expensive and also shows the least variability, making it easier to estimate than other tasks.

Litigation data at the task level provide a potentially rich source of information to benchmark and estimate costs at a more granular level. (Appendix A contains more benchmarks for Employment and Labor litigation.)

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

**Figure 25: Distribution of Employment and Labor Litigation Matter Task Cost, by UTBMS Code**

*25th, Median (Indicated by Dot), and 75th Percentiles*



n = 905 opened and closed employment litigation matters, 2009–2011.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

52    The 2012 Real Rate Report

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Chapter 4
# International and Industry Real Rates

www.tymetrix.com
www.executiveboard.com
GCR25996125YN

# Real Rates by Selected Countries

The next few pages contain some selected regional and industry data cuts. Our dataset is continually growing, and in this edition of *The Real Rate Report*, we're pleased that we can add international data and high-level industry descriptive statistics.

Hourly rates vary surprisingly in legal markets in North America and Europe.[22] This may be partially explained by the demand in a particular jurisdiction, the prevalent type of clients in terms of their size and sophistication, the geographic concentration of work in a particular market (such as London for the United Kingdom), and the dominance of a relatively small number of firms in a market, such as the "Magic Circle" firms in the United Kingdom.

Figure 26 shows 2011 rates for partners and associates across several regions. Partner and associate rates are highest in the United Kingdom and lowest in Canada. The high average rates in the United Kingdom are not surprising, as London's Magic Circle firms are known as some of the most expensive firms in the world. Although many complain about the litigious nature of the United States, it has the second lowest rates across the regions examined. (It's worth noting that we are only examining rates and not total costs. Certain types of matters, litigation in particular, can last much longer in the United States than in other countries, resulting in relatively high overall costs.)

Regional rate information can help legal departments and law firms forecast legal expenses for different matters. (Appendix A contains more detailed regional rate information.)

---

[22] Please note that this analysis does not account for currency effects.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

**Figure 26: Average Timekeeper Rates by Country/Region, 2011**



www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# International Data: A Look at Selected Practice Areas in the United Kingdom

Figure 27 shows 2011 UK partner and associate rates for selected practice areas. UK partner rates were relatively high compared to Canadian and US partner rates (see pp. 37 and 59); the average partner rate for each practice area was greater than $800 per hour. With the exception of Finance, average UK partner rates were very close across practice areas—within a $25 range. Like their US counterparts, UK partners in Finance and Securities charged the highest rates across all practice areas. Average rates for UK associates were also very close across practice areas—within an $80 range. UK Litigation associates had the lowest rates and Finance associates had the highest rates, on average.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

**Figure 27: UK Partner and Associate Rates by Selected Practice Area, 2011**



n = 580 timekeepers (197 partners and 383 associates).

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# International Data: A Look at Selected Practice Areas in Canada

Figure 28 shows 2011 Canadian partner and associates rates for selected practice areas. Rates for Canadian partners and associates show greater variability than UK rates (see p. 57). Interestingly, Canadian partners in Finance and Securities had the second lowest average rate across practice areas examined. Canadian Litigation partners had the lowest average rate, while partners working in Regulatory and Government had the highest. Associate rates roughly correlated with partner rates, although Commercial and Contracts associates charged slightly higher rates, on average, than did Regulatory and Government associates.

Average partner rates by practice and region can help provide estimates for forecasting and budgeting for different types of matters. (Appendix A contains more detailed rate information by region and practice area.)

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

**Figure 28: Canada Partner and Associate Rates by Selected Practice Area, 2011**



n = 2,191 timekeepers (1,104 partners and 1,087 associates).

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Real Rates by Selected Industries

These two pages display industry rate information, focusing on four industries represented in the dataset. As the dataset grows, we plan to provide more data and analysis across other industries.

As Figure 29 shows, the largest rate increases occurred in the Finance, Investments, and Banking industry, while the lowest rate increases occurred in the Retail industry. Some of this can be explained by the mix of practice area work. The Finance, Investments, and Banking industry had the largest proportion of Finance and Regulatory work—these two practice areas have experienced large rate increases across the past three years (see p. 21). Retail had the largest proportion of Employment and Labor and Real Estate work, and these practice areas experienced relatively low rate increases over the past three years. Across all industries, rate increases were higher in 2011 than 2010.

Table 5 provides a summary of partners' average hourly rates by industry and practice area for 2011. Finance partners had the highest rates for the Technology and Telecommunications and Retail industries. Commercial and Contracts partners had the highest rates for the Finance, Investments, and Banking industry, while M&A partners had the highest rates for the Manufacturing industry. Real Estate partners had the lowest rates for the Finance, Investments, and Banking and Technology and Telecommunications industries. In the Retail industry, Employment and Labor partners had the lowest average rate. In Manufacturing, Litigation partners had the lowest average rate. It's also interesting to note the Finance, Investments, and Banking industry tends to have higher partner rates than do other industries.

Appendix A contains more rate information by industry for benchmarking purposes.

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

**Figure 29: Average Hourly Rates by Industry, 2009 to 2011**
*Percent Change from 2009 to 2011*

■ 2009 Average Rate
⋯ 2010 Average Rate
▨ 2011 Average Rate



n = 7,322 lawyers who billed in 2009, 2010 and 2011.

**Table 5: Average Partner Rates by Practice Area and Industry, 2011**

|  | Finance, Investments, and Banking | Manufacturing | Technology and Telecommunications | Retail |
|---|---|---|---|---|
| **Litigation** | | | | |
| Litigation | $461 | $393 | $509 | $389 |
| **General** | | | | |
| Commercial and Contracts | $778 | $473 | $601 | $484 |
| Corporate and General | $650 | $588 | $589 | $531 |
| Employment and Labor | $572 | $475 | $502 | $381 |
| Intellectual Property | $487 | $461 | $495 | $458 |
| Real Estate | $421 | N/A | $429 | $408 |
| Regulatory And Government | $751 | $526 | $545 | $486 |
| **Finance and Transactions** | | | | |
| Finance and Securities | $646 | $593 | $735 | $617 |
| Mergers and Acquisitions | $597 | $704 | $727 | $515 |
|  | n = 5,390. | n = 4,204. | n = 3,453. | n = 1,938. |

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

62   The 2012 Real Rate Report

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN

# Appendices

www.tymetrix.com
www.executiveboard.com
GCR2599612SYN